IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MANDI SWAN, on behalf of herself and her son, I.O, DENISE BURNS, on behalf of herself and her daughter, V.B., FELICIA BRADLEY, on behalf of herself and her son, C.B., on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BOARD OF EDUCATION OF THE CITY OF CHICAGO, BARBARA BYRD-BENNETT, Chief Executive Officer, and CITY OF CHICAGO, <br><br> Defendants. | No. 13-cv- <br><br> **Jury Demanded** |

# COMPLAINT

### Introduction

1.  In violation of Title II of the Americans with Disabilities Act (ADA), the defendants propose to carry out the closings of 53 elementary schools in a manner that does not permit a timely and orderly process either for the proper review and revision of the individualized education programs (IEPs) for the plaintiff children and over 5,000 other children in special education programs or for the extra services and counseling such children require to make the difficult transition to unfamiliar schools and unfamiliar teachers and students.

2.  By putting off their decision on the closings to the eleventh hour, or the very end of the school year – for the largest closing of public schools in American history – the defendants place the plaintiff children and other children in special education at far greater risk than their non-disabled peers. The late date makes it impossible to conduct the closings without significant disruption to the programs in which these children participate and without adequate provision for the special safety risks faced by children with disabilities. In violation of federal law, this late,

1

ill-timed, and ill-prepared program for the closing of 53 elementary schools will have a discriminatory impact upon the plaintiff children and other children with disabilities, compared to their non-disabled peers.

3. Furthermore, in this manner, the defendants have also violated their affirmative duty under Title II of the ADA to make a reasonable accommodation to the plaintiff class, by allowing a reasonable transition period to minimize the specially disruptive and negative effects of closings upon children with disabilities. By rushing the closings of 53 elementary schools and by splitting up the cohorts or groups in which these children are educated, without adequate time to socialize them to a new environment, defendants are likely to inflict serious emotional and learning setbacks on plaintiff children. Accordingly plaintiffs request that the Court postpone the closings for a minimum one school year.

**Parties**

4. Plaintiff Mandi Swan is the parent of I.O. and L.O., both students at Jean D. Lafayette Elementary School (hereinafter "Lafayette").

5. Plaintiff I.O. is a minor and is in fourth grade at Lafayette. He has autism and has an IEP to accommodate his special educational needs.

6. Plaintiff Denise Burns is the parent of V.B.

7. Plaintiff V.B. is a minor and is in second grade at Lyman Trumbull Elementary School (hereinafter "Trumbull"). She has Down syndrome and has an IEP to accommodate her special educational needs.

8. Plaintiff Felicia Bradley is the parent of C.B.

9. Plaintiff C.B. is a minor and attends Garrett A. Morgan Elementary School (hereinafter "Morgan"). He stopped speaking at a young age, requires speech therapy, and has an IEP to accommodate his special educational needs.

10. Defendant Board of Education of the City of Chicago is a body politic and corporate, organized under the State of Illinois School Code, 105 ILCS 5/34-1.

11. Defendant Barbara Byrd-Bennett is the Chief Executive Officer of the Chicago Public Schools and a member of the Board of Education. She is sued here in her official capacity.

12. Defendant City of Chicago is a municipal corporation organized and existing under the laws of the State of Illinois.

## Jurisdiction

13. Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. §1331 and 1343.

14. This suit arises under the laws of the United States, including the enforcement provisions of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12133, which incorporates by reference the Rehabilitation Act of 1973, 29 U.S.C. § 794a, and, in turn, the private right of action to enforce civil rights from Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq.*

## Class Action Allegations

15. Plaintiffs Swan, Burns, and Bradley seek to certify a class pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure that consists of all children in special education programs in the 53 elementary schools defendant Byrd-Bennett proposed to close on March 23, 2013, as well as all children in the over 50 designated receiving or welcoming schools.

16. The class is readily ascertainable. The class members are the over 5,000 children at these schools are in special education programs and who have individualized education programs known as IEPs.

17. The proposed class meets all the requirements for class certification under Rule 23(a).

18. The class members are too numerous to join.

19. There are common issues of fact and law, as there are systemic violations of federal law alleged herein.

20. The claims of the named plaintiffs are typical of those of other members of the class.

21. Plaintiffs will adequately represent the interests of the class.

22. Plaintiffs do not seek individualized relief. They seek relief for the class as a whole pursuant to Rule 23(b)(2), to stop discrimination against the entire class.

### Facts

23. Under Illinois law, CEO Byrd-Bennett was originally required to make recommendations for school closings no later than December 1, 2012, with final action by the Board of Education in February 2013. See, 105 ILCS 5/34-230.

24. The schedule was set so as to carry out an orderly transition of the displaced children into new and unfamiliar schools.

25. Nonetheless, this year defendants sought and obtained a change in state law to make such recommendations as late as March 31, 2013.

26. The final approval by the Board will now come as late as the next Board meeting on May 22, 2013, at the very end of the school year. See, 105 ILCS 5/34-232.

27. Specific school transition plans will not be available until mid-June, just two months before the start of the coming school year.

28. On March 23, 2013 CEO Barbara Byrd-Bennett proposed the closings of 53 elementary schools.

4

29. These actions represent the largest closings by a single school district in the history of American education.

30. The decisions will not be final until approved by the Board on May 22, 2013.

31. Plaintiff Swan's child I.O. has autism.

32. Defendants have proposed to close Lafayette, which I.O. attends, and transfer I.O. to James Russell Lowell Elementary School (hereinafter "Lowell").

33. Plaintiff Burns's child, V.B., has Down syndrome.

34. Defendants have proposed to close Trumbull, which V.B. attends, attends and transfer her to John T. McCutcheon Elementary School (hereinafter "McCutcheon").

35. Plaintiff Bradley's child, C.B., requires speech therapy and has made significant progress in the special education program at Morgan.

36. Defendants have proposed to close Morgan and transfer C.B. to William H. Ryder Math & Science Specialty Elementary School (hereinafter "Ryder").

37. At this late date, there is not adequate time to provide the special services that plaintiff children and other children in special education programs will need to make the transition from the closing schools.

38. Defendants still have not made known whether the special education teachers who know the plaintiff children and other children with IEPs and who know and are familiar to them will be reassigned to the receiving schools.

39. There is no other information at this time as to who will teach these children.

40. There is no information as to whether these children will be placed in larger classes.

41. There is no information or specific plans about the supportive services the children will receive to make the transition to the receiving schools.

42. There is no information about the specific safety plans for these children who are at special risk because of their disabilities.

43. As a result, parents like the plaintiffs cannot make informed decisions as to where to place their children, and have inadequate time to enroll the children in different schools.

44. State law requires that school transition plans afford parents an option to enroll children in higher performing schools.

45. However, the defendants waited to announce the closings months after the deadline had passed to enroll in magnet or selective schools or charter schools.

46. Furthermore, it is difficult to enroll children in other neighborhood schools that might be better – or simply safer – choices at this late date.

## Disparate Impact on Children In Special Education

47. The closings proposed by defendants will change or affect the services being offered to the plaintiff children and over 5,000 children in special education programs in the closing and receiving schools.

48. The closings create special difficulties for these children compared to non-disabled children.

49. Each plaintiff child and member of the class has a special individualized education program or IEP which is created by the "IEP team" for that particular student.

50. The IEP details the particular services the child receives, the conditions under which the child will receive them, and who is responsible for delivering these services.

51. In many cases at Chicago public schools, the IEP is devised and written based on the resources of the particular school or school building, rather than the child's actual needs.

6

52. The existence of this practice is contrary to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1432, et seq. and other federal laws governing access to education, but is a reality in Chicago Public Schools.

53. Prior to transferring children to a different school, all the IEPs should be reviewed to ensure the same resources exist in the receiving school, and revised in cases where those resources do not exist, or exist in a different form.

54. On April 11, 2013, CEO Byrd-Bennett promised on CBS radio that the same IEP of each child and same teachers and services will be carried over to the new school.

55. However, the IEPs of these children cannot be carried over in this mechanical way without change, since the closing and receiving schools have different teachers, class sizes, and special needs programs.

56. In addition, because of personnel layoffs and other changes, the members of the IEP teams will change.

57. Furthermore, a proper transition for the plaintiff children will require additional services, which in turn will require revision or changes in their IEPs.

58. A child with autism, for example, may require multiple field trips to the new schools to acclimate and socialize the child prior to transfer.

59. It is very unlikely or impossible for these field trips to occur during the summer when teachers are on vacation.

60. Teachers and clinicians will require additional time with the plaintiff children to help each of them adapt to the new environment.

61. Other children with disabilities will require safety plans for movement outside the building and navigating the new building space.

62. Accordingly, these services require careful review and often revision of the IEPs.

63. If IEPs are revised, there must be meetings with the plaintiff parents to discuss and sign off on the IEPs.

64. In a few short months, it is extremely unlikely, if not impossible, to conduct a two part process: first to schedule the meetings with the parents and then conduct the meetings themselves.

65. In short, the teachers and clinicians may have to revise thousands of IEPs – and there is already a huge backlog in the drafting of IEPs.

66. The IEPs can be revised in this time period only if they are carried over in a rushed and improper manner.

67. Furthermore the plaintiff children are likely to work with new teachers and clinicians in the new schools.

68. These teachers and clinicians may not know the children and may have to make IEP decisions without proper background knowledge.

**Special Transition Needs for Plaintiff Children**

69. In the few months that remain to the start of the next school year, the teachers and clinicians are required to be meeting with each of the plaintiff children and other children with disabilities to explain the transition and discuss the challenges the child will face.

70. Such meetings with each of the plaintiff children should take place to walk the path the child will take to the school or introduce the child to the new staff or otherwise accustom the child to a new environment.

71. While the approach will vary from child to child, it is crucial to prepare the plaintiff children and all other children in special education for unfamiliar schools, unfamiliar teachers, and unfamiliar classmates.

72. The inclusion of each plaintiff child in a new school is a complex and time consuming process that demands trust and relationship building and development of a sense of belonging.

73. For the plaintiff children and their teachers and families, years of work to give a sense of inclusion will vanish as the children are rushed into new schools they do not know and with teachers and classmates they do not know.

74. The setbacks to the plaintiff children will be even greater if the process is rushed over a few summer months and without any specific plans or specific commitment of resources to help the plaintiff children make the transition.

75. The defendants have issued only boilerplate or generic "transition plans" that do not identify or commit to any specific support services for the children at specific schools.

## Lack of Specific Safety Plans for Plaintiff Children

76. Furthermore, there is justifiable concern for the physical safety of these children with disabilities.

77. Defendants have no specific safety plans in place for the children generally, and nothing at all for children in special education specifically, to take into account the different safety risks to children with disabilities.

78. The children must walk through new and unfamiliar urban neighborhoods – including some of the most dangerous and violent areas of the city.

79. It is precisely because the safety risks may differ from child to child that defendants should have specific safety plans in place.

80. For example, V.B. is a very young child with Down syndrome who is going into a school in a much more dangerous area than the area around Trumbull.

81. C.B. will have a much longer walk to school through an area that is boarded up and dangerous.

82. Plaintiff children and all children in special education risk even greater harm than children who are not in special education to the extent that they are forced to walk through new, unfamiliar, and dangerous neighborhoods, an experience that exacerbates the effects of their conditions.

83. Parents typically are working and are not able to provide personal protection of these displaced children.

84. Children who have cognitive learning problems, autism, Down syndrome, or emotional or behavioral problems, like the plaintiff children, do not pick up cues in an appropriate manner and are especially at risk for physical and psychological injury caused by the unfamiliar territory, gangs and violence on the streets.

85. Children with such problems often have low self-esteem and self-worth and as a result, are often the targets of bullying and gang recruitment – an especially serious concern in cases where children will be forced to cross into rival gang territory.

86. This low self-esteem and self-worth also creates a danger that the children internalize or feel blame for the closings of their schools.

87. While children in elementary schools cannot "drop out," they can stop attending classes and become truants and have done so as a result of prior closings.

88. Defendants have issued only boilerplate or generic "safety plans" that do not identify or commit to any specific safety measures for children with disabilities at specific schools.

89. Defendants have given only bland assurances that safety is important but have provided no specific safety plans for problems at specific schools or for problems specially affecting students with disabilities.

90. Former United States District Judge David Coar pointed this fact out when he acted as the Independent Hearing Officer during the public hearing addressing the closures of Mahalia Jackson Elementary and Morgan Elementary, which plaintiff C.B. attends.[1]

91. Specifically, Judge Coar found that it was "impossible" to tell from the generic transition plan "what if any planning and analysis had been done to address the security needs" at specific schools, "as opposed to generalized discussions and generic proposals to deal with security in the abstract."

92. His finding applies to all schools because defendants' safety plan for each school used exactly the same language, except that the names of the schools were changed out as necessary.

93. Furthermore, Retired Judge Charles R. Winkler recommended that defendants wait until at least the 2014-2015 school year to implement the proposed school closings because the school safety plans will not be ready for at least another 90-100 days, which will not be in time for the 2013-2014 school year.[2]

94. Other Independent Hearing Officers, all retired judges, also noted the lack of specific safety plans when recommending that defendants not go through with their plan to close those schools.

---

[1] Findings available to the public at https://secure.cps.k12.il.us/sa_wizard/Download.aspx?fid=2759 and https://secure.cps.k12.il.us/sa_wizard/Download.aspx?fid=2776.

[2] Findings available to the public at https://secure.cps.k12.il.us/sa_wizard/Download.aspx?fid=2789 and https://secure.cps.k12.il.us/sa_wizard/Download.aspx?fid=2791.

11

95. Furthermore, the schools set for closure were "safe places" for children in the neighborhood to congregate, and the closings of the schools create risks to the children back in their own neighborhoods.

96. Parents of children with disabilities are entitled to see meaningful safety plans before the closings place their children at risk, both with respect to the empty school buildings being vacated and the longer routes the children must take to school.

### Irreparable Injury to Plaintiff Children

97. The scope of the work – the proper review of the IEPs, the scheduling of meetings with parents, and the provision of supportive services for the transitions – cannot reasonably be performed in an adequate or appropriate manner from the end of May to the start of the school year in August.

98. Such transition process should have started months ago, and the late start is likely or certain to cause irreparable injury.

99. Years of work in building trust and developing a sense of inclusion and belonging for the plaintiff children will be irretrievably lost by the rushed and haphazard manner in which defendants will close these schools.

100. By putting off the decisions on school closings from February 2013 to May 22, 2013 – in other words, to the eleventh hour – the defendants have made it impossible for special education teachers and clinicians to conduct a transition that will avoid both academic and emotional setbacks for these children.

101. The hurried pace of the closings places children in special education at special risk and disadvantage compared to their non-disabled peers.

Case: 1:13-cv-03623 Document #: 1 Filed: 05/15/13 Page 13 of 17 PageID #:13

102. Uprooted from situations in which they have learned to adapt, these children are more likely to suffer loss of self confidence or self esteem which is crucial to their ability to make any academic progress at all.

103. By the Board's admission, described in a recent article in *Catlayst* magazine, the Board is unable to account for the whereabouts of 11 percent of the children displaced by the four school closings carried out last year.

104. Many of these children who "disappeared" were emotionally or learning impaired.

105. It is likely that more than 11 percent of the displaced children from the upcoming closings will be lost, since there is even less time to counsel and prepare children and minimize the harms. This is a huge number of children, as 16,059 children attended the closing schools this year.

106. While the plaintiff children will not "disappear," they will be adversely affected by the chaos and confusion that has accompanied past closings conducted by defendants, but on a larger scale now than before.

107. There is no financial reason why the defendants cannot accommodate these children by postponing the closings for a year, to allow adequate time to manage their transition.

108. There will not even be any savings at all from the closings in the coming academic year.

109. Defendants will spend $325 million to conduct the closings next year, and there is no plausible argument that postponing the closings will have adverse effect on the deficit the Board is facing in the coming fiscal year.

13

110. As required by state law, independent hearing officers have issued decisions as to whether the defendants are in compliance with state law.

111. Such decisions are non-binding, and such hearing officers have no authority to determine claims under Title II of the ADA.

112. The hearing officers – including retired federal and state court judges – issued recommendations opposing the closings of 13 schools.

113. Other hearing officers approved the closings only on technical state law grounds and expressed concerns about the impact of the closings on children in special education.

114. As described in more detail above, many of the hearing officers expressed concern at the failure of the defendants to have adequate and specific plans to carry out the closings.

## COUNT I
## Violation of Title II of the ADA
### Conduct of Closings in a Manner that has a Discriminatory Impact on Children in Special Education

115. In violation of Title II of the ADA and by the acts set forth above, and by otherwise failing to allow additional or reasonable time to carry out the closings, the defendants have failed to take in account the special needs of the plaintiff children and thousands of other children in special education.

116. In violation of Title II of the ADA, and by the acts set forth above, and by otherwise failing to allow additional or reasonable time to carry out the closings, the defendants have acted in a manner that will cause disproportionate harm to the plaintiff children and thousands of other children in special education.

WHEREFORE plaintiffs pray this Court to:

A. Certify the proposed class pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Declare that by the acts set forth above, the defendants have threatened to violate the rights of plaintiffs and the plaintiff class under Title II of the ADA;

C. Enjoin the defendants from carrying out the closings for at least a year and until such time as the defendants can assure an orderly process of transition that will minimize the emotional and learning setbacks to the plaintiff class; and

D. Grant plaintiffs their fees and costs and such other relief as the Court deems just and equitable.

## COUNT II
### Violation of Title II of the ADA:
### Violation of the Duty to Accommodate Children in Special Education by Allowing for Reasonable Period of Transition

117. Furthermore, and in further violation of Title II of the ADA, the defendants have violated their duty to provide reasonable accommodation by carrying out the closings next year.

118. There is no adequate reason why the closings have to be carried out in haste or why defendants cannot make the proposed reasonable accommodation to ensure that children in the plaintiff class do not suffer irreparable injury from the timetable now in place.

119. Plaintiffs seek an order that the defendant City of Chicago is responsible and liable as well for providing such a reasonable accommodation.

120. The City of Chicago through the Office of the Mayor appoints the Board of Education.

121. The City of Chicago through the Office of the Mayor treats the Board of Education as an instrumentality of the City.

122. The City of Chicago through the Office of the Mayor makes the decisions with respect to the revenue available for the education of children in the Chicago public schools, including children in special education.

123. Because the City of Chicago has at all times treated the Board of Education as an instrumentality and has determined the amount of revenue the Board of Education has for the education of children in the Chicago public schools, the City of Chicago also has the same duty as the Board of Education to make reasonable accommodation to the plaintiff children.

WHEREFORE Plaintiffs pray this Court to:

A. Certify the proposed class pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Declare that by the acts set forth above, the defendants have threatened to violate the rights of plaintiffs and the plaintiff class under Title II of the ADA;

C. Enjoin the defendants from carrying out the closings for at least a year and until such time as the defendants can assure an orderly process of transition that will minimize the emotional and learning setbacks to the plaintiff class; and

D. Grant plaintiffs their fees and costs and such other relief as the Court deems just and equitable.

## Jury Demand

Plaintiffs hereby demand a jury trial pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

Dated: May 15, 2013                                    By:     /s/ Thomas H. Geoghegan
                                                             One of Plaintiffs' Attorneys

Thomas H. Geoghegan (admin@dsgchicago.com)
Sean Morales-Doyle (smoralesdoyle@dsgchicago.com)
Michael P. Persoon (mpersoon@dsgchicago.com)
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511

Robin Potter (robin@potterlaw.org)
Shankar Ramamurthy (shankar@potterlaw.org)
Patrick Cowlin (patrick@potterlaw.org)
Robin Potter & Associates, P.C.
111 E. Wacker Drive #2600
Chicago, Illinois 60601
(312) 861-1800

Randall D. Schmidt
Edwin F. Mandel Legal Aid Clinic
  of the University of Chicago Law School
6020 S. University Ave.
Chicago, IL 60637
(773) 702-9611