# EXHIBIT 1

# Expert Witness Report,

Laurie Siegel, MA, LCPC, CADC, MISAII,
Type 73 &Type 75
10217 South Hoyne Avenue
Chicago, Illinois, 60643

1. Statement of opinions.  See Attachment A:  Statement of Opinions.

2. List of Exhibits:  Exhibit 1:  Social worker & Nurses Staffing Analysis
                     Exhibit 2:  American School Counselor Association
                                 Student-to-School-Counselor Ratio 2010-2011
                     Exhibit 3:Accessible Handicap Buildings in CPS and
Renovations needed

3. Qualifications: (a) Associates in Early Childhood (B) Bachelor's Degree in
   Elementary Education  (c) Master's degree in Community counseling,
   School counseling (type 73), Educational Leadership (type 75)  Licensed
   Clinical Professional Counselor (LCPC) Certified Addictions
   Counselor(CADC) Mentally Ill and Substance Abuse (MISA II) (D)Worked
   as a Counselor/Case Manager at the Chicago Public School for 12 years
   (2000-2012) (E) Assistant Professor at National Louis University, teaching
   Community And School Counseling in the graduate program (August 2012
   to present) (F) For prior work experience, see Attachment A& B:
   Resume (A) Curriculum Vita (B)

4. Other cases as an expert witness:  none in the past 4 years

By _Laurie Siegel_, MA, LCPC, _____Date July 5, 2013
                CADC, MISA II

**STATEMENT OF OPINIONS**

My opinion regarding the school closures and student transitions is that the children transitioning from one school to the other may suffer irreparable harm, socially, emotionally and cognitively if CPS does not attend to all details to ensure a smooth transition process. I also believe that this process needs to be slowed down or stopped, to care for all the details of the transitioning of all the students, most specifically to the special education students.

Research in Chicago, (Mason 2013) notes that school closings result in: (1) Disruptive and demoralizing climate: People in receiving schools reported a school climate of uncertainty, demoralization, tension, and stress affecting students, teachers, and families as a result of school closings; (2) Negative effect on teaching and learning: Teachers reported an influx of new students negatively affected academic work at receiving schools, and (3) Problems with safety and discipline.

Transfer of students across gang lines and into unfamiliar neighborhoods, coupled with the stress experienced by transferred students, contributed to increased discipline problems and concerns about school safety (Lipman and Person, 2007). For students changing schools, they will be required to adjust to new peers, teachers and the overall environment. This change can result in stress and anxiety, which can lead to social and academic difficulties. These effects on all students will especially be pronounced in our special education students because they may not have all skills necessary to adjust to these changes.

In my opinion, the proposed school actions highlight the myriad **of social and emotional factors** that need to be considered for children's well-being and academic engagement. I will outline the potential risks throughout in this report.

Research, (Mason 2013) finds that students can suffer socially, psychologically and academically from mobility. Further, research demonstrates that mobility is related to misbehavior and youth violence (Rumberger, 2003). According to Davies (2003), children report that moving, leaving friends, and changing grades, schools or classes can cause great anxiety. Transitions for some students result in academic difficulties, social/emotional problems, decline in self-concept, poor motivation, decreased attendance, and increased dropout rates.

This proposed CPS closures of schools and movement of the students to "new" schools, would have the following effects; **LOSS AND GRIEF, TRANSITON AND SAFETY** (Mason 2013).

***Loss and Grief:*** Not unlike losing a loved one, leaving a school that is closing may be devastating for some students and families who have built strong ties to faculty, staff and other families. Some students, especially young ones, or those with certain disabilities, may not understand the context of why their school is closing, why they cannot return to their school next year or why they must go to a new school that is unfamiliar to them. For those who have built strong ties to their closing school, grief and loss will likely be experienced.   In CPS, special education students are often "looped" with the same special education teacher and classmates for multiple years.  As a result the sense of loss and grief may be more profound for some special education students because the bonds they have forged are that much stronger due to having more continuity and time together.

Students may express sadness, fear, anxiety, frustration, anger and confusion evidenced by crying, withdrawal, and changes in behavior or academic performance. Students from closing schools may believe their school is a failure and that therefore they too, are failures.

***Transition:*** The process of leaving a school and going to a new one, in and of itself, poses many potential challenges for students and families. While many students from closing schools will enter "welcoming" schools, the climate and culture of schools vary greatly from one to the next, even if they are in close proximity to one another. Families and students will not be familiar with the staff and faculty, but may also not know the current families or the norms, procedures or expectations of the school. Depending upon how the "welcoming" schools receive their new students, children and families may experience anxiety, confusion and even isolation or alienation.

Students who receive special needs may be especially vulnerable in transitioning and adjusting to school closures. These students' families can be expected to have concerns about whether or not their children will have the same services at the welcoming school as they had at the closing school.  For special education students, especially those who have difficulties with transition stemming from their disabilities, the difficulties with transition may be exasperated.

**Adjustment:** Adjustment is part of the process of transition but how students adjust depends upon many factors. Adjustment is not always smooth. Students from closing schools will likely experience a period of adjustment, the length of which may vary for the individual student given contextual, personal and developmental variables. The processes in place at the welcoming school to help new students adjust will be critical. Students who have difficulty adjusting especially some students with autism and other low-incidence disabilities may lose ground academically, become withdrawn, depressed or even aggressive. Oftentimes students with learning disabilities struggle with issues of self-esteem and poor self-concept due to their academic difficulties and perceiving themselves as different from their non-disabled peers.  The transition may be more difficult for them as they try to make new friends and become acclimated to the new environment and new teachers. Welcoming schools' faculty, families and students will

also experience a period of adjustment. Students in welcoming schools may also experience emotional upheaval and have concerns. For example, they may be concerned about issues of safety, anxiety, vulnerability of friendships anger and even jealousy related to sharing their school with new students.

**Safety:** Basic safety is a primary need to be met for all children. The closing of schools may pose greater danger for some students who must travel further to get to school or who must travel across known gang lines or through unsafe areas. As a result, students may experience anxiety, fear and thus may be more likely to be absent, tardy, to skip school, receive suspensions or show a decrease in academic performance. In addition, for students entering a welcoming school, even school itself may not be safe if they believe they are in fact, not welcomed by current students. Conflict between students from welcoming schools and students from the closing schools may be likely and should be anticipated. Certain students with disabilities will be especially vulnerable to the peer pressure and influence of gangs due to their lowered self-concept and a desire to fit it.

**Building Accessibility:** CPS has promised that the receiving schools will have the same ADA construction work as the closing schools, (Hainds 2013). For at least 10 school actions, this is not the case and CPS documents concur[1]. Furthermore, CPS is not promising to make any accommodations for the schools whose attendance boundary changes will take over part of the closing school's attendance boundary, even though CPS admits that realistically, only about 50% of the students will probably attend the designated welcoming school[2]. Finally, the construction timeframe for renovating the welcoming schools is well beyond the first day of school on August 26, 2013[3] and an analysis of recent ADA renovations shows that it has taken CPS longer than expected to complete the renovations. For the welcoming schools, CPS is projecting that renovations will start in April and be completed by October or December for all schools with ADA renovations, thus a 6 – 8 month estimate for the construction work[4]. For recent ADA projects that are identified as such on the CPS Capital Improvement website, the estimated time frame was on average five months, but in reality took on average 11 months[5].

Comparing the ADA renovation work that closing schools have had in the last decade to what CPS is proposing for the receiving schools, and cross-referencing that with the Design Manager concerns listed on the spreadsheet entitled, "CBOE_0001016 3.8.13," it is clear that CPS is aware that some of the receiving schools will not have the same ADA accommodations as the schools that are being closed. This not only affects the specific student who will have to transition to the receiving school in August, but it will also affect all future students who live in the former attendance boundary of the closing

school who may need this accommodation.  Thus, CPS is "taking offline" a building would be accessible to current and future area students, leaving these students without such accessibility.

## Exhibit 3

| School | DM Issue #'s CBOE_1016.xls | Project Type | Budget Year | accessible ramp | accessible entrance | new main entrance | doors | signage | improvements | modifying bathrooms | new bathroom | modifying locker rooms | renovating/upgrading classrooms/programs | renovating library | auditorium stage lift | seating | floor | installing new elevator | renovating elevator(s) | drinking fountains | new fire alarm system | system | areas | replacement | devices | landscape compliance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mays at BANNEKER | #3, #5 | Welcoming School Improvement | 2013 Sup | | | | | | | | | | X | | | | | | | | | | | | | | |
| Mays Academy | | ADA | 2009 | X | | | | | | X | X | | | | X | X | | | | | | | | | X | | |
| Banneker School | | ADA Accommodations | 2012 | X | | | | | | | | | | | | | | | | | | | | | | | |
| Goodlow Magnet | | ADA | 1998 | X | | | | | | X | | | | | | | | | | | | | | | X | | |
| Goodlow Magnet | | ADA | 2002 | | | | X | X | | | | | | | | | | | X | X | | | | X | | | X |
| O'Toole (receiving Goodlow and Earle; co-share with Montessori Englewood) | #5 | DCEO Capital Improvement Grant | 2011 | | | | | | | | | | | | | | | | | | | | | | | | |
| Beethoven School | #3 | Welcoming School Improvement | 2013 Sup | | | | | | | | | | | | | | | | | | | | | | | | |
| Attucks (Farren) | | ADA | 2009 | | X | X | | | X | | | | | | | | | | | X | X | | | | | | X |
| Bethune School | | ADA | 2010 | | | | | | | | | | | | X | | | X | | | X | | | | | | |
| GREGORY | #5 | Welcoming School Improvement | 2013 Sup | | | | | | | | | | X | | | | | | | | | | | | | | |
| Burnham at LAWRENCE | #3, #5 | Welcoming School Improvement | 2013 Sup | | | | | | | | | | X | | | | | | | | | | | | | | |
| Burnham Academy | | ADA | 2003 | X | | | X | X | | X | | X | | | | | | | | X | X | | | X | | |
| Lawrence | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Courtenay at STOCKTON w/CPC | #2, #3, #4, #5 | Welcoming School Improvement | 2013 Sup | | | | | | | | | | X | | | | | | | | | | | | | | |
| Courtenay School | | ADA | 2000 | X | | | | X | | X | | | | | | | | | X | | X | | | X | | |
| Stockton | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Dodge School | | ADA | 2009 | | | | | | | X | X | | | | | | | | | | X | | | | | | |
| Morton | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pershing East at | #3 | Welcoming School | 2013 | | | | | | | | | | | | | | | | | | | | | | | | |

| PERSHING WEST MIDDLE | | Improvement | Sup | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pershing Magnet | | ADA | 1998 | X | | | X | | | | | | | | | |
| Pershing Magnet | | ADA | 2000 | X | | | X | | | | | | | X | X | |
| Mason HS @ Farragut | | | | | | | | | | | | | | | | |
| Mason School | | ADA | 2008 | | X | X | X | X | | X | | X | | | X | |
| Farragut | #5 | | | | | | | | | | | | | | | |

1. "CBOE_0001016 3.8.13 conc summary.xls," BOE 6.7.13 Production
2. "Working Draft SY13 School Actions Overview," CBOE_0001398.pdf
3. http://www.cps.edu/Pages/Capital_Plan_Data.aspx
4. Welcoming School Improvement Project Detail reports on the CPS website. See for example Beethoven: http://schoolreports.cps.edu/capitalplan2013/2013-25931-CSP.pdf.
5. This calculation is based on tracking construction projects through the Change Order Logs in the monthly CPS board reports.

**Homelessness:** Transitioning will affect the **homeless** population. According to Bradley (2013), the impact of mobility and transition is especially critical for students experiencing homelessness and instability as they often lack a consistent, stable and safe home environment. This lack of consistency, stability and safety often results in social and emotional difficulties such as depression, anxiety and trauma. Further, homeless students experiences chronic hunger, fatigue, difficulty trusting people, and higher levels of illness. They consistently experience loss—loss of routines, possessions, and security—placing them at greater risk of traumas such as assault and violence. Lastly, homeless students experience problems with depression and anxiety; which are exacerbated by the instability of having their school close (Rivera, 2013). Due to the constant transition, mobility, and unpredictability associated with homelessness, students often rely on their schools to be places of consistency, stability and safety.

In the 2011-12 school year, CPS identified 17,255 homeless students. Homeless children comprise 4% of students enrolled in CPS, however, 8.5% of homeless students who are already experiencing instability and high mobility will be impacted by the proposed school actions (Chicago Coalition for the Homeless [CCH], 2013). When CPS has previously closed schools, they have not provided the necessary support for homeless children. Children did not end up at better performing schools. Currently, there are not enough slots at better performing schools for homeless students, let alone all the other students whose schools will be impacted. These circumstances create conditions that will further exacerbate the instability and unpredictability student's face; leading to increased stress, anxiety and academic loss. Moreover, instability in both home and schooling environments is associated with the poorest educational outcomes

(Fantuzzo, et. al., 2012). CCH lawyer, Patricia Nix-Hodes shares, "The very cornerstone of homeless education law and policy is to provide stability in education to students who lack stable housing. The massive scale of CPS' proposed school actions undercut the very stability that students who are homeless so need and richly deserve." Students experiencing homelessness already struggle with attendance, safety and emotional stability. At a time when funding for homeless students has been severely cut, it is unlikely that CPS has the capacity to ensure their successful transition to new, higher performing schools or the resources to track and ensure that all students are enrolled in school for the fall.

A case for how students who have mental health issues are serviced in the CPS:

**MENTAL HEALTH ISSUES:** Currently, there are limitations in CPS for the provision of mental health services to students. Providing critical services for students experiencing mental health has become more difficult due to the closure of several community-based centers (Karp, 2012). Further, Illinois ranks third in the nation for cuts to mental health services (Honberg, Diehl, Kimball, Gruttadaro, Fitzpatrick, 2011). And, funding for community mental health services for children has been reduced by 13 percent between fiscal year 2009 and 2012 (Illinois Kids Count, 2012).

An analysis of information collected by Communities in Schools in Chicago states, "80% of respondents think that mental health issues are impacting classrooms now more than ever." The report states, "current resources are not enough" (Communities in Schools Chicago, 2012). Given the increased need that will be created by these school actions, and the already limited resources of CPS in having enough social workers and counselors, we are concerned that there will not be adequate resources to address the needs of all children, specifically homeless students already exhibiting signs of stress (e.g. withdrawal, anxiety and acting out).

**STAFFING ISSUES:**

***Social Workers:*** CPS has a ratio of approximately 1 social worker for every 1,000 student students, which is well above the 1:250 ratio recommended by the National Association of Social Workers. (Karp, 2012).

Currently, the job of a CPS social worker includes servicing special education students by providing to each individual students, all the minutes of services set forth in their individual IEP's.  Due to the time commitment and understaffing, CPS social workers typically have no time to work with the "other" students in need of services.

**School Counselor Clinician Analysis** – CPS policy for the 2013/2014 school year is as follows:

CPS intends to fund one school counselor per school. If student population doubles, the ratio doubles.   In addition, the school counselor is also the special education case manager, unless the principal uses his/her discretionary funds to buy the case manager position.   Student to Clinician ratios are set to increase for students from closing schools by 60% if only half the students from closing schools go to the welcoming schools. If all students from closing schools go to the welcoming schools, the ratios will double.

**(EXHIBIT 1)**

### Social Workers & Nurses Staffing Analysis:

| Closing School | FY13 FTE Social Worker Allocation | FY13 FTE Nurse Worker Allocation | FY13 Enrollment | FY13 Student to Social Worker Ratio | FY13 Student to Nurse Ratio | FY14 Welcoming School | FY 14 Welcoming School Social Worker Allocation | FY 14 Welcoming School Social Worker Allocation | FY14 Projected Enrollment (1/2 of Yale + Harvard) | FY14 Student to Social Worker Ratio | FY14 Student to Nurse Ratio | % Change in Social Worker Ratio | % Change in Nurse Ratio |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Yale | 0.4 | 0.25 | 186 | 465:1 | 744:1 | Harvard | 0.7 | 0.47 | 534 | 762:1 | 1144:1 | **164%** | **154%** |
| West Pullman | 0.3 | 0.2 | 301 | 1003:1 | 1505:1 | Haley | 0.47 | 0.24 | 680 | 1455:1 | 2837:1 | **145%** | **188%** |
| King | 0.3 | 0.25 | 284 | 947:1 | 1136:1 | Jensen | 0.35 | 0.30 | 491 | 1415:1 | 1614:1 | **150%** | **142%** |
| Bontemps | 0.3 | 0.2 | 314 | 1047:1 | 1570:1 | Nicholson | 0.39 | 0.34 | 626 | 1602:1 | 1823:1 | **153%** | **116%** |
| Songhai | 0.3 | 0.45 | 317 | 1057:1 | 704:1 | Curtis | 0.54 | 0.45 | 633 | 1406:1 | 1174:1 | **133%** | **167%** |
| Stewart | 0.5 | 0.2 | 256 | 512:1 | 1280:1 | Brenneman | 0.55 | 0.32 | 448 | 818:1 | 1410:1 | **160%** | **110%** |

The planned allotment of clinicians to welcoming schools shows that many students from closing schools will have less access to these crucial services in their new schools. Many of these receiving schools will be much larger; some expected to double in size. The allocation of clinicians however, is not rising proportionately so that students can enjoy the same student to clinician ratios they had previously. Even though prior ratios were often woefully inadequate, the school closings will make them even worse in the new consolidated schools.

Student to clinician ratios are increasing in the closing schools. At Harvard elementary next year, the student to social worker ratio will be 164% of the ratio at Yale elementary this past school year. Brenneman's student to social worker ratio will be 160% of the

ratio at Stewart. Students from the closing school West Pullman, can expect their student to nurse ratio to nearly double at Haley next year. Students from closing schools King, Bontemps and West Pullman will face student to social worker ratios that are 50% larger at their new welcoming schools.

The data used is from Board provided projections of clinician allocations for school year 2013-2014, and actual clinician allocations from the 2012-2013 school year. The only assumptions made were of the projected enrollments for the welcoming schools next year, in order to construct new ratios. It was assumed that only half of the students from closing schools would move to receiving schools.

**Nurses:** CPS does not have a nurse in the building on a daily basis.  I have experienced many times as the case manager "at risk "situations where students were experiencing medical emergencies and as a case manager, I was the point person on the crisis. I rode the ambulance, administered first aid and attended to many serious medical situations. Please note:  I did not receive any medical training from CPS and was not offered any.  I am concerned about the amount of students transitioning, the medical problems that these students bring to the new building and the potential "risk of harm" to the students.  How is this case manager/counselor going to handle these multiple roles when the nurse is not in the building?

### *PARAPROFESSIONAL SUPPORT AND SPECIAL EDUCATION STUDENTS:*

My experience with CPS and paraprofessional support has not been a good one.  In my 12 years in CPS as a counselor/case manager, students who transferred into my school and had IEP's indicating that they needed paraprofessional support, failed to receive the supports for an extended period of time -- usually 2 months, if at all.  Parents had to go due process and complain to newspapers and seek out other assistance to get the paraprofessional that was indicated in the IEP.  I am very concerned that the Special Education students who will be transferred into the receiving school will not get the supports they are entitled to.

### *COUNSELORS/CASE MANAGERS:*

The current practice in most CPS schools is to use the counselor in the schools as a special education case manager. These are two different jobs! The counselor/case manager may have a case management load (special education cases) that would take up to 90% of his/her time, which leaves a small percentage of time dedicated to the needs of the regular education students. I believed myself to be an excellent counselor. In the 12 years I worked for CPS (2000-2012), there was many times I was interrupted during the IEP meetings.  I was interrupted to deal with crisis situations such as suicidal ideations or other social emotional issues that arose.  Counselors and special education case managers are **two** different jobs and CPS needs to recognize this.  We are

harming our children, regular education as well as special education, by not focusing our attention to them.  In many schools, there are special education compliance issues (not completing IEP's on a timely basis) due to the overworked counselor/case manager job.  It is important to note that Case Managers that are hired to be the "Special Education "experts are also the type 73 counselors.  The Type 73 training required to become a counselor, has as its main focus counseling, not special education.  I work as an assistant professor at National Louis University, in the school and community counseling department.  I teach the courses required of the type 73 (master's degree in counseling) candidates. We are a CACREP program, which follows a rigor that adheres to the best practice of educating counselors in training. The students in this program do not receive any special education training. They are taught this when working for CPS.

There is not any other district outside CPS that has their counselors work as case managers.  In fact, there is not another state that practices this way.

So while CPS puts certified counselors in charge of running IEP meetings, checking IEPs for accuracy and appropriate content (in fact they are the ones that sign off on the final document and approve it), they are not necessarily trained in sped teaching practices, appropriate accommodations/modifications, or even the requirements of IDEA.

They oftentimes, in my opinion, have never been taught about how IEPs are written or how the meetings should be run.  So, not only are they squeezed in terms of case loads and amount of work, but they are also being forced to work outside of their area of expertise.  With this "large" job of making sure special education students are transitioned properly and also dealing with the IEP's, case managers are not properly prepared for this large job!

In my opinion, the counselor/case manger would not be able to adequately address the social –emotional needs of the Special Education students transferring into the "new" schools.  In addition to the new regular education students with presenting issues, they would also be handling the "new" special education cases, that would be coming into his/her school.  This would include holding transitioning IEP meetings, 3 year re-evaluations, annual reviews as well as revisions to IEP's due to a different curriculum at the receiving schools.

The present counseling staffing allocations as follows: **1 counselor to 655 students**. Please note:  this can also mean the special case management role as well as the counselor role.

The American School Counseling Association recommended ratio is **250 to 1** (EXHBIT 2), with the role being primarily a counselor.

**Case Managers and illegal IEP revisions:**

**Background:**  In April 2012, revisions needed to be made to IEP's due CPS's imposed longer school day mandate. The process was as follows: CPS's Office of Specialized Service mandated that case managers send out a notice to all of the parents of special education students asking them to agree to projected changes to be made in the IEP, due to a longer school day.  It was not known at the time of the mandate what subject areas minutes need to be increased, how this was going to affect the special education students and many other questions that seemed to go unanswered, due to the fact that that CPS did not know for sure if the longer school day was going to get passed.

**My Experience:** At my school (Mt. Greenwood School), I had 140 IEP's that needed to be changed.  When revising and changing these IEP"s (140), I believe this practice was illegal and not best practice under IDEA law --- there was not a definite plan for the minutes, due to CPS's uncertainty. We did not hold any parent IEP meeting for these revisions to the IEP's. Parents were not consulted on the amount of minutes.  We were told by CPS to just do the revisions and send the paperwork home (Completed revised IEP's).  In addition, after the revisions of the IEP's, we were then again notified to revise IEPs again due to another change in the longer school day minutes. The process then repeated itself with the same illegal practices.

**My Previous Experiences with Transitioning of Students (No Child Left Behind):**

In September of 2002, I was a counselor/case manager at Mt. Greenwood School. We received 50 students from under achieving poor performing schools – all African Americans.  Mt. Greenwood school (predominately Caucasian) was a higher achieving school.  Some of the students were special education students and some had severe behavior as well as learning issues (they were not previously staffed as special education students).  It was an absolute disaster!  The adjustment was very difficult for these students; they experienced emotional issues, such as depression, becoming withdrawn and behavioral issues, which included aggressive behavior.  They became bullies and experienced bullying themselves. The parents were very frustrated with the difference in the tolerance of behavior. In addition, their academics did not match or come close to the school they had left.  In addition, most of these students struggled academically. They had difficulty keeping up and even though we added tutoring or other services, it wasn't enough.   We ended up evaluating 10 of the 50 students that were sent to us.  Out of the 10, 70% or seven were determined to have special education needs.  By the year 2005, 30 of the 50 students (60%) ended up being expelled, or transferred back to their sending schools.  The only students that ended up staying were some of the special education students, who were receiving many intensive services.

This process certainly played a toll on the students (both current and receiving), parents, teachers and other staff members. From personal experience, I could not keep up with the demands of the students that came to our school. Their issues - social/emotional and educational, as well as their transition issues, were large and overwhelming.

**Proposed action plan from CPS:**

I reviewed a CPS power point (April 2013) Supporting Students with Disabilities. This power point speaks to the potential issues that occur when transitioning special needs students, but does not address especially who is responsible for these tasks. With the proposed staffing for counselors and social workers, these ideas outlined in the power point will not be a reality, just an idea! How about the idea of using research based programs to address the effects this transition will have on this population. The power points also talks about case managers coming in during the summer to assist with transitions but doesn't seem to be a concrete plan. On page 20, 21 and 26 of the document, there is language regarding the first day of school and how the case manager will review the receiving students IEP's. This is not realistic at all; in fact it is a crazy idea, and I do not in way support this plan.

On the first day of the school year, the counselor/case manager's job includes but not limited to: registering students, caring for crying children, children that won't part with their parents, transportation issues(special education students), getting children to the right classrooms, dealing with parent issues, dealing with student issues, returning a great deal of phone calls, or talking to parents, regarding many issues the students experienced during the summer months; hospitalizations, injuries, divorce ,sexual abuse, and many other problems that students or parents may have experienced during the summer break. In the 12 years of working at CPS, I believe the first days of school are the most hectic, stressful and totally chaotic. Adding these transitioning students to the mix, I believe will be disastrous for all. I also believe our children will suffer emotional and possibly physical harm, due to this rapid process.

In addition, I have read the testimony of Rebecca Clark's deposition, July 1, 2013. I don't believe she is confident about how this transition will work. She was uncertain which schools will be having case mangers during the summer to assist with the IEP's. She talked about the proposed plan, including field trips and meet and greet days, but was not certain which schools have planned to make this really happen. I am wondering if these proposed activities, are really going to happen, and if this is the most effective way to make this transition work.

In conclusion, as a clinician, a former CPS counselor and case manager, in my opinion, I am so very concerned about the effects this transition is going to play on all parties:

students, parents, the school staff as well as the communities. I also believe that this process will have a deep impact on the regular education students, but I most certainly believe the special education students will suffer the most.  This population is not equipped cognitively as well as emotionally to handle such a devastating event in their lives. Preparing children to move to another school or environment with "social stories" and field trips is not enough. I also believe this process is moving too fast and needs to be slowed down or stopped to address the issues outlined above.

**END**

# EXHIBIT 2



Department of Criminology, Law, &
Justice (MC 141)
4022 Behavioral Sciences Building
1007 W. Harrison Street
Chicago, Illinois  60607-7140

Robin Potter
Robin Potter & Associates,
111 E. Wacker Drive #2600
Chicago, IL. 60601

July 5, 2013

Dear Attorney Potter:

You asked me to provide an expert opinion on the impact of the proposed CPS school closing on the safety of students by street gangs.  Based on my research experience and knowledge of Chicago gangs, I have concluded that:

> a/ The current CPS school closing plans puts children from many closing schools at serious risk of gang violence.
> b/The travel of children between some schools will aggravate tensions between gangs and literally puts some children in the line of fire
> c/ The "safe passage" plan does not appear to recognize the importance for security of a drastically changed pattern of gang violence in Chicago today.
> d/ Special education students are particulary at risk for gang recruitment and vulnerable to violence.
> e/ The closing plans for schools where children would have to cross gang boundaries should be delayed at least a year, to protect students from substantial harm and violence.  This will allow for a more interactive, informed community involved planning process. It will permit CPS to develop a plan with special attention to specific gang issues and make closing decisions based on the safety of children.

This report contains 1/ My credentials as an expert on gangs and violence, particularly in Chicago.  2/ A brief review of research on Chicago gangs and violence and an overview of  the current situation. 3/ A review of the specific risks to students in four specific sets of closings and why we can generalize from these examples to other schools where children cross gang boundaries. 4/  My conclusions.  5/ Exhibits and References.

**1. Credentials**

I, John M. Hagedorn, Ph.D. am presently Professor of Criminology, Law, & Justice at the University of Illinois-Chicago.  I have been employed there for the past 16 years.  I have been researching street gangs for nearly 30 years, beginning in Milwaukee, Wisconsin in 1984 and since 1996 in Chicago. I have been involved in several international cross-cultural research projects, including participation in a Social Science Research Council study of youth and organized violence.  In 2010 I was a Visiting Research Professor at Glasgow University comparing Chicago gangs to those in Glasgow.  I am the author of three books, two on gangs, and one on the child welfare system.  I am currently completing another book on gangs, organized crime and corruption in Chicago that centers on the Chicago gang wars of the 1990s and their consequences.

I am also editor of two collected volumes, one on female gangs and the other entitled "Gangs in the Global City."  I have published in peer reviewed academic journals in sociology, criminology, history, African American studies, urban studies, and for the US Air Force. I was a consultant for the National Institute for Justice, training other social scientists in techniques of gang research.  I have published many chapters in edited books, popular articles, and am the owner of the popular website, gangresearch.net. My books and articles are among the most cited academic works on gangs.  My research builds on more than 80 years of social science studies on gangs in Chicago.

I have received numerous awards for my research including  the Robert Ezra Park Award for Sociological Practice from the Association for Applied and Clinical Sociology,  the Scott Greer Award for Distinguished Contributions to Urban Research from the University of Wisconsin-Milwaukee, and the Hans Mattick Award for Distinguished Contributions to Criminology by the  Illinois Academy of Criminology.

Directly relevant to the issues of Chicago gang violence, I was the Principal Investigator of a 2003 Harry Frank Guggenheim study that concluded the instability caused by the relocation of CHA residents was a major reason why homicide in the 1990s did not decline in Chicago as quickly as in New York City. I contributed an essay on "Gangs in the Post Industrial Era" to the 1998 Crime & Justice volume of essays written by the leading scholars in the field on youth violence. My essay comparing gang violence in Chicago to violence by gangs in 10 other nations appeared in a collected volume *Neither Peace nor War*. I have written two chapters in collected volumes on Chicago gangs, violence, and public policy that will be published in 2014 by Sage and Oxford University presses.  I have taught courses at the University of Illinois-Chicago on the history of gangs in Chicago, variations in homicide, and an annual course on gangs and the media.

I have done extensive research for the past 15 years in Lawndale and have reliable research contacts and associates in Pilsen and Little Village, the west side, Woodlawn,  Englewood, the far south side, and other neighborhoods across Chicago. I was the Principal Investigator of the 2012 Hull House Exhibit,  "Report to the Public: The Untold Story of the Conservative Vice Lords." Two chapters of my last book, *A World of Gangs*, were devoted to looking at gangs in Lawndale in comparative perspective.

I have consulted and/or testified in approximately 50 trials including more than a dozen capital cases.  I have published an article in the Memphis Law Review examining gang stereotypes in court proceedings and have written other popular articles on gangs and the courts. In the last four years I have consulted on more than a dozen gang-related cases and to the best of my recollection over that time have personally testified in two:  *Stout vs Tennessee*, a 2010 Habeas proceeding at the Tennessee Court of Appeals; and at a sentencing,  *Illinois vs. Melendez,*  in 2010 in Lake County, Illinois.

I have reviewed maps of proposed school closings superimposed on Chicago Crime Commission gang territory maps prepared by the Chicago Teachers Union. See Exhibit # 3, 5, 8,  and 12).  I have also reviewed COC 0000201,  a Chicago Public Schools document explaining the rationale for school closings and consolidation and several updated documents on the same topic.  I have also reviewed the CPS Safe Passage contracts dated June 26, 2013;  a CPS document reprinting a power point presentation April 12, 2013: "School Actions: Supporting Students with Disabilities." I read the  CPS Student Safety Transision Preview, dated 3-12-13,  CBOE0003623.  I watched the video-deposition of  CPS Transition chief Tom Tyrell detailing CPS security plans for closing schools.

On Monday, July 1, 2013 I traveled to Lawndale and Little Village for four hours with attorneys and employees of the Chicago Teachers' Union to personally view the neighborhood, including the routes children may take to the "welcoming schools" as a result of the closing their home school.  I spoke by phone with other expert witnesses in a conference call with attorneys on July 3.  In the course of writing this report, I spoke confidentially with gang members, parents, Chicago police officers, and research associates in Lawndale, Little Village, Woodlawn, and West Town.

## 2.  Chicago Gang Research and the Changed Threat to School Children

Gang violence in Chicago has been a major topic of social science research from the 1920s to today.

### a/ Classic Gang Research

The acknowledged "Father of Gang Research" is Frederic Thrasher who studied "1313" gangs in 1920s Chicago and defined gangs as shaped by conflict. Shaw & McKay followed in this "Chicago School" tradition by finding gang violence was the product of disorganized neighborhoods regardless of which ethnic group resided there. Short & Strodtbeck studied the "aleatory"or spontaneous random processes by which gang violence often occurred. Studies by Irving Spergel on Chicago gang violence and his outreach program in Little Village led to the US Department of Justice to adopt Spergel's "comprehensive gang intervention plan" as a model program for the entire country.

Richard and Carolyn Block have done extensive work on gang homicide and have differentiated between "expressive" homicides, which are more spontaneous and related to local conflicts and lack of self control vs. "instrumental" homicide which are calculated, more

planned killings. Recently Andrew Papachristos has done evaluations of the CeaseFire gang intervention program and elaborate quantitative studies of the relationship between patterns of gang homicide and distressed neighborhoods.

Unfortunately, there are a only handful of historical studies of gangs including Sudhir Venkatesh's history of gangs in Robert Taylor Homes and Andrew Papachristos study of the results of the 1990s federal prosecution of the Gangster Disciples. Among Latino gangs, there are even fewer historical studies, marked by only Felix Padilla's history of a north side Puerto Rican gang. Andrew Diamond has published a unique history of 20th century youth gangs up to the 1960s.

One major finding of almost every Chicago research study is that gangs are a significant contributor to high rates of violence in both African American and Latino communities. What is most significant for school closings however, is that the nature of gang violence in the last years has fundamentally changed and poses new threats to children. This trend, recognized by community residents and law enforcement officers, can be seen in my own studies of Chicago gangs.

### b/ The historical context of Chicago's contemporary gang violence

My own work combines detailed histories of Chicago gangs with analysis of the reasons for the level of Chicago's homicide rate. In the 1950s and 1960s, new gangs began all across Chicago and those gangs have persisted now for more than half a century. Tens of thousands of Chicago young people, many as early as elementary school, join gangs. Gang membership continues into adulthood for many of them and traditions are often passed down to their children. Neighborhoods all over Chicago are marked by gang boundaries as represented in the CPD and Chicago Crime Commission maps (see Exhibits 3, 5, 8, and 12 )

Gangs in 1960s Chicago were different than most prior gangs and they quickly expanded as multi-neighborhood race-based alliances of local sets. Cross neighborhood gang wars raged from the 1960s on. For example, in 1973, 83 people were killed in East Garfield Park, 58 in North Lawndale, and 66 in Englewood alone. The now defunct People & Folks Coalitions, which were formed in prison in 1978, had as a goal, in part, to control violence both within the prisons as well as on the streets (see exhibit 1 depicting Chicago's changing history of homicide).

These efforts had only moderate success as violence between "People" and "Folks" gangs continued into the 1980s. What was significant about gangs during this time was their hierarchical organization and control of street activity by leadership in prison. In my articles and in my book, *A World of Gangs*, I explained Chicago gangs as having *institutionalized*, meaning they were permanent fixtures in Chicago and Illinois prisons that would not go away "no matter what we do" (p.xxxi). The 1990s, however, would fundamentally alter the nature of Chicago gangs and their violence.

Two events shook Chicago's gang world and these events have decisive significance for why school closings present a threat to the safety of children today  In the 1990s, Mayor Daley decided to tear down the CHA housing projects and disperse the residents, mainly to the far south and west sides (see exhibit 2 –a picture of Robert Taylor Homes and Stateway Grdens prior to their destruction). This stands in sharp distinction to the decision by New York City's Mayor Koch to substantially invest in public housing and not displace the residents. In my Urban Affairs Review article, I concluded this instabilty was a major reason why Chicago's homicide rate did not drop like New York City's, or, for that matter, like many other large US cities during that time.

Through interviews with displaced gang members, I showed this dispersal of CHA residents raised gang tensions in those areas and schools.   For example, Roseland was described to me by gang members who moved their from Robert Taylor Homes as "The Wild, Wild, West" where shootings were the unanticipated result of gang members mixing with rivals as well as their inability to get along with members of the same gang.  Both schools and communities were unprepared for the influx of gang members and were unable to contain the upsurge in violence.

On both the west and far south sides, gang members moved into neighborhoods where housing was available, not necessarily into areas controlled by their own gang.  This resulted in making neighborhoods on the west and far south side much more heterogeneous and volatile.  The gang maps of the CPD and Chicago Crime Commission are misleading in representing "gang boundaries" as bounded and homogeneous. (Exhibits 3, 5, 8, and 12). Today these gang neighborhoods are much more fluid and volatile than at any time in the past 40 years. More than ever, security means understanding people and on-going relationships, not fears of crossing this or that line

The other event that changed the nature of gangs and violence today, were the internecine gang wars of the 1990s. Rather than battles between "People" and "Folks," these wars took place within "nations" and led to the most violent years in Chicago's history. The Black Disciples/Gangster Disciples war mainly took place on the south side while Vice Lord sets fought one another on the west side. For example, in 1992, 98 people were killed in East Garfield Park, 62 in Englewood, and 60 in North Lawndale.  Among Latinos, a "War of the Families" cost many lives of Latin Folks gangs. The wars of the 1990s had homicide rates twice that of the "spike" of 2012 or any year since 2004 (return to Exhibit 1).

These horrific wars, along with changed, more gang-heterogenous neighborhoods,  shattered the hierarchical structure of Chicago gangs and discredited their leadership.  In the last ten years, Chicago's established gangs have turned in on themselves and killings are often intra-gang, not just between gangs. Additionally, my research contacts have consistently reported the formation of new, younger, non-affiliated gangs that are not part of Chicago's half century old institutionalized gangs and represent a contant challenge to them.

While the level of violence in Chicago today is much less than in the gang wars of the 1990s, it is more unpredictable and dangerous for young people and less defined by old gang boundaries.  Violence today, according to my historical research and contacts among

community residents, gang members, and police officers, is fundamentally different than the organized gang violence of the 1990s. Unlike gang "hits" of past years, violence today is more spontaneous and much less amenable to control by "OGs" — a street term for "Old Gangster" or influential gang elders.

### c/ The nature of risk to elementary school children.

This changed gang situation poses some old and some very new threats to children who move from schools on one gang turf to another. When African American children move into Latino gang controlled areas, the risks may be more racially based than gang-related.

What children walking past rival gang turfs face today is not just violence between rival gangs, but the spill over of violence within gangs as well unpredictable violence with new, sometimes even un-named gangs. Rather than formal wars between gangs, as was the case in the past, the situation today is marked by interpersonal feuds and violence that cannot always be categorized neatly as "gang-related."  What is most important in this fluid situation is familiarity with people, other families, and the past contours of gang conflicts.  In situations where children must cross gang boundaries, today is the worst time to ask for changes.

I am disturbeded that The Transition chief, Mr. Tyrell,  demonstrated no knowledge of Chicago's gangs and admits to not knowing the racial demographics of schools.  Chicago is not Afghanistan, and a military solution to its gang problem is neither possible, nor to my mind desireable.  My expertise, combined with my interviews with Chicago Police Department, community residents, and gang members all suggest that given the constant gang shifts and anarchy along with a lack of cohesive gang leadership, the CPD cannot protect students crossing gang boundaries from gang violence. The Safe Passage plans, of sending a community volunteer to accompany some children walking past gang turfs,  provide no real safety from a bullet.

Gang problems exist, of course,  in the current schools and must always be taken seriously. However, in schools where children and their siblings have attended for long periods of time, informal arrangements are made and negotiations take place between families and can mitigate gang problems. Once children move to a new school, the lack of informal arrangements between families or different gangs can mean violence is a more likely result of disputes, not negotiation between families who know one another.

Finally, problems don't stop once the kids get to a new school.  Especially when the "welcoming" school is on or near rival gang turf, tensions will certainly escalate. The CPS plans for the welcoming school reported on by Mr. Tyrell do not appear to have a gang component and he admits they lack specificity.  This is a blueprint for harm and violence, and standing alone, justifies a moratorium on closings this year.  Tensions getween families and gangs when someone has died or was the victim of violence do not go away after a one hour session teaching kids "how to get along with one another," as Mr Tyrell said in his deposition.

In a nutshell, gang violence in Chicago today is more unpredictale and uncontrollable than ever before. This means when school children cross gang boundaries the risks are complex they need careful, specific, informed attention or else children can die.

## 3. Case Studies and Generalization

I looked at the entire list of school closings and it was quickly apparent that the extent of the plan far exceeded my capacity to comment in depth on the gang situation in so many schools. Each school closing presents different, unique problems with gangs, and indeed the lack of a specific, tailored plan for each schools' specific gang problem is most troubling. While the CPS safety transition plan calls for a "dedicated, customized safety plan" ( CBOE 0003624) no such plans apparently are available. Given the difficulty of developing a sound plan and the questions raised about whether any plan could provide security in some school closings, a delay of a year's time seems prudent if CPS administrators are concerned with student safety.

I am most familiar with Lawndale and the Vice Lord sets there. I looked carefully at three school closings in that neighborhood and my conclusions are applicable across the board to the 49 schools where the same patterns are present. I contacted community residents, gang members, and law enforcement officials from other neighbhoods where children need to cross gang boundaries to see if the method of my analysis might be valid for those areas as well and I conclude it does.

### a/ Pope to Johnson

The attendance area of the closing Pope school adjoins turf of both the Conservative Vice Lords and the New Breed. Students walking north to Johnson will cross areas adjacent to the turf of the Black Souls. The Johnson attendance area also includes turf of the Traveling Vice Lords (see exhibit 3 and 4). The CPS safety plan asserts children walking Albany Avenue to their new school do not aggravate "existing gang conflicts" (see exhibit 7, COC 0000238) is dead wrong and on more than one level.

First, there has been more than 25 years of warfare between the Black Souls and New Breed since Booney Black, the New Breed leader, was stabbed in prison by a Black Soul in 1987. This longstanding hatred carries down to the children of gang members who live in those areas. Rivalries between Vice Lord sets, in this case Travelors and Conservatives, has beeen intermittent. I was told by one former Vice Lord leader that on July 1st, as I was investigating the situation, there were conflicts between these two Vice Lord sets.

But the CPD and Crime Commission maps are inaccurate and misleading as to the depth of the problem in at least three ways. First, one of the gangs in the Lawndale area, the Albany Lords, are not even depicted on the map  Gang leaders from that area told me this Vice Lord set is a force to be reckoned with by any kids walking what they called the "Albany Avenue gauntlet" from Pope to Johnson.  One mother told me that kids had been posting on FaceBook that anyone trying to go through their turf on Albany would get assaulted. She described the situation as worse than when the projects first came down and new gang members moved to Lawndale.

Second, the neat boundaries of gangs as seen on the map do not reflect the demographic changes that shook the west side when the CHA projects came down. In those years gang members from the projects moved into available housing, not necessarily to their own gangs' turf.  This exacerbated tensions and makes violence more unpredictable as rival gang members sometimes live side by side. The old neat and concise gang boundaries do not exist any more making personal relationships and specific neighborhood knowledge of conflicts more important.

Third, the area has seen the emergence of new, unaffiliated gangs that owe no allegiance to any established gang nation. I was told by one gang leader two years ago with some indignation, that kids in Douglas Park were sporting "blue and red bandanas like from LA."  He said: "This is Chicago. They ain't supposed to do that."

I do not see any planning by CPS to deal with the consequences of such a complex gang situation  CPS is just plain wrong that this specific Lawndale plan does not exacerbate gang tensions and violence. In this situation,  forcing children to walk through multiple,  hostile, and unstable gang turfs undoubtedly puts them in the line of fire. This specific school closing, from the point of view of the safety of children,  is ill-advised and risks the lives of children.

### b/ Henson to Hughes

Also in North Lawndale, the new attendance area of the Henson and Hughes schools includes a variety of gang turfs that children would have to pass through (see exhibits 5 and 6). Depending on where a student lived, s/he would have to move through areas controlled by the New Breed, Gangster Disciples, Black Souls, all former "Folks" gangs. The Four Corner Hustlers and many Vice Lord families also live in this traditional Vice Lord area.  The first thing one Vice Lord gang leader told me about Henson and Hughes was that the area between the schools was home to a major drug business by the New Breed. His unsolicited opinion was that sending kids through that "war zone" was "crazy." I see no evidence that CPS has assessed or dealt with the harm in its transition plan in these schools nor does it appear to be capable of doing so and in such a short period of time.

The instability among established gangs and the emergence of new gangs also applies to this area.  The gang situation is especially dangerous and the CPS conclusion that forcing chldren to walk through a gang "war zone" is not especially risky is irresponsible (see exhibit 7; COC 000238).

### c/ Paderewski to Cardenas and Castellanos

A different kind of problem can be found in the planned closing of Paderewski School just a few block away from the other North Lawndale schools and on the border with South Lawndale, called Little Village. The plan for this school sends African American children under the tracks and to two schools, Cardenas and Castellanos, squarely within Latin King turf.  The safety plan, incredibly, says there are "no significant safety concerns." (COC 0000228). CPS' statement is just false.

My own astonishment at such a statement was supported when I spoke to a Latin King leader that said "any black kids coming into King territory would be in for trouble." My own research, several years ago lends support to this idea. After the North Lawndale High School Collins was closed, I was conducting research among Vice Lords and holding inter-generational meetings. The purpose was to try to imbue the spirit of the 1960s CVLs, who "went conservative" and rejected the name "gang," to the younger generation.  The young VLs told me after Collins closed in 2009, they had to fight their way to Little Village High School.  I asked them, since they had to go through both Latin King and 2-6 turf whether the problem was gangs or race. "Race! Race! Race!" they yelled out with anger and emotion. From Los Angeles to Chicago, Latino/African American tensions are escalating and need to be taken seriously in any safety plan.  "No significant safety concerns" makes a mockery of serious safety planning for children in this closing.

### d/ Other Areas. Can we generalize?

I did not have time to go through each of the closings and I am not familiar enough with neighborhoods in each situation without further study. In the three schools above, gangs and racial factors do not seem to have been seriously taken into account by planners. Mr. Tyrell testified that the CPS central planners put a generic model plan into place and specific plans are apparently forthcoming. Nothing I have read in the transition plan documents even spells out how a specific plan would be made and takes for granted that the named schools can be closed with little chance for violence. What my report asserts is that the planning process needs to be careful and specific and take into account gang problems that need more than superficial investigation and hasty bureaucratic decisions. In my opinion, in some schools, like those in North Lawndale, no plan can guarantee an acceptable level of safety.

My method of analysis of the schools in North Lawndale is applicable to other schools where children need to cross gang lines   For example, the closing of Peabody school into Otis is claimed by CPS to result in  "minimal serious or safety concerns." (COC 0000254)  While this closing represents school in gentrifying areas, when I asked a gang leader from the area what he thought, he said Otis was "right in middle of Satan Disciple" turf. The gang in that area, he said, would not take "kindly" to the kids of Harrison Gents parents coming to their school. The Harrison Gents turf surrounds closing Peabody.  The Satan's Disciples have a long history of violence and to say that safety concerns in that school would be "minimal" reflects at best,  a lack of knowledge.

A different issue arises when we travel to far south side schools which are slated to be closed. In some of these cases, CPS appears to recognize there are serious gang problems but plans to go ahead with closures anyway. For example, CPS says closing Garvey and Cohn should proceed even though an intersection children would cross, 103rd and Halsted, is the "*epicenter of violence"* (COC 0000209). Closing West Pullman, Songhai, and Owens is okayed even though Altgeld Gardens, where some students live, *"is isolated with a history of violence"* and perplexingly the report says: "*Large concentration of active gang conflicts and gang boundaries create major safety challenges"* (COC 0000214).  The situation of children crossing dangerous gang lines is similar to North Lawndale

In my research on the consequences of the displacment of CHA tenants, I interviewed many gang members from what they call "the hundreds," the far south side area where many displaced gang members moved. Most had dropped out of school due to violent disputes that were mainly intra-gang. Like on the west side, the far south side has traditional rivalries, intra-gang conflicts, and numerous new gangs which are wild cards in the mix.  Violence is unpredictable and uncontrollable. My analysis of west side schools, that a detailed, specific risk analysis is necessary to truly understand student safety concerns, holds for the far south side and anywhere children must cross gang boundaries.

### e/Special Education Children and Gangs

I have no professional expertise on special education children. My research, like others, has found that gangs are made up of youth from many different kinds of families and are composed of different kinds of individuals. Not all are from troubled families, but most are. Gangs recruit from available youth within a neighborhood and for a variety of purposes. Very young kids, in elementary schools, are useful as look-outs, runners, and for holding drugs and guns for older gang members.

Youth that are cognitively challenged and disabled are at a high risk in the closing process. They are recruited by gangs as well.  Many special education youth are in need of attention and lack self esteem. Gangs provide those qualilties to youth and in turn some of these children form strong attachments to their gangs. These children can be more easily manipulated by older gang members and are sought out for exactly that quality.

For example, I was an expert witness in a gang homicide in Mississipi where a teen from a family of youth with mental retardation and who also had a low IQ, was recruited into a local gang. In a situation of conflict between gang members, the gang leader ordered him to shoot his best friend and in a state of confusion and fear, he shot and killed him, to his later horror.

Of course special education children can also be slow to recognized a dangerous situation or can misread danger. Special education children are clearly more at risk due to the kind of unpredictable gang situation that exists in Chicago today.

### Conclusion

I've drawn my conclusions from my own research and street contacts, and the broader gang research literature. I've also looked over various documents of the plan for "safe passsage" of children through extremely dangerous and volatile gang areas.  In my opinion, the new, changed situation in Chicago of gang violence has not adequately informed the school closing planning process.

a/The current CPS school closing plans puts children from many closing schools at serious risk of gang violence.
b/The travel of children between some schools will aggravate tensions between gangs and literally puts some children in the line of fire

c/ The "safe passage" plan does not appear to recognize the importance for security of a drastically changed pattern of gang violence in Chicago today.

d/ Special education students are particulary at risk for gang recruitment and vulnerable to violence.

e/ The closing plans for schools where children would have to cross gang boundaries should be delayed at least a year, to protect students from substantial harm and violence. This will allow for a more interactive, informed community involved planning process. It will permit CPS to develop a plan with special attention to specific gang issues and make closing decisions based on the safety of children.

I am aware that training for safe passage has commenced and I have reviewed the contracts. It is difficult to understand what the communty volunteers will do if violence breaks out. In fact, the CPS plan puts them at high risk as well as the children. Walking along with a group of kids does very little if a gang member has a gun. If the volunteers "call 911" that hardly protects anyone. A Chicago police official said simply to me, "How can that (calling 911) protect kids?" What he meant was consistent with the analysis in this report. If violence is spontaneous and unpredictable, calls to 911 as Safe Passage volunteers are advised to do under the CPS plan would occur only after violence has broken out and are not a plan to keep children safe.

I also did not see anything that recognized that not all kids go to school on time and how stragglers or kids who just come in late to school would be protected by the safe passage volunteers. The shallowness of the safety plans for schools where children need to cross gang boundaries seems to me to require a delay and call for developing a more prudent, informed plan of how to deal with gang conflicts. In some situations, as in North Lawndale, it seems to me that the school closings themselves are ill-advised and no plan can assure children that they will be safe.

_____

John M. Hagedorn, PhD.
Professor,
Criminology, Law & Justice

John M. Hagedorn, PhD.
Professor,
Criminology, Law & Justice

12



# EXHIBIT 3

| School Id | Community | School | Status | IEP 20th day | STLS | Total enrollment | White students | Black students | Hispanic students |
|---|---|---|---|---|---|---|---|---|---|
| 609775 | Englewood | Altgeld | Closing | 60 | 29 | 443 | 0 | 436 | 5 |
| 610156 | Austin | Armstrong L. | Closing | 27 | 18 | 98 | 0 | 95 | 3 |
| 609781 | Bronzeville | Attucks | Closing | 39 | 131 | 275 | 0 | 273 | 1 |
| 610265 | Englewood | Banneker | Closing | 52 | 27 | 337 | 0 | 332 | 4 |
| 610365 | Garfield - West Humboldt | Bethune | Closing | 52 | 49 | 377 | 0 | 373 | 0 |
| 610161 | Englewood | Bontemps | Closing | 23 | 32 | 314 | 0 | 313 | 1 |
| 610280 | South Shore | Buckingham | Closing | 35 | 4 | 35 | 0 | 34 | 1 |
| 610243 | Garfield - West Humboldt | Calhoun North | Closing | 45 | 3 | 314 | 0 | 312 | 1 |
| 610018 | Hyde Park | Canter Middle | Closing | 34 | 5 | 228 | 3 | 210 | 9 |
| 609881 | Garfield - West Humboldt | Delano | Closing | 20 | 62 | 395 | 0 | 390 | 5 |
| 610266 | Woodlawn | Dumas | Closing | 34 | 16 | 331 | 0 | 328 | 0 |
| 609906 | Austin | Emmet | Closing | 30 | 81 | 458 | 0 | 454 | 1 |
| 609916 | Woodlawn | Fermi | Closing | 65 | 25 | 237 | 0 | 234 | 2 |
| 400095 | Garfield - West Humboldt | Garfield Park Prep Acad | Closing | 14 | 29 | 154 | 0 | 150 | 3 |
| 610348 | Garfield - West Humboldt | Goldblatt | Closing | 22 | 38 | 236 | 0 | 230 | 5 |
| 609913 | Englewood | Goodlow Magnet | Closing | 39 | 59 | 378 | 0 | 361 | 8 |
| 610240 | North Lawndale | Henson | Closing | 40 | 29 | 252 | 0 | 251 | 0 |
| 609989 | Near West | Herbert | Closing | 92 | 29 | 355 | 0 | 326 | 12 |
| 610020 | Austin | Key | Closing | 48 | 18 | 306 | 1 | 292 | 9 |
| 610023 | Near West | King EL | Closing | 37 | 2 | 284 | 1 | 219 | 51 |
| 610028 | Far South Side | Kohn | Closing | 37 | 18 | 390 | 0 | 387 | 1 |
| 610031 | Humboldt Park | Lafayette | Closing | 132 | 21 | 470 | 11 | 160 | 287 |
| 610045 | Far East Side | Lawrence | Closing | 46 | 24 | 398 | 0 | 389 | 5 |
| 610241 | Garfield - West Humboldt | Marconi | Closing | 23 | 16 | 233 | 0 | 233 | 0 |
| 610058 | Austin | May | Closing | 47 | 17 | 463 | 0 | 460 | 1 |
| 610061 | Bronzeville | Mayo | Closing | 34 | 28 | 408 | 0 | 379 | 4 |
| 610072 | Auburn Gresham | Morgan | Closing | 48 | 8 | 236 | 0 | 229 | 5 |
| 610085 | Near North | Nr North SPED Ctr | Closing | 90 | 2 | 90 | 3 | 61 | 25 |
| 610277 | Bronzeville | Overton | Closing | 35 | 100 | 431 | 1 | 396 | 5 |
| 609932 | Far South Side | Owens | Closing | 35 | 14 | 328 | 0 | 322 | 6 |
| 610273 | Pilsen - Little Village | Paderewski | Closing | 24 | 10 | 172 | 1 | 138 | 33 |
| 610114 | Englewood | Parkman | Closing | 41 | 50 | 231 | 0 | 208 | 20 |
| 610119 | Near North | Peabody | Closing | 39 | 6 | 266 | 2 | 59 | 201 |
| 610395 | Bronzeville | Pershing W. Magnet | Closing | 34 | 1 | 240 | 2 | 227 | 4 |
| 610134 | North Lawndale | Pope | Closing | 24 | 31 | 184 | 0 | 165 | 18 |

| School Id | Community | School | Status | IEP 20th day | STLS | Total enrollment | White students | Black students | Hispanic students |
|---|---|---|---|---|---|---|---|---|---|
| 610320 | Humboldt Park | Roque De Duprey | Closing | 14 | 7 | 92 | 3 | 27 | 62 |
| 610150 | Woodlawn | Ross | Closing | 36 | 27 | 344 | 1 | 341 | 2 |
| 610154 | Garfield - West Humboldt | Ryerson | Closing | 48 | 24 | 399 | 0 | 388 | 10 |
| 610169 | Woodlawn | Sexton | Closing | 31 | 13 | 359 | 0 | 354 | 4 |
| 610160 | Far South Side | Songhai | Closing | 26 | 21 | 317 | 1 | 304 | 11 |
| 610187 | Ravenswood | Stewart | Closing | 44 | 10 | 256 | 6 | 125 | 109 |
| 610189 | Ravenswood | Stockton | Closing | 129 | 37 | 475 | 40 | 250 | 148 |
| 610205 | Ravenswood | Trumbull | Closing | 116 | 2 | 389 | 43 | 57 | 221 |
| 610210 | Humboldt Park | Von Humboldt | Closing | 33 | 10 | 362 | 2 | 163 | 179 |
| 610224 | Far South Side | West Pullman | Closing | 30 | 18 | 301 | 0 | 296 | 3 |
| 610232 | Bronzeville | Williams | Closing | 32 | 35 | 256 | 1 | 251 | 3 |
| 610336 | Bronzeville | Williams Middle | Closing | 31 | 22 | 127 | 0 | 126 | 1 |
| 610285 | Englewood | Woods | Closing | 53 | 63 | 371 | 1 | 365 | 3 |
| 610233 | Englewood | Yale | Closing | 42 | 10 | 186 | 1 | 185 | 0 |
| | | TOTALS | | 2162 | 1331 | 14581 | 124 | 12658 | 1492 |
| | | | | | | | | | |
| School Id | Community | School | Status | IEP 20th day | STLS | Total enrollment | White students | Black students | Hispanic students |
| 610252 | Near West | Dett | Welcoming | 32 | 51 | 202 | 1 | 199 | 2 |
| 609897 | Englewood | Earle | Welcoming | 37 | 38 | 358 | 0 | 348 | 10 |
| 610075 | Near West | Montefiore | Welcoming | 27 | 2 | 27 | 0 | 20 | 7 |
| 610202 | Garfield - West Humboldt | Tilton | Welcoming | 37 | 34 | 303 | 0 | 300 | 2 |
| 610133 | Garfield - West Humboldt | Ward L. | Welcoming | 36 | 30 | 398 | 4 | 382 | 11 |
| 610242 | Ravenswood | Brennemann | Welcoming | 50 | 8 | 320 | 12 | 231 | 52 |
| 610367 | Austin | DePriest | Welcoming | 105 | 56 | 549 | 2 | 516 | 23 |
| 609894 | Bronzeville | Drake | Welcoming | 55 | 10 | 242 | 3 | 226 | 5 |
| 609919 | Woodlawn | Fiske | Welcoming | 32 | 17 | 220 | 0 | 217 | 1 |
| 609943 | Far South Side | Gompers | Welcoming | 46 | 9 | 246 | 0 | 245 | 1 |
| 610005 | North Lawndale | Hughes C. | Welcoming | 26 | 47 | 286 | 0 | 281 | 2 |
| 610368 | Far South Side | Hughes L. | Welcoming | 107 | 13 | 417 | 2 | 407 | 7 |
| 610290 | Englewood | Mays | Welcoming | 23 | 12 | 307 | 0 | 301 | 4 |
| 610293 | Garfield - West Humboldt | Melody | Welcoming | 38 | 8 | 293 | 0 | 285 | 2 |
| 610276 | Bronzeville | Mollison | Welcoming | 26 | 20 | 237 | 0 | 233 | 2 |
| 610153 | Auburn Gresham | Ryder | Welcoming | 72 | 7 | 305 | 1 | 284 | 1 |
| 610213 | Woodlawn | Wadsworth | Welcoming | 25 | 93 | 251 | 0 | 247 | 1 |
| 610110 | Bronzeville | Wells Prep | Welcoming | 10 | 32 | 198 | 0 | 155 | 1 |
| 609791 | Englewood | Bass | Welcoming | 25 | 26 | 336 | 0 | 331 | 3 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 610237 | Bronzeville | Beethoven | Welcoming | 61 | 74 | 389 | 2 | 371 | 5 |
| 609821 | Far East Side | Burnham | Welcoming | 16 | 7 | 268 | 0 | 266 | 2 |
| 610024 | Pilsen - Little Village | Cardenas | Welcoming | 61 | 4 | 657 | 2 | 5 | 648 |
| 609826 | Pilsen - Little Village | Castellanos | Welcoming | 77 | 2 | 545 | 0 | 6 | 538 |
| 610251 | Garfield - West Humboldt | Cather | Welcoming | 41 | 48 | 237 | 0 | 230 | 6 |
| 609852 | Ravenswood | Chappell | Welcoming | 93 | 2 | 493 | 75 | 24 | 303 |
| 609854 | Humboldt Park | Chopin | Welcoming | 41 | 2 | 267 | 9 | 22 | 211 |
| 610355 | Ravenswood | Courtenay | Welcoming | 85 | 7 | 281 | 59 | 45 | 158 |
| 610004 | Far South Side | Cullen | Welcoming | 34 | 4 | 245 | 1 | 239 | 3 |
| 609900 | Far South Side | Curtis | Welcoming | 42 | 33 | 474 | 0 | 457 | 14 |
| 610313 | Humboldt Park | De Diego | Welcoming | 96 | 3 | 807 | 16 | 82 | 681 |
| 610263 | Woodlawn | Dulles | Welcoming | 52 | 37 | 528 | 1 | 518 | 4 |
| 609904 | Austin | Ellington | Welcoming | 68 | 2 | 337 | 2 | 319 | 14 |
| 610055 | Garfield - West Humboldt | Faraday | Welcoming | 20 | 45 | 184 | 0 | 181 | 1 |
| 609954 | Garfield - West Humboldt | Gregory | Welcoming | 34 | 17 | 330 | 0 | 324 | 3 |
| 609808 | Far South Side | Haley | Welcoming | 54 | 42 | 529 | 0 | 524 | 3 |
| 609969 | Hyde Park | Harte | Welcoming | 53 | | 328 | 10 | 260 | 16 |
| 609971 | Auburn Gresham | Harvard | Welcoming | 41 | 49 | 441 | 1 | 435 | 3 |
| 609985 | Garfield - West Humboldt | Hefferan | Welcoming | 43 | 47 | 251 | 0 | 245 | 2 |
| 610271 | Garfield - West Humboldt | Jensen Magnet | Welcoming | 30 | 6 | 349 | 0 | 334 | 2 |
| 610274 | North Lawndale | Johnson | Welcoming | 45 | 19 | 402 | 0 | 397 | 3 |
| 610208 | Far South Side | Lavizzo | Welcoming | 39 | 46 | 403 | 0 | 398 | 4 |
| 610305 | Austin | Leland | Welcoming | 24 | 5 | 170 | 0 | 167 | 3 |
| 610269 | Ravenswood | McCutcheon | Welcoming | 57 | 115 | 373 | 15 | 179 | 78 |
| 610070 | Ravenswood | McPherson | Welcoming | 138 | 24 | 704 | 65 | 29 | 548 |
| 609793 | Englewood | Nicholson | Welcoming | 48 | 56 | 469 | 0 | 466 | 1 |
| 610107 | Near North | Otis | Welcoming | 99 | 12 | 471 | 22 | 85 | 354 |
| 610126 | Bronzeville | Pershing E. Magnet | Welcoming | 16 | 3 | 249 | 1 | 230 | 13 |
| 610142 | Hyde Park | Ray | Welcoming | 84 | 7 | 676 | 142 | 326 | 63 |
| 610173 | Englewood | Sherwood | Welcoming | 37 | 43 | 312 | 0 | 304 | 5 |
| 610530 | South Shore | South Shore | Welcoming | 31 | 7 | 308 | 0 | 300 | 3 |
| 610223 | Englewood | Wentworth | Welcoming | 56 | 25 | 333 | 0 | 323 | 4 |
| | | **TOTALS** | | **2525** | **1306** | **18305** | **448** | **13299** | **3833** |

Source data:
http://www.cps.edu/Performance/Documents/Datafiles/lep_iep_frl_report_2013.xls
http://www.cps.edu/Performance/Documents/Datafiles/FY13_Racial_Ethnic_Survey.xls

# EXHIBIT 4

# REPORT BY LUCY WITTE

## 254 North Park Avenue

## Indianapolis, IN 46202

## JULY 2013

I have been asked to determine the impact of the closing of Chicago Public Schools (CPS) on students with disabilities. Upon examination of the document describing supports for children in special education, I opine that the plan is vague and aspirational and not concrete as to specific steps that will be taken to prevent harm to children in special education. I further opine that a transition of this kind cannot occur on this rushed timeline. The IEP's I have examined need review and need specific steps to help the children make transition.

## Qualifications

My educational and professional qualifications are detailed in my resume, attached. I have had 37 years of experience in the area of special education. I have been an advocate for students with disabilities with the goal of improving the educational results and functional outcomes for these students. For twelve years I have served in administrative roles in the area of special education. I have been Director of Special Education in the MSD Warren Township Schools, Indianapolis, Indiana, the MSD of Wayne Township Schools, Indianapolis, Indiana, and Executive Director of West Central Joint Services Special Education Cooperative (WCJS). In these administrative roles I was responsible for all aspects of special education including staff supervision and evaluation, IEP implementation and compliance with state and federal special education law. I also supervised the federal grant applications and allocations for federal special education dollars (Part B – 611 and Part C – 619).

As Director of Special Education I have had experience in transitioning students with disabilities from buildings to different buildings due to redistricting or changing from a traditional calendar to a year-round calendar often called balanced calendar and ensuring that the transition was seamless and IEPs were successfully implemented. In my position as Executive Director of WCJS we are currently in a year-long transition phase as 4 out of the 9 member districts withdraw from the cooperative and provide services to their students with disabilities in their own district. In 2007 when I became the Executive Director of WCJS I implemented the "reorganization" of WCJS as students with disabilities (students with significant disabilities, autism, and preschoolers) would be served by the local member districts and not the cooperative.

In 2011 Governor Mitch Daniels appointed and commissioned me to serve as a member on the Indiana School for the Deaf. I have also worked as an adjunct professor at Butler University, Indianapolis, Indiana in the area of special education.

As a special educator in the Greenburg Community Schools system and the MSD of Warren Township, I have participated in numerous Individual Education Program (IEP) meetings. I have also testified on behalf of the MSD Warren Township schools. MSD of Wayne Township schools, and West Central Joint Services Special Education Cooperative. In June 2004 I also testified as an expert witness on behalf of the Indianapolis Public Schools (IPS).

## Work

I have reviewed the following educational documents describing programs and services regarding the plaintiffs' concerns of the closing of the Chicago Public Schools:

- Plaintiffs' current IEP, psychological report and eligibility determination
- "School Actions: Supporting Students with Disabilities, April 12, 2013"
- "Draft Master Plan for Transition Guidelines, May 2013"

## Summary of Educational Records

As I reviewed the current IEP in entirety, I focused on the key components of present levels of educational performance, needs, goals, and services offered in the IEP. I also reviewed the psychological report and eligibility determination to ensure there was a match with the goals and services offered in the IEP.

It is a concern that the IEP's have no goals by which the student's progress can be measured with respect to behavioral and social skills. Because the IEP's are not compliant it will be harder to know whether the children are suffering setbacks as a result of the transition.

Student C.B.

- C.B. is identified as a student with a disability in the areas of Moderate Cognitive Impairment, Autism, and Speech/Language Impairment. He is currently in grade 5.
- Based on present levels of educational performance as stated in the IEP, C.B. is functioning more than 2 grade levels behind his age level peers in all academic areas. C.B. can read all sight words for pre-primer, first, and second grade. Student lacks the comprehension skills to infer, draw conclusions, and find the theme/main idea. Student is unable to follow multiple verbal directions. Student can add/subtract basic math problems using manipulatives with no regrouping. Student rarely communicates with his peers and does not engage directly with any student on his own. C.B. requires close

staff monitoring because he lacks awareness of social situations. Student will follow another student if asked without any understanding of why or why he should not do what is asked of him. C.B. does not communicate with his peer.

- C.B. has goals in the areas of expressive language skills, Language Arts/English/Reading, mathematics, and Biology and Physical Sciences. These goals are not measureable and specific. They are ambiguous. There are not any goals in the area of social skills and reciprocity to address autism, an area of need. The IEP violates IDEA for failing to contain measurable and specific goals and therefore transition must be delayed until compliant. These IEP's are not compliant. Transition must be delayed until IEP's are complaint as students will not be receiving the required services under IDEA.
- The student's Least Restrictive Environment is LRE 3 with 56% of the student's time spent outside the general education classroom

Student I.O.

- Student is identified as a student with a disability in the area of Autism. He is in Grade 3.
- Based on present levels of performance, the student's language arts and math skills are below kindergarten level. The student is working on recognizing letters of the alphabet and recognition of numbers 1 through 10. I.O. is functioning at the 4th percentile compared to peers and also has low Vineland Scores. The student also had significant delays in expressive/receptive language skills. His intellectual functioning is significantly reduced. The student is physically aggressive. He has difficulty with transition and requires adult supervision. The student requires prompting/modeling for socially appropriate behaviors and is unaware of safety concerns. I.O. is unable to answer personally identifiable questions and has difficulty understanding directions.
- The student has goals in the areas of Language Arts/English/Reading, mathematics, biology and physical sciences, social sciences, independent functioning, social/emotional, and speech/language. These goals are not measureable and specific. The IEP violates IDEA for failure to contain measureable and specific goals and therefore transition must be delayed until compliant. Without compliant IEP's students will not be receiving required services.
- The student's Least Restrictive Environment is LRE 3 with 71% of the student's time spent outside the general education classroom.

<u>Student V.B.</u>

- Student is identified with a disability in the area of Moderate Cognitive Impairment. V.B. is a student with Down's Syndrome. She is in Grade 1.
- Based on present levels of performance, the student functions in the lower range of a moderate cognitive disability and is significantly below grade level. The student requires one-on-one assistance with all academic tasks and recognizes 5 sight words. The student is at the pre-readiness level. She counts 1 to 5, identifies some letters, and lacks writing skills (scribbles). Adaptive skills are significantly below age expectations and there are significant delays in all functional areas. The student does not know how to make connections with peers and due to decreased attention and awareness she requires supervision from an adult for safety. Comprehension skills are sufficiently below age level and speech is unintelligible.
- The student has goals in the areas of Language Arts/English/Reading, mathematics, biological and physical sciences, social sciences, independent functioning and speech/language. The goals are ambiguous. They are not measureable and specific. The IEP violates IDEA for failing to contain measureable an specific goals and therefore transition must be delayed until compliant. Without compliant IEP's students with disabilities will not be receiving the required services under IDEA.
- The student's Least Restrictive Environment is LRE 3 with 63% of the student's time spent outside of the general education classroom.

## Conclusions/Recommendations

- Based on the document "School Actions: Supporting Students with Disabilities" page 48, staff are being directed to change the minutes on student IEPs. Closing schools offer 400 minutes in academic areas but "welcoming schools" offer 350 minutes. It is critical to keep in mind that the services and supports are determined by the case conference committee and based on <u>individual needs</u>. The development of an IEP is a process that reviews the student's present levels of performance and from these levels needs are determined. Needs then determine the goals which define the needed services and establishes the student's Least Restrictive Environment (LRE). LRE is an entitlement for students with disabilities.
- Chicago Public Schools CANNOT UNILATERALLY change the LRE of a student with a disability . It is a case conference decision that requires parent agreement.
- Based on the document "School Actions: Supporting Students with Disabilities" page 52 the "welcoming schools" are NOT prepared for students with LRE 3. These LRE 3 students are those with the most intense needs and requiring more specialized services

4

from special education staff.  School leadership and all staff must be knowledgeable of disabilities and required services and supports.

- The IEP for a child with disabilities must be "reasonably calculated to confer educational benefit."  Bd. of Educ. of Hendrick Hudson Central Sch. Dist. V. Rowley, 458 U.S. 176 (1982).  An IEP must contain specific goals, and the goals and objectives must provide measurable criteria against which the student's achievement can be measured.  Independent Sch. Dist. No. 701, Hibbing Pub. Sch.v. J.T., 45 IDELR 92 (Minn. 2006).  The IEPs reviewed lacked specific and measureable goals.  The IEPs also lacked Functional Behavior Assessments and Behavior Intervention Plans (BIP) to address physical aggressive behaviors.  Specific strategies, goals, and plans were not evident for developing social skills and interaction for students identified with Autism.

- Advocates for students with disabilities along with parent(s) could challenge the quality and educational benefits of these students IEPS with due process hearings and prevail.  Due process hearings are time consuming and expensive.  The student with disabilities with inadequate IEPs will be at more risk to transition.

- Students with disabilities are particularly more vulnerable to transitions.  Of the 2,459 students with disabilities being displaced from their home school, 63% (1553) experience low self esteem, mental health issues, social and emotional concerns, and cognitive impairments.

- The Plaintiff students have significant cognitive deficits, lack of communication skills, and the inability to negotiate social circumstances and therefore cannot protect and/or defend themselves from gangs, bullying, and assaults.  These school closings will cause irreparable harm to students with disabilities.

- Time is essential to even consider and strategize the closings of schools.  My experience with significant transitions has been a year of preparing/planning before the actual transition occurs to ensure a "safe passage" and successful implementation of IEPs.

- ADA requirements must also be in place and implemented.  These include access to the building, classroom, restrooms, and the playground.  These requirements are necessary to maintain safety.

It is my professional opinion that the closing of the Chicago Public Schools will most likely cause harm to students with disabilities.  The transition is much too fast to ensure proper and successful implementation of IEP's and be compliant with the federal regulations of IDEA.  This fast transition is not in the best interest of students with disabilities and will cause irreparable harm.

Signed:

*Lucy Witte*

_____

Educational Consultant

# EXHIBIT 5

# ROBIN POTTER & ASSOCIATES, P.C.

### A T T O R N E Y S    A T    L A W

**111 East Wacker Drive ♦ Suite 2600 ♦ Chicago, Illinois 60601**
**Telephone [312] 861-1800 ♦ Facsimile [312] 861-3009**
**potteroffice@robinpotter.org**

 445

## ROBIN POTTER & ASSOCIATES, P.C.  BIOGRAPHY

### Background

1.    I am the principal in my firm, Robin Potter & Associates, P.C., composed of myself and six associates. I am admitted to practice in Illinois (1979) and Iowa (1978)(inactive); before the United States District Courts for the Northern and Central Districts of Illinois, the Northern District Trial Bar and the United States Court of Appeals for the Seventh Circuit.

2.    Following law school, I was a staff attorney at HELP Legal Assistance in Davenport, Iowa, where I represented poor people in constitutional, class and impact litigation. I have been in private practice in Chicago since 1979, concentrating in Labor & Employment, Discrimination, Wage & Hour and False Claims Act litigation on behalf of unions, class plaintiffs, individual employees and whistleblowers.  Since 2010, I have been counsel to the Chicago Teachers Union (CTU).

3.    From approximately 1981-1983, I taught Labor Law at Indiana University, Department of Labor Studies (Gary).  I frequently lecture, mentor and write on representing employees and litigating labor & employment, discrimination, class actions, FLSA and False Claims Act cases.

### Organizational Memberships and Officer Appointments

4.    I am a member of the ABA Labor and Litigation Sections and from 1995-2003, served as the Plaintiffs' Chair of the ABA's Labor & Employment Committee, Workers' Dislocation Subcommittee.  I frequently lecture, including at the following: ABA Midyear / annual/ labor & employment and EEOC meetings; ISBA

(Labor Section); National Employment Lawyers' Association [NELA], ATLA (Civil Rights and Individual Employee Rights Sections); the Taxpayers Against Fraud [TAF] (lawyers representing plaintiffs in Qui Tam litigation); the American Federation of Teachers and American Federation of Labor Lawyers' Coordinating Committee [AFL-LCC and AFT];  and the Practicing Law Institute [PLI]. I am a member of the Board of Directors of Advocates for Justice, a New York City based group engaged in nation-wide advocacy and litigation, in public education and other areas of law reform.

5.   After helping to found the National Employment Lawyers Association (NELA), I co-founded the Illinois chapter of NELA, served on the NELA/Illinois Executive Board from about 1988 through March 2000, and as its President from April 1997-1999.  I founded and edited the state-wide newsletter, *the Illinois Advocate.*

6.   In 1996 and again in 2001, I was appointed as a government Election Supervisor overseeing and conducting elections in the Laborers' International Union (LIUNA).   My appointment was pursuant to the Consent Decree between LIUNA and the United States Department of Justice.   In my position as an election supervisor in LIUNA, I supervised a staff of election officers and assistants in Chicago.

7.   In December 2007, I was appointed as the Claims Administrator in *Smith v. NIKE*, Case No.  03 C 9110 (N.D. Il., J. Shadur), a class action race discrimination case.  As the Claims Administrator, I determined the damages to be awarded to the class members pursuant to the Court approved Settlement

8.   In the fall of 2003, I was appointed by the United States District Court for the Northern District of Illinois (J. Urbom), as the Special Master in *EEOC v. The Dial*

*Corporation,* Case No. 99 C 3356 (N.D. IL.), a pattern and practice sexual

harassment case. My work was completed on schedule, in 2003. As the

master, I oversaw all appeals and final approvals of settlement awards to the

class members.

**Speaking Engagements and Writings**

9.     My speaking engagements and writings since 1998, include the following:

* May 1998-2001, Speaker, EEOC Chicago District Office Technical Assistance Program Seminar - Chicago - Speaker, on *EEO Basics and Litigation* and paper
* January 1999- Illinois National Employment Lawyers Association - Moderator and Program Organizer - *Title I of the ADA*
* July 1999 - University of Louisville, Kentucky, Carl Warns Labor & Employment Institute - speaker - *Labor Law Developments* and paper
* November, 1999 - Practicing Law Institute - Chicago - Speaker - *Retaliatory Discharge and Public Policy*, and paper
* January 2001 - Chicago Bar Association Civil Rights Committee - Chicago - Speaker - *Damages In Employment and Civil Rights Cases* and paper
* January 2002 - Chicago Bar Association Labor & Employment Committee - Chicago Panelist - *Recent Developments In Civil Rights Litigation*
* January 2002 - Chicago Bar Association Civil Rights Committee - Chicago - Speaker - *Damages In Employment and Civil Rights Cases* and paper
* May, 2002 - ITLA Civil Rights - Employment Litigation Strategies & Trends Seminar - Chicago - Speaker - *Illinois Retaliatory Discharge & Federal Retaliation* and paper;
* July 2002 - ATLA Annual Convention, Atlanta - Panelist - *Qui Tam* Litigation under the False Claims Act
* October 2002 - Panelist - Practicing Law Institute - Chicago, Workplace Torts, A Plaintiffs' Perspective and paper (annual speaker)
* October 2002 - Program Organizer and Committee - National Employment Lawyers Association Mid-Year Seminar- Chicago - *Evidentiary Issues for The Plaintiff Employment Lawyer*
* December, 2002 - Panelist & Paper - ISBA Labor & Employment Section, Chicago. *Representing Whistleblowers Under the False Claims Act*
* January 2003 - Panelist & Paper - ABA National TeleConference on *Using Expert Witnesses in Labor and Employment Cases, The Trial Stage*
* June 2003 - panelist - National Employment Lawyers Association Fourteenth Annual Convention, Vail, Colorado - Panelist - *Building Your*

*Case Through Depositions - Trial Advocacy Track*

* August 2003 - Panelist & Paper - ABA National Meeting, Section of Labor and Employment, San Francisco - Update: Equal Employment Opportunity - *Review of Desert Palace v. Costa*

* October 2003 - Panelist & Paper - Practicing Law Institute - Chicago - *Workplace Violence*

* November 2003 - Chicago Bar Association - Chicago - Panelist - Labor & Employment Committee - *Desert Palace v. Costa.*

* March 2004 - American Bar Association Labor and Employment Section - Employee Rights and Responsibility Committee Mid-year meeting, Palm Springs, Ca. - Trial Advocacy Track - *Trial Practice Tips*

* June 2004 - Panelist & Paper - National Employment Lawyers Association Annual Convention - *Representing Whistleblowers Under the False Claims Act*

* November 12, 2004 - Panelist & Paper: Illinois Public Sector Labor Relations Law Program, Kent Law School; *Litigating FLSA Cases in the Public Sector.*

* July 2005 - Paper presented - Association of Trial Lawyers of America, Toronto - *Litigating False Claims Act Cases*

* October 2005 - Panelist: Impact Litigation: Representing Workers in Class, Collective and Multiple Plaintiff Actions - *Litigating State Wage & Hour Claims*; National NELA Conference, Cambridge, Mass.

* October 2005 - Panelist - Practicing Law Institute - Chicago, Workplace *Electronic Evidence Discovery & Employment Litigation*

* October 2006 - Panelist - Practicing Law Institute - Chicago, Workplace *Use of Demonstrative Evidence in the Trial of Employment Cases*

* March 2007 - panelist - National Employment Lawyers Association Mid-year meeting, Chicago - *Representing Whistleblowers in Employment and False Claims Act cases*

* October 2007 - Panelist - Practicing Law Institute - Chicago, Workplace *Trial Evidence in Employment Cases - Plaintiffs' View*

* June 2008 Speaker - Contemporary Labor Relations Law, NLRB Region 13, Chicago Kent Law School - *Ethical Conflicts in Employment Cases*

* June 2008 Moderator Representing Whistleblowers - National Employment Lawyers Association Annual Convention, Atlanta.

* August 2008 Presentations to *EEOC* National Excel Meeting - *Ethics for Attorneys,* Chicago

* Fall, 2009 - Panelist - *Retaliation Under the False Claims Act,* Webinar, Taxpayers Against Fraud

* October 2009- Panelist - Practicing Law Institute - Chicago, Workplace *Direct Examination of Retaliation Plaintiff* (live)

* October, 2009 - Panelist and Moderator - *Proving Retaliation Under The*

  *False Clai*ms Act, presented at the Annual Conference of the Taxpayers
Against Fraud, Washington, D.C.
* November, 2009 (ABA National Convention, Chicago)
* November, 2010 (ABA National Convention, Chicago)(Deposing Expert witnesses)
* November 2010 - Panelist and Co-Moderator - *Retaliation Updates* presented at the Annual Conference of the Taxpayers Against Fraud, Washington, D.C.
* 2010 NELA National Convention Committee Member (plans the national annual convention and speakers)
* 2011 NELA National Convention Committee Member
* 2011 NELA National Convention, New Orleans - Moderator, Retaliation Developments - New Laws
* 2012 NELA National Convention Committee Member
* June 2012 NELA National Convention
  Plenary Chair - Defense Playbook in Litigation (San Diego)
* November 2012, Chicago Bar Association, Year in Review with NLRB Regional Director
* March 2013 NELA Mid Year Seminar - Panelist Preventing Wage Theft: Litigating Cases Involving Wages, Hours & Work, Chicago, IL
* October 2013 NELA Fall Seminar Planning Comm. Member - Representing Workers in Whistleblower & Retaliation Actions (Washington, D.C.)
* Author: *Overtime Wages and the Suffer or Permit to Work Standard under the Fair Labor Standards Act*, Illinois Public Employee Relations Report, Spring 2005, Vol.  22, No.  2 (Institute of Labor & Industrial Relations - Univ.  Of Illinois and Chicago-Kent College of Law)
* Author: Employment Litigation and Practice, Matthew Bender, published by the National Employment Lawyers Association, *Duty of Fair Representation Litigation* chapter

## SKILL AND EXPERIENCE

  11. For the last thirty-five years (35) years, I have represented thousands of

employees in civil rights, FLSA, FCA, discrimination, retaliation and employment cases,

seeking to expand and protect the rights of employees and unions, including the

following individual and class cases.  I have handled dozens of cases involving the

False Claims Act or retaliation under the Act.

**False Claims Act Cases (Excludes cases under seal):**

◆ Absher v. Momence, et al., Case No. 04-2889 C.D. Il.; (J. Baker) - FCA- Nursing home abuse case; 2 week jury trial, tried to verdict by Matt Farmer, lead trial counsel, RPA; jury verdict on February 8, 2013 for Government damages in the amount of $3,030,409 trebled to $9,091,227; civil money penalties - 1,729 false claims x $11,000 per claim = $19,019,000; 3730(h) retaliation for Vanessa Absher  ($150,000); 3730(h) retaliation for Christine Mitchell  ($262,320) or a total verdict of $28,522,547; Judgment entered 2-16-13 for $9,503,547 - Government damages in the amount of $3,030,409 trebled to $9,091,227; in favor of the Vanessa Absher for $150,000 and in favor of Christine Mitchell $262,320 (rejecting statutory penalties of $19,019,000 as violative of 8th A excessive fines);

◆ *USA ex rel Chandra*, Case No. 06 C 2191 (J. Holderman); Intervened False Claims Act- Qui Tam Medicare Fraud, $20 million settlement and judgment);

◆ *USA ex rel District Council of Carpenters v. Sound Solutions,* Case No. 09 C 6948 (N.D. Il., J. Nordberg)(intervened case, minority business enterprise fraud);

◆ *USA ex rel Baltazar*, Case No.  09-2167, 635 F.3d 866 (7th Cir. 2011) (J. Norgle) Summary Judgment reversed on public disclosure/original source; USA amicus; Medicare - private carrier fraud;

◆ *Howard v. Urban, et al.,* Case No. 03 C 7668 (J. Leinenweber) - whistleblower, retaliation and fraud case (embezzlement of CHA and HUD funds); numerous *Memorandum Opinions*, on Motions to Dismiss and for Summary Judgment; ($125,000 verdict on retaliation/constructive discharge count);

◆ *USA ex rel Coose v.  ANL*, Case No.  03 C 1949 (J. St. Eve) -Intervened and settled Grant Fraud Case; (2-20-08 Mem.Op. denying M-D on res judicata and affirming doctrine that DOJ, Court and relator approval is required for QT settlements);

◆ *Toomey, et al., v. Maxwell Manor*, Case No.  00 C 1102 (N.D. IL.) - Intervened False Claims Act case - Nursing Home Abuse case, alleged to be a "house of death, terror and filth"; settlement with management company in November 2004 for $1,898,000; $55 million FCA default judgment entered in 1/05 and 3/05 against owner)

◆ *USA ex rel. Dr. Raymond Pollak v. University of Illinois*, et al., Case No. 99 C 710 (J. Leinenweber) - Intervened False Claims Act; partial settlements in 2003 of $2.4 million on Medicare and Medicaid fraud, false hospitalizations in liver transplantation;

◆ *USA ex rel. Grandeau v. Cancer Treatment Centers of America,* Case No. 99 8287 (N.D. IL.l)(J. Moran) - Medicare and Medicaid overbilling - reported decisions, including on motions to compel arbitration of *Qui Tam* claims and to dismiss *Qui Tam* action;

◆ *USA ex rel., Figurski v. Forest Health Systems et al., (J.* Grady)- Case No. 96 C 4663 ($4.1 million settlement of intervened federal False Claims Action; separate retaliatory discharge claims under 31 U.S.C. §3730(h).

### Wage and Hour Cases

◆ *Silva et al. v. Sabatino's, Inc.,* No. 10 C 4226 (J. Pallmeyer) (Fed.R.Civ.P) Rule 23 class action and FLSA collective action certified in wage and hour restaurant case);

◆ *Gillespie et al v. Devry,* Case No. 09 CV 06041 (J. Hibbler- J. Lee)(nation-wide FLSA collective action conditionally certified for college admissions advisors);

◆ *Hall v. Sterling Park District*, Nos. 08 C 50116 and 09 C 50146, 2011 U.S. Dist. LEXIS 48367 (N.D.Ill. 5/4/11)(Mag. Mahoney)(denial of summary judgment in individual wage & hour, age discrimination and retaliation case)(settlement);

◆ *Kuhl v. Guitar Center,* Case No. 07 C 214 (J. Gottschall)(nation-wide FLSA and Rule 23 class for commissioned sales force; class settlement of $2,870,000 - 9000 class members)

◆ *Osorio et al v. Sprint,* 08 C 3228 (J. Darrah) (nation-wide Rule 23 class wage and hour class action for commissioned sales force; class settlement of $2,712,200

◆ *Cruz v. Unilock Chicago, Inc.*, (J. Colwell) 383 Ill. App. 3d 752; 892 N.E.2d 78; 322 Ill. Dec. 831 (1st Dist. 2008); certified class of 300 plant employees under IMWL and IWPCA; class-wide settlement of $1,600,000;

◆ *Lueders et al. v. 3M,* Case No. 08 C 4047 *(J.* Mihm)(C.D. IL); $4,950,000 million overtime / doff & don class settlement for hourly employees at Cordova plant)

- *Millage v. CRC,* Case No. 09 C 5834 (J. St. Eve)(FLSA-W& H case, confidential settlement);

- *Cioe & Mynes v. GVCN, a/k/a Bamboo Room,* Case No. 05 CH 7829 (Cook Co.)(Prevailing parties - default judgment in FLSA and state W & H case; (11-07 Order granting default judgment and 2-15-08 Mem. Op., J. Mary Rochford

- *O'Neil et al. v. Bar Louie,* Case No. 04 CH 8916 (J. Maki)(Class action overtime case - J. Maki

- *Brooker et al. v. Rizzo's Live et al.,* Case No. 06 C 4308 (N.D. IL.)(J. Gottschall); FLSA and class settlement for restaurant workers;

- *Vander Vennett v. AIU, et al.,* (J. Hart),Case No. 05 C 4889 (N.D.IL)(FLSA collective action on behalf of 300 college admissions advisors (confidential settlement)

- *Finnigan v. AIU,* Case No. 03 CH 18335 (J. Quinn)(Cook) IMWL-IWPCA overtime action for college admissions advisors; defense judgment following trial;

- *Skelton-Abbinanti v. AIU,* Case No. 03 C 9009 (J. Kennelly)(N.D. IL.) FLSA and FLSA retaliation case for college admissions advisors; (confidential settlement;

- *Stallings v. City of Chicago,* Case No. 03 C 8977 (J. Holderman) (N.D. IL., FLSA overtime case for City of Chicago crossing guards)(settlement);

- *Muecki v. A-Reliable,* et al., Case No. 01 C 2361 (N.D. Ill.) (J. Kennelly) - Class action -FLSA overtime case for auto parts employees; ruling refusing to compel mandatory arbitration of FLSA claims (confidential settlement);

- *Pauley v. A-Reliable, et al.,* Case No. 01 C 2359 (MJ. Keys); overtime and retaliatory discharge case; (confidential settlement)*;*

- *Guillebeaux v. Riteway, et al.,* Case No. 99 C 1043 (J. Hibbler) FLSA and wage and hour class action for gravel haulers/truck drivers; class settlement;

- *Berry v. NW,* et al., Case No. 98 CH 12167 (J. Foreman)(Cook); overtime class action for 140 hospital employees, settlement of $300,000

- *Bell v. UPS,* Case No. 94 CH 1658 (Cir. Ct. of Cook Co., IL.); $7.25 million settlement of class action overtime case for 3000+ Illinois package car drivers;

◆　*Johnson v. CHA,* Case No. 94 C 7692 (J. Plunkett) (N.D. Il.) $2.5 million settlement in FLSA and Illinois overtime class action for CHA police officers;

## Employment & Retaliation Cases

◆　*Chicago Teachers Union, Local No. 1, AFT v. Bd. of Educ. of Chi., 2011 U.S. App. LEXIS 6395 (7th Cir. Ill., Mar. 29, 2011) - affirming District Court injunction enjoining massive layoffs of teachers; per curiam decision reversing injunction, certifying questions to Illinois Supreme Court; - 2011 U.S. App. LEXIS 11977; 190 L.R.R.M. 3243 (June 13, 2011); rev'd. by Illinois Sup. Ct.*

◆　 *McKinney v. Valley Fire Protection Systems, LLC, et al.*, No. 11 C 8043 (N.D.Ill.) (Feinerman, J. and MJ Kim)(race, age discrimination)

◆　*Blount v.  Stroud, et al.,* 01 L 2330 (Cook County, IL. - J. Goldberg)($3.1 million verdict for retaliatory discharge and retaliation under 42 U.S.C. §1981, November 2005; 376 Ill. App. 3d  935, 877 N.E.2d 49 (1ˢᵗ Dist. 2007)(<u>verdict rev'd.</u> on IDHR preemption grounds); *PLA recon. granted* to Illinois Supreme Court - 232 Ill. 2d 302, 904 N.E.2d 1 (2008)(reversing and remanding to Appellate Court), 395 Ill. App. 3d 8; 915 N.E.2d 925; 2009 Ill. App. LEXIS 553; 333 Ill. Dec. 854; 106 Fair Empl. Prac. Cas. (BNA) 1163 (1ˢᵗ Dist. - Oct. 6, 2009);(denying remaining post-trial appeals and reinstating jury verdict); *Rehearing den.,* 2009 Ill. App. LEXIS 1051 (Ill. App. Ct. 1st Dist., Oct. 2, 2009); defense appeal denied 2010 Ill. LEXIS 160 (Ill., Jan. 27, 2010); *cert den.,* 131 S. Ct. 503 (2010)

◆　*Hall v. Sterling Park District,* Nos. 08 C 50116 and 09 C 50146, 2011 U.S. Dist. LEXIS 48367 (N.D.Ill. 5/4/11)(Mag. Mahoney)(denial of summary judgment in individual wage & hour, age discrimination and retaliation case; settlement before trial);

◆　*Moore v. Board of Trustees,* et al., Case No. 09 C 4470 (MJ Ashman) - whistleblower -retaliatory constructive discharge for exposing misuse of federal funds (confidential settlement);

◆　*Perius v. Abbott,* Case No. 07 C 1251- 2009 U.S. Dist. LEXIS 5590 (N.D. IL. 6-26-09) (J. Coar) granting summary judgment on retaliatory discharge - whistleblower claims;  and 7ᵗʰ Cir. Appeal and Case No. 09 L 8765 (J. Pierce); and Mem. Opinion, 2008 U.S. Dist. LEXIS 83775 (Mag. Brown) - granting and denying in part Motions to Compel and for Protective Orders, 8/20/2008. (confidential settlement)*;*

◆ *Serafinn v. IBT*,(N.D. Il. J. Kendall) jury verdict, upheld on appeal, 597 F.3d 908 (7th Cir. 2010)), (

◆ *West v. Ortho*, 405 F.3d 578 (7th Cir. 2005); (J. Leinenweber); Reversing directed verdict for defense in race discrimination case; remanded for trial; Confidential Settlement);

◆ *Gissendanner v. Gerber, et al.*, Case No. 01 C 5988 (J. Andersen); race discrimination under Title VII and Section 1981) (confidential settlement, January, 2006);

i◆ *Jackson v. Lake Co.*, Case No. 01 C 6528 (J. Lefkow) - ADA case - $325,000 verdict in 11/03 on emotional distress damages (11-7-03); + back pay judgment; (11/04)

◆ *EEOC v. The Dial Corporation,* Case No. 99 C 3356 (J.Urbom) (N.D. IL.) - Court appointed Special Master in classwide sexual harassment case)($450/hour fee paid and approved; Fall 2004);

◆ *Kessel and Meador v. Cook County, et al.,* 00 C 3980 (N.D. Ill.)(J. Amy St. Eve) - 2001 U.S. Dist. LEXIS 10300 (N.D.Ill. July 17, 2001) - jury verdict of $700,000 for Kessel in July, 2003 on Section 1983 / sex harassment claims - all pretrial discovery by Potter & Schaffner; trial by successor counsel;

◆ *Kramarski v. Vill. of Orland Park,* 2002 U.S. Dist.LEXIS 14662 (N.D.Ill. Aug. 9, 2002) - ($1 million settlement, Section 1983/ sex harassment claims; (J. Leinenweber);

◆ *Price, et al. v. ComEd,* Case No. 99 C 5616 (N.D. Il., J. Kennelly)(class action and individual sexual harassment, confidential settlement);

◆ *Eager v. Com Ed,* Case No. 01 C 3159 (J.Bucklo-MJ Mason)(sexual harassment and tort case, confidential settlement);

◆ *Quinn v. Ultimo,* et al., Case No. 99 C 7268 (J. Holderman) (ADA discrimination

◆ *Meeker v. City of Chicago,* Case No. 97 C 8946 (J. Kocoras) - 1998 U.S. Dist. LEXIS 9279 (N.D.Ill. 1998) - $250,000 settlement, ADA case

◆ *Nicosia v. SEIU and Williams,* et al., Case No. 98 C 3903 (J. Lindberg) (LMRDA - removal of union officer)(confidential settlement);

◆ *Gee v. Textile Processors,* 164 LRRM (BNA) 2049 (N.D. Il. 2000)(J. Pallmeyer - J. Kennelly) (representing UNITE union and individual union members; preliminary injunction issued enjoining union merger, following hearings under LMRDA - Title I);

◆ *Rankin v. UPS,* Case No. 96-MI-307598 (Law Division)(retaliatory discharge for filing <u>Bell</u> class action overtime case)(confidential settlement);

◆ *Kennedy v. Commercial Carriers, Inc.,* Case No. 89 CH 11486 (Duncan-Brice)(Cook) - $2,313,142 verdict and interest on behalf of class of truck drivers for breach of lease agreement/contract; *affd.,* 1997 Ill. App. LEXIS 904 (1st Dist. 12/30/97);

◆ *Cook v. McCarron,* Case No. 92 C. 7042 (J. Manning)(N.D. Illinois) - $13.5 million class action settlement on behalf of 15,000 ERISA Fund participants;

◆ *Gaul v. Crawford & Co.,* Case No. 95 C 586 (J. Holderman) (N.D. Ill.) (ADEA/breach of contract case; discovery sanctions and attorneys' fees awarded to plaintiff, with orders for electronic discovery and recovery)(confidential settlement)

◆ *Agretti, et al. v. ANR,* 982 F.2d 242 (7th Cir. 1992) (J. Lindberg) -class settlement upheld - LMRA/LMRDA case;

◆ *Daniels v. L. 597,* 53 FEP 1669 (J. Alesia)(N.D. Ill. 1990), aff'd., 945 F.2d 906 (7th Cir. 1991), *cert. denied*, 112 S.Ct. 1514 (1992) (Title V11, Section 1981 [race] and LMRA jury verdict $321,000; Consent Decree entered, 12/10/93, widespread class relief in individual case);

◆ *Kennedy v. CCI,* 739 F. Supp. 406 (N.D. Ill. 1990) (J. Grady) - class action; union members' rights to pursue independent contract claims against employer upheld; LMRA/Section 301 preemption denied);

◆ *Brooms v. Regal, et al.,* 881 F.2d 412 (7th Cir. 1989) *aff'd in part, rem'g in part*, 44 FEP 1119 (N.D. Ill. 1987)(J. Leinenweber) - Title VII sexual harassment & Section 1981 race discrimination case - established the prevailing reasonable woman standard in sexual harassment cases; (settled following jury verdict for plaintiff on Title VII claims)

◆ *Thomas v. UPS,* 890 F.2d 909 (7th Cir. 1989) - LMRA Section 301 discharge case of Teamster union dissident and reformer; confidential settlement)

◆ *Grant v. Chicago Truck Drivers Union,* 806 F.2d 114 (7th Cir. 1986) -Title I - equal rights, right to vote case;

◆ *Brazinski v. Transport Service Co.,* 159 Ill. App.3d 1061, 513 N.E.2d 76 (1st Dist. 1987) - discharge of union member/whistleblower for filing wage claim in violation of Illinois public policy- (confidential settlement following remand);

◆ *Lynn v. City of Chicago,* Case No. 86 C 2207 (J. Nordberg) -(Section 1983, 1st and 14th Amendment case - City's practice of improperly referring police officers for psychiatric exams enjoined; (confidential financial settlement);

◆ *Glavas v. USWA, et al.,* Case No. 85 C 1077 (J. Mihm) (C.D. Ill.) -jury verdict for plaintiff on LMRDA Title I free speech and unlawful discipline claims; (confidential settlement following jury verdict for plaintiff)(J. Mihm);

◆ *Bassett v. Teamsters Local 705,* 773 F.2d 932 (7th Cir. 1985) (J. Marshall) - LMRA case; futility of exhaustion of internal remedies under IBT Constitution established)(defense verdict at trial);

◆ *Sako v. Teamsters Local 705,* 125 LRRM 2373 and 127 LRRM 2556 (N.D. Ill. 1987) -LMRDA Title I class case - rights to vote, free speech and assembly on contract ratification; (confidential settlement agreement);

◆ *Conroy v. Teamsters Local 705,* 124 LRRM 3229, 3238, 3240 and 3246 (N.D. Ill. 1984-1985); LMRDA Title I class case - rights of free speech and to vote on contracts for union members; (confidential settlement);

◆ *Vallone v. Teamsters,* 755 F.2d 520 (7th Cir. 1985) - LMRDA Title I - Right to Vote on Teamster contracts; summary judgment for defendants on LMRDA under DelCostello statute of limitations; *overruled* and expanded tort limitations period applied in *Cliff v. Int'l Union,* 881 F.2d 408 (7th Cir. 1989).

*Robin Potter*

Robin Potter