IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MANDI SWAN on behalf of herself and her son I.O., DENISE BURNS on behalf of herself and her daughter, V.B., FELICIA BRADLEY on behalf of herself and her son, C.B., on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BOARD OF EDUCATION OF THE CITY OF CHICAGO, BARBARA BYRD-BENNETT, Chief Executive Officer, and CITY OF CHICAGO,<br><br>Defendants. | 13 C 3623<br><br>Judge John Z. Lee<br><br>Magistrate Judge Soat Brown |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Mandi Swan, Denise Burns, and Felicia Bradley (collectively "Plaintiffs") are parents of children who are enrolled in special education programs and attend the Chicago public schools slated for closure before the commencement of the 2013-2014 school year. They have sued the Board of Education of the City of Chicago ("Board"), Barbara Byrd-Bennett, the Chief Executive Officer of the Chicago Public Schools ("CPS"), and the City of Chicago (the "City") (collectively "Defendants"), alleging two violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132. First, Plaintiffs allege that closing the schools as scheduled will disproportionately harm children in special education programs because the closures will not allow sufficient time for students with disabilities to adequately socialize and acclimate to their new schools. Nor will there be enough time, according to Plaintiffs, for CPS administrators to ensure that the Individualized Educational Programs ("IEPs") for the individual students are satisfied at the new schools. Second, Plaintiffs allege that the scheduled closings fail to

reasonably accommodate students with disabilities. Plaintiffs seek an injunction delaying the school closings for at least one year.

The City moves to dismiss Plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(6), arguing that, as a matter of law, the Board, not the City, is responsible for school closings and has the statutory power to delay the closings. For the reasons stated herein, the City's motion is granted, and Plaintiffs' claims against the City are dismissed.

## Background

The following facts are taken from Plaintiffs' Complaint and are accepted as true for purposes of resolving this motion to dismiss. *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010).

On March 23, 2013, CPS's CEO Byrd-Bennett proposed to close fifty-three CPS elementary schools, including the elementary schools that Plaintiffs' children attend. (Compl. ¶¶ 28, 32, 34, 36.) On May 22, 2013, the Board met to approve the closings. (*Id.* ¶ 30.) The City, through the Mayor, appoints the Board members and makes decisions with respect to the revenue available for the education of CPS students. (*Id.* ¶¶ 120-21.)

In their requests for relief, Plaintiffs ask the Court to issue injunctive relief "enjoin[ing] the defendants [including the City] from carrying out the closings for at least a year and until such time as the defendants can assure an orderly process of transition that will minimize the emotional and learning setbacks to the plaintiff class." (*Id.* at pp. 14, 16.) On May 29, 2013, the City moved to dismiss the lawsuit pursuant to Rule 12(b)(6).

## Discussion

Although the City brings its motion to dismiss pursuant to Rule 12(b)(6), the Court's "first task, as it is in every case, is to determine whether we have subject matter jurisdiction" over Plaintiffs' claims against the City. *Grinnell Mut. Reins. Co. v. Haight*, 697 F.3d 582, 584

(7th Cir. 2012). The Court must engage in this jurisdictional inquiry, even if it is not directly raised by the parties. *Hay v. Ind. State Bd. of Tax Comm'rs*, 312 F.3d 876, 879 (7th Cir. 2002) ("[N]ot only may the federal courts police subject matter jurisdiction *sua sponte,* they must.") (internal citations omitted). In this case, the Court must determine whether Plaintiffs have standing to seek the requested injunction against the City. For the reasons discussed below, the Court finds that they do not. Additionally, even if Plaintiffs possess standing to seek alternative forms of relief against the City, *see Bontkowski v. Smith*, 305 F.3d 757, 762 (7th Cir. 2002), they have failed to state a claim upon which relief can be granted and fall short of the pleading standard announced by the Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court will address each of these issues in turn.

I. **Standing for Injunctive Relief**

Article III, section 2 of the United States Constitution "limits the 'judicial power' to the resolution of 'cases' and 'controversies.'" *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). A necessary element of Article III's case-or-controversy requirement is "that a litigant have 'standing' to challenge the action sought to be adjudicated in the lawsuit." *Id.* Whether a litigant has standing is a "threshold question" which the Court must address even if the parties do not raise it, because if the litigants do not have standing, the Court is without authority to consider the merits of the action. *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). Moreover, "standing is not dispensed in gross." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (internal quotations omitted). "[A] plaintiff must demonstrate standing for

each claim he seeks to press and for each form of relief that is sought." *Id.* (internal quotations omitted); *see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 185 (2000).

"[T]he irreducible constitutional minimum of standing contains three elements." *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 495 (7th Cir. 2005) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). A party must have personally suffered an injury-in-fact, which is fairly traceable to the defendant's challenged conduct, and which is likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. The party invoking federal jurisdiction bears the burden of establishing each of these elements. *Id.* at 561.

The third element, commonly referred to as "redressability," "examines the causal connection between the alleged injury and the judicial relief requested. . . ." *Norton*, 422 F.3d at 501 (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984)). "Redressability thus depends upon the relief requested." *Id.* at 502. And there must be a "'substantial likelihood' that the relief requested will redress the injury claimed. . . ." *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 75 n.20 (1978).

Furthermore, even where a plaintiff may have suffered a legally cognizable injury, this does not mean that the redressability requirement is satisfied. *Perry v. Sheahan*, 222 F.3d 309, 314 (7th Cir. 2000) ("Standing does not automatically attach once an ongoing injury is identified."). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998)).

It follows from these fundamental principles that where, as here, a plaintiff seeks an injunction against a defendant, he or she must demonstrate that the defendant to be enjoined has

the authority to effectuate the injunction. *See Turner v. McGee*, 681 F.3d 1215, 1218-19 (10th Cir. 2012) ("As is often the case, redressibility turns on the scope of authority of the defendants. We ask: Could these Defendants, enjoined as [plaintiff] has requested, remedy [plaintiff's injury]?"); *Bronson v. Swensen*, 500 F.3d 1099, 1111 (10th Cir. 2007) ("The redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute.").

Indeed, if a defendant does not have the authority to carry out the injunction, a plaintiff's claim for injunctive relief must be dismissed because the Court cannot enjoin a defendant "to act in any way that is beyond [the defendant's] authority in the first place." *Okpalobi v. Foster*, 244 F.3d 405, 426-27 (5th Cir. 2001) (dismissing claims for lack of jurisdiction because "these defendants have no powers to redress the injuries alleged"); *see also Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1074-75 (9th Cir. 2010) (plaintiffs lacked standing as to defendant Park Service because it was not the lead agency responsible for the project in dispute); *Scott v. DiGuglielmo*, 615 F. Supp. 2d 368, 373 (E.D. Pa. 2009) ("If the defendants have no power to redress the alleged injuries even if the court were to grant the requested relief, the plaintiff has no case or controversy against those particular defendants"); *Snyder v. Millersville Univ.*, No. 07-1660, 2008 WL 5093140, at *12 (E.D. Pa. Dec. 3, 2008) ("In proceeding instead only against individuals who do not have authority to afford her the desired relief, however, Plaintiff's request for a mandatory injunction necessarily fails."); *Williams v. Doyle*, 494 F. Supp. 2d 1019, 1024 (W.D. Wis. 2007) ("a claim for injunctive relief can stand only against someone who has the authority to grant it."); *Libertarian Party of Ind. v. Marion Cnty. Bd. of Voter Registration*, 778 F. Supp. 1458, 1461 (S.D. Ind. 1991) (plaintiff

lacked standing as to certain defendants because they did not have the authority to carry out the relief requested).

In this case, Plaintiffs seek to enjoin Defendants, including the City, "from carrying out the [school] closings for at least a year." (Compl. at pp. 14, 16.) But, as Plaintiffs acknowledge, under Illinois law, the City does not have the legal authority to keep the schools open – only the Board does.

Illinois statutes provide that cities – like Chicago – with a population exceeding 500,000 must "maintain a system of free schools *under the charge of a board of education.*" 105 Ill. Comp. Stat. 5/34-2 (emphasis added). The Board is a "body politic and corporate" and "may sue and be sued in all courts and places where judicial proceedings are had." *Id.* The Board "exercise[s] general supervision and jurisdiction over the public education and the public school system of the city." *Id.* 5/34-18. The Board also has the authority to levy taxes for the purpose of establishing and supporting schools (*id.* 5/34-53), adopt budgets (*id.* 5/34-43), and determine appropriations (*id.* 5/34-45). Most significantly for our purposes, only the Board can approve "school actions," which include "any school closing[s]" or "school consolidation[s]." *Id.* 5/34-200, 225. Plaintiffs do not challenge the validity of these statutes and have conceded on numerous occasions that "the lawful authority to make decisions affecting the closings of the schools or the impact on children in special education is a statutory authority that formally and exclusively belongs to the Board." (Pls.' Resp. 7.)

In short, as Plaintiffs recognize, the Illinois legislature has empowered the Board, not the City, to administer CPS. Thus, even if Plaintiffs were to prevail in their claims against the City and this Court were to grant the injunctive relief they seek, the City would lack the power to carry out the injunction. In effect, Plaintiffs ask this Court to order the City to act in a manner

6

that Illinois law prohibits; this the Court will not do. For these reasons, Plaintiffs lack standing to pursue their injunctive relief against the City, and those claims must be dismissed.[1] But this does not end the Court's analysis.

## II. Stating a Claim Under Rule 12(b)(6)

That Plaintiffs demand from the City relief to which they are not entitled does not categorically doom their complaint. *See Bontkowski*, 305 F.3d at 762. In such circumstances, the Seventh Circuit has observed that "[i]t would be appropriate and indeed quite sensible for a judge confronting a complaint that does not demand proper relief to ascertain whether the plaintiff wants the improper relief sought in the complaint or nothing; if so, the complaint must be dismissed." *Id.* Because Plaintiffs may have alternative forms of relief in mind, the Court also analyzes the sufficiency of Plaintiffs' complaint in light of the City's motion under Rule 12(b)(6).

The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of the complaint. *Christensen v. Cnty. of Boone*, 483 F.3d 454, 458 (7th Cir. 2007). To survive a Rule 12(b)(6) challenge, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal citations omitted). Although Rule 8 "does not require 'detailed factual allegations,'" "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "To survive a motion to dismiss, the plaintiff

---

[1] Plaintiffs also seek an order declaring that the City "ha[s] threatened to violate the rights of plaintiffs and the plaintiff class under Title II of the ADA." (Compl. at pp. 14, 16.) However, because the City has no statutory authority to redress Plaintiffs' injury, the request for declaratory relief in and of itself does not confer upon Plaintiffs the standing they require. *See Perry*, 222 F.3d at 314 (no standing where injunction or declaratory judgment will not redress plaintiff's injury); *see also Valley Forge*, 454 U.S. at 471 (noting that the "requirements of Art. III are not satisfied merely because a party requests a court of the United States to declare its legal rights").

must do more in the complaint than simply recite the elements of a claim. . . ." *Zellner v. Herrick*, 639 F.3d 371, 378 (7th Cir. 2011). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Rather, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Id.*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In this case, Plaintiffs allege that Defendants have violated Title II of the ADA by deciding to close CPS elementary schools before the 2013-2014 school year. Title II of the ADA prohibits (1) the exclusion of otherwise qualified persons with a disability from participating in or receiving "the benefits of the services, programs or activities of a public entity," and (2) a public entity from discriminating against an individual on the basis of a disability. 42 U.S.C. § 12132. To state a Title II claim, a plaintiff must allege that he was excluded from participation in a public entity's program because of his disability. *See* 42 U.S.C. § 12132; *Glick v. Walker*, 272 Fed. App'x 514, 520-21 (7th Cir. 2008); *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 750 (7th Cir. 2006).

Plaintiffs' claims against the City alleging that it has discriminated against their children by deciding to close certain schools must be dismissed, because the City did not possess the legal authority to close the schools in the first place. As discussed above, pursuant to the Illinois School Code, the Board, not the City, administers CPS. *See* 105 Ill Comp. Stat. 5/34-2. The Board is a separate corporate entity that can sue and be sued; it has the exclusive authority to

8

adopt budgets and close schools. *Id.*, 5/34-18, 43, 200, 225. Thus, although the City is *a* "public entity" under Title II, it is not *the* "public entity" that provides CPS services, programs, or activities. For this reason alone, Plaintiffs' Title II claims against the City must be dismissed.

In response, Plaintiffs argue that their claims against the City are proper because, as alleged in the Complaint, the City, through the Mayor, "control[s] the Board and control[s] whether and how many schools will be closed." (Pls.' Resp. 1.) Plaintiffs acknowledge that the City "has no legal right to make day-to-day or even year-to-year decisions about the operation or funding of Chicago Public Schools" and that "the lawful authority to make decisions affecting the closings of the schools . . . formally and exclusively belongs to the Board." (*Id.* 6.) But Plaintiffs nevertheless contend that the City, through the Mayor, has ignored this legal separation and exercised control over the Board by appointing Board members, "mak[ing] the decisions with respect to the revenue available for the education of children in the Chicago public schools," and treating the Board "as an instrumentality of the City." (Compl. ¶¶ 120-23.) Importing a concept from corporate law, Plaintiffs argue that the Board is the City's alter ego and that the Court should pierce the Board's corporate veil to reach the City.

Plaintiffs have provided no legal authority to support their veil-piercing theory in the context of municipal entities like those at issue here, and the Court finds none. "Under Illinois law,[2] a corporation is a legal entity separate and distinct from . . . other corporations with which it may be affiliated." *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569 (7th Cir. 1985) (citing *Main Bank of Chi. v. Baker*, 427 N.E.2d 94, 101 (Ill. 1981)). This separateness protects a corporation's stockholders and owners from unlimited liability for the corporation's actions and "is the rule to which piercing the corporate veil is a stringently applied exception."

---

[2] Illinois law applies the law of the state of an entity's incorporation to veil piercing claims. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 378 (7th Cir. 2008); *Retzler v. Pratt & Whitney Co.*, 723 N.E.2d 345, 354 (Ill. 1999).

*Chi. Florsheim Shoe Store Co. v. Cluett, Peabody & Co., Inc.*, 826 F.2d 725, 728 (7th Cir. 1987) (citing *Van Dorn Co.*, 753 F.2d 565)). *See Cosgrove Distribs., Inc. v. Haff*, 798 N.E.2d 139, 141 (Ill. App. Ct. 2003) ("Courts are reluctant to pierce the corporate veil."). "Illinois law permits veil piercing when two separate prongs are met: (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Wachovia Secs., LLC, v. Banco Panamericano, Inc.*, 674 F.3d 743, 751-52 (7th Cir. 2012) (internal quotations omitted). Put another way, the party seeking to set aside the corporate identity of one entity as the alter ego of another "must bear the burden of establishing that the corporation was so controlled and manipulated that it had become a mere instrumentality of another, and, furthermore, that misuse of the corporate form would sanction a fraud or promote injustice." *Chi. Florsheim Shoe Store Co.*, 826 F.2d at 728; *see In re Estate of Wallen*, 633 N.E.2d 1350, 1357 (Ill. App. Ct. 1994) ("A party seeking to pierce the corporate veil has the burden of making a substantial showing that one corporation is really a dummy or sham for another . . . and courts will pierce the corporate veil only reluctantly.") (internal quotations omitted). In determining whether the requisite degree of control is maintained by one corporation over another, Illinois courts consider several factors, including (1) the failure to maintain adequate corporate records or to comply with corporate formalities; (2) the commingling of funds or assets; (3) undercapitalization; and (4) one corporation treating the assets of another corporation as its own. *Main Bank of Chi.*, 427 N.E.2d at 102.

It bears repeating that Plaintiffs have offered no Illinois or Seventh Circuit authority that applies a corporate veil-piercing theory to hold a municipality liable for the actions of a

statutorily-created independent corporation.[3] Other courts, however, that have addressed this issue have refused to apply corporate veil-piercing theory in the municipal context. For example, in *Foster Wheeler Energy Corp. v. Metro. Knox Solid Waste Auth., Inc.*, 970 F.2d 199, 202 (6th Cir. 1992), plaintiffs sought to hold the city and county liable for the contractual obligations of a separately incorporated metropolitan waste authority, whose board of directors the city and county appointed, because the city and county allegedly exercised "complete dominion and control" over the waste authority. The Sixth Circuit reversed the trial court's denial of the city and county's motion to dismiss, noting that "there is no [state] case law which gives a plaintiff the express right to pierce the corporate veil of a nonprofit corporation in the municipal context" and "this court is reluctant to extend the corporate veil theory to the present set of facts absent more specific guidance from the [state] courts." *Id.* at 202-03. The Sixth Circuit went on to find that, in any event, the purposes behind the corporate veil piercing doctrine did not apply because the city was not an equity owner of the waste authority and there was no allegation of fraud or tortious wrongdoing. *Id.* at 203.

---

[3] In their response brief, Plaintiffs remark that "taxpayers and citizens can obtain a *writ of quo warranto* when one unit of government invades or usurps the powers of another unit." (Pls.' Resp. 8.) The very next sentence of the brief, however, states: "[b]ut Title II of the ADA is not concerned with the restoration of the proper division of legal authority." (*Id.*) Plaintiffs do not mention the *writ of quo warranto* anywhere else in their response brief or pleadings. A "[q]uo warranto is an extraordinary remedy." *People ex rel. Hansen v. Phelan*, 634 N.E.2d 739, 741 (Ill. 1994). Originally, it was a "writ of right for the crown against one who claimed or usurped any office, franchise or liberty, to challenge by what authority he asserted a right thereto." *Id.* It was a "high prerogative writ" that "could be availed of only by the sovereign." *Id.* Today, private parties can bring an action in *quo warranto*, but only by leave of court, and the decision to grant or deny a petition for leave to file a *quo warranto* action is a matter within the trial court's discretion. *Id.* Plaintiffs do not seek leave to file such a writ nor do they explain whether or how such a writ would be appropriate. The single sentence in their response brief fails to provide the Court with a basis to grant Plaintiffs leave to file a *writ of quo warranto* and constitutes waiver of the issue for the purposes of this motion. *See Kerr v. Farrey*, 95 F.3d 472, 481 (7th Cir. 1996) (failure to develop argument results in waiver).

Similarly, in *Newcrete Products v. City of Wilkes-Barre*, 37 A.3d 7 (Pa. Commw. Ct. 2012), the plaintiff sought to hold the city liable for the debts of a municipal redevelopment authority under a veil-piercing theory. Plaintiff alleged that the city, through the mayor, appointed the redevelopment authority's members and that the city operated the authority "with near absolute control as its alter ego." *Id.* at 11. The Pennsylvania appellate court held that "the doctrine of piercing the corporate veil is wholly inapplicable to the relationship between redevelopment authorities and municipalities." *Id.* at 13. As the court explained, while the veil-piercing doctrine was "a means of assessing liability for the acts of a corporation against an equity holder," "a redevelopment authority is not authorized to sell ownership interests," nor was the city "capable of being an equity interest holder in the Authority." *Id.* at 13-14.

The Court finds the reasoning of these cases persuasive. Here, Plaintiffs have provided no Illinois law or other authority that confers upon Plaintiffs the right to pierce the corporate veil of a statutorily-created corporation to reach a municipality. In fact, the traditional veil-piercing analysis employed by the Illinois courts is ill-suited to these circumstances. For example, the Illinois veil-piercing doctrine requires the parties to have a "unity of interest and ownership." *Old Orchard Urban Ltd. P'ship v. Harry Rosen, Inc.*, 904 N.E.2d 1050, 1061 (Ill. App. Ct. 2009). But the Board is not authorized to sell ownership interests, and the City is incapable of possessing an equity interest in it. Nor do Plaintiffs allege that the Board and the City are commingling funds or failing to maintain corporate formalities, or that the City is attempting to use the Board to perpetrate a fraud upon Plaintiffs (or why it would even try to do so). Based upon these considerations, coupled with the general reluctance of Illinois courts to engage in veil piercing, the Court declines to apply the principles of corporate veil-piercing here.

But, even if the Court were to accept Plaintiffs' invitation to employ veil-piercing in this instance, Plaintiffs have failed to plead sufficient facts from which the Court can reasonably infer that the Board has abdicated its statutory responsibilities to the City. Plaintiffs' complaint contains only two factual allegations and one conclusory assertion in support of their theory that the City controls the Board. First, Plaintiffs note that the City, through the Mayor, "appoints the Board." (Compl. ¶ 120.) But, it is well-settled law that "the power to appoint is not the power to control." *Takle v. Univ. of Wis. Hosp. & Clinics Auth.*, 402 F.3d 768, 770-71 (7th Cir. 2005) (collecting cases); *see Auer v. Robbins*, 519 U.S. 452, 456 n.1 (1997) (noting that although the governor appointed four of the five-member board of police commissioners, the "board [was] not subject to the State's direction or control in any other respect"). The Board is given the statutory authority to exercise general supervision and jurisdiction over CPS. 105 Ill. Comp. Stat. 5/34-18, 34-43, 34-45, 34-53. The City does not transform the Board into its instrumentality simply by appointing Board members. Indeed, the Mayor of Chicago has long appointed members to the Board, and Illinois courts have repeatedly recognized the legal separateness between the City and the Board. *See, e.g., Schreiner v. City of Chi.*, 92 N.E.2d 133, 138 (Ill. 1950) (noting that the Illinois legislature provided for public schools to be "under the charge of a board of education . . . appointed by the mayor" and that "although the territory of the city [of Chicago] and the school district is coterminous, and some of the officers perform dual duties, they are two separate organizations" because "the City of Chicago is a municipal corporation, and the statute likewise provides that the board of education is a 'body politic and corporate.'"); *Fifth Third Union Trust Co. v. Cont'l Ill. Co.*, 81 F. Supp. 350, 350 (N.D. Ill. 1948) (recognizing that "the City of Chicago and the Board of Education of Chicago exist as separate and distinct corporate entities").

13

Second, Plaintiffs allege that the City "makes the decisions with respect to the revenue available for the education." (Compl. ¶ 122.) But again, the Board, not the City, possesses the legal authority to levy taxes, adopt budgets, and determine appropriations for Chicago's public schools. 105 Ill. Comp. Stat. 5/34-18, 43, 45, 53. Furthermore, even if the City were to provide some funding to CPS, "[t]o make funding entities responsible for the statutory violations of funding recipients would stretch the contours of Title II [of the ADA]." *Bacon v. City of Richmond*, 475 F.3d 633, 642 (4th Cir. 2007). Title II does not "impose guarantor liability or make funding entities ADA insurers for funding recipients." *Id.* "To the contrary, the plain text of Title II limits responsibility to public entities that discriminate against or exclude persons with disabilities from the services, programs, or activities administered by the entity." *Id.* "To hold that a city or State by virtue of its funding authority is liable for injury caused solely by a separate and independent corporate body is a novel and unprecedented theory." *Id.* (reversing the denial of the City of Richmond's motion to dismiss plaintiff school children's Title II claims because the Virginia legislature had vested exclusive control over the city schools in the legally separate and independent Richmond Board of Education).

Finally, Plaintiffs' complaint contains the bald pronouncement that the City "treats the Board . . . as an instrumentality of the City" (Compl. ¶ 122), but sets forth no additional facts to support this conclusion. A pleading that offers only "labels and conclusions . . . will not do." *Twombly*, 550 U.S. at 555. Perhaps realizing their predicament, Plaintiffs provide copies of a press release from the Mayor's office and six news articles that they contend "make it more than 'plausible' that the Mayor and the City control the Board of Education, including in deciding which and how many schools to close." (Pls.' Resp. 6.)[4] The strongest language in these

---

[4] Although the articles are not part of Plaintiff's complaint, the Court may consider materials attached to a response to a motion to dismiss if those materials elaborate on the factual allegations

attachments appears in a press release in which the Mayor states that he has "*directed* CPS to implement a moratorium on CPS facility closures" after the current closures are complete. (Pls.' Resp. 5, Ex. A, Mayor's Press Release 1 (emphasis added)). According to Plaintiffs, this language demonstrates that the Mayor can dictate when schools closings will occur. (*Id.* 5-6.)

Understandably, few issues incite as much passion or draw as much attention as the education of Chicago's children. In the debate over how to confront the challenges currently facing CPS, various stakeholders and constituencies, including parents, teachers, administrators, public officials, concerned citizens, and others have offered their views on the wisdom and necessity of various competing proposals. It is no surprise then that, as the chief elected official of Chicago, the Mayor has added his voice to this public discourse by giving interviews, making statements, and issuing press releases. Indeed, one could argue that advocating on behalf of the children who attend the public schools in Chicago should be among the Mayor's highest priorities, and one would be exceedingly surprised if he had remained silent during the course of this debate. But the Mayor does not subjugate the Board to him simply by using forceful language, making recommendations, or promising the residents of Chicago that he will push for certain policies. And Plaintiffs have offered no specific facts alleging that the Board, in fact, has abdicated its statutory authority and ceded its powers to the Mayor. The Court recognizes that the Mayor's voice may stand out among the many other voices vying for the Board's ear, but strong language in a press release from the City's top elected official addressing a topic that has been at the center of public debate fails to provide the Court with sufficient facts to raise a reasonable inference that the Board has abdicated to the City its statutory responsibilities of administering CPS.

---

contained in the complaint and are consistent with the pleadings. *See Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

In sum, Plaintiffs have failed to provide any legal authority to support their veil-piercing theory and have failed to provide facts from which the Court may reasonably infer that the Board has relinquished its legal duties to the City such that the legal separation between the Board and the City should be ignored. Thus, the Court dismisses Plaintiffs' claims against the City for this additional and independent reason.

## Conclusion

For the reasons set forth above, the Court grants Defendant City of Chicago's motion to dismiss [36]. Plaintiffs' claims against Defendant City of Chicago are dismissed.

**SO ORDERED**   **ENTER:**

_____
JOHN Z. LEE
**U.S. District Judge**