**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MANDI SWAN on behalf of herself and her son I.O., DENISE BURNS on behalf of herself and her daughter, V.B., FELICIA BRADLEY on behalf of herself and her son, C.B., on behalf of themselves and all others similarly situated,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **13 C 3623** |
| **BOARD OF EDUCATION OF THE CITY OF CHICAGO, and BARBARA BYRD-BENNETT, Chief Executive Officer,** | ) ) ) ) | **Judge John Z. Lee** |
| **Defendants.** | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Mandi Swan, Denise Burns, and Felicia Bradley (collectively "Plaintiffs") are parents whose children are enrolled in special education programs in Chicago public schools that are slated to close before the commencement of the 2013-2014 school year.  They have sued the Board of Education of the City of Chicago (the "Board") and Barbara Byrd-Bennett, the Chief Executive Officer of the Chicago Public Schools ("CPS") (collectively "Defendants"), alleging two violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132.  First, Plaintiffs allege that closing the schools as scheduled will disproportionately harm children in special education programs as compared to their general education peers because the closures will not allow enough time for administrators in the new schools to ensure that the students' Individualized Educational Programs ("IEP") are properly revised and implemented, or for the students with disabilities to adequately acclimate to their new schools.  Second, Plaintiffs allege that the scheduled closings fail to reasonably accommodate students with disabilities.

Plaintiffs request that the Court delay not only the closure of the three schools their children attend – namely, Lafayette, Trumbull, and Morgan elementary schools – but also the closure of the other forty-six elementary schools approved by the Board. To accomplish this, Plaintiffs have filed a motion pursuant to Federal Rule of Civil Procedure 23 ("Rule 23") to certify a class consisting of the "parents of minor children and all children who have IEPs and are currently in special education programs" at all forty-nine elementary schools, as well as the "parents and all minor children with IEPs in the over 50 designated receiving or welcoming schools." But Plaintiffs have failed to establish, among other things, that the members of the proposed class would suffer a common class-wide injury as a result of the closings. For example, Plaintiffs' own expert testified that a significant portion of the students may actually benefit academically, rather than be harmed, from the closings over time. Similarly, although Plaintiffs allege that all children with disabilities will face a disproportionate degree of risk when walking through unfamiliar neighborhoods to their new schools, all three named Plaintiffs have children who will receive transportation services from CPS to and from their schools as detailed in their IEPs. Indeed, the creation, revision, and implementation of an IEP for a particular student is a highly individualized process that is entirely dependent upon the specific needs of the student and his or her unique academic and social surroundings. For these and the other reasons discussed below, Plaintiffs have failed to satisfy the commonality, typicality, and adequacy of representation requirements of Rule 23(a). Plaintiffs have also fallen short of establishing the appropriateness of class-wide injunctive relief under Rule 23(b)(2). Accordingly, Plaintiffs' motion for class certification is denied.

<u>**Background**</u>[1]

On May 22, 2013, the Board approved the closing of forty-nine elementary schools. (Pls.' Mem. Class Cert. 2.) Each of the students at the forty-nine closing schools has been assigned by CPS to one of fifty-two receiving schools. (Defs.' Resp. 1.)

## I. Plaintiff Swan and Her Children "I.O." and "L.O."

Plaintiff Mandi Swan's son, I.O., attended Jean D. Lafayette Elementary School during the 2012-2013 school year. (Compl. ¶ 5.) Lafayette is scheduled to close at the end of the 2012-2013 school year. (*Id.* ¶ 32.)

I.O. has autism and receives special education services pursuant to an IEP. (Defs.' Resp., Ex. F. at 24-25, 29.) Specifically, I.O. receives speech therapy, social work services, inclusion classes, and has access to a sensory room, a life skills room, and a calming room. (*Id.*) I.O. also is eligible to receive transportation services to and from school. (PI Ex. Px 92A at 31.) I.O. will attend Lowell Elementary School in the 2013-2014 school year. (Defs.' Resp., Ex. F. at 31.)

Swan's daughter, L.O., also attended Lafayette during the 2012-2013 school year. (*Id.* 26.) L.O. has a speech disability and receives speech therapy. (*Id.*) Swan also enrolled L.O. at Lowell for the 2013-2014 school year. (*Id.* at 22, 31.) Swan recognizes that her two children will have different transition-related needs. (*Id.* at 48-49.)

---

[1]    The facts cited herein are taken from Plaintiffs' Complaint as well as the parties' briefs supporting and opposing class certification and the accompanying exhibits. Furthermore, during the briefing period and prior to Plaintiffs' submission of their reply brief, the Court conducted a four-day evidentiary hearing to assist the Court in deciding Plaintiffs' motion for preliminary injunction. Testimony and documents introduced at the hearing are also cited in this opinion to the extent that they relate to class certification issues. *See Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010) (stating that "a district court must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits") (citing *Szabo v. Bridgeport Machs. Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)). Testimony presented at the hearing will be cited by transcript page number as "PI Tr. [ ];" exhibits admitted at the hearing will be referred to as "PI Ex. [ ];" deposition designations offered by the parties as part of the preliminary injunction hearing will be referred to as "PI Dep. of [ ]."

## II.   Plaintiff Burns and Her Daughter "V.B."

Plaintiff Denise Burns' daughter, V.B., attended Lyman Trumbull Elementary School during the 2012-2013 school year.  (Compl. ¶ 34.)  Trumbull is scheduled to close at the end of the 2012-2013 school year.  (*Id.*)

V.B. has Down syndrome and receives special education services pursuant to an IEP.  (Defs.' Resp., Ex. G at 19, 22.)  Specifically, V.B. receives social work services, speech therapy, and occupational therapy.  (*Id.*)  Like I.O., V.B. is eligible to receive transportation services to and from school.  (*Id.* 22.)

Students who were enrolled in special education programs at Trumbull, like V.B., could elect to attend either John T. McCutcheon Elementary School or James B. McPherson Elementary School for the 2013-2014 school year.  (*Id.* 29; PI Dx 11 at 10.)  Burns chose McPherson because she thinks that the school will better meet V.B.'s needs, and V.B. has been enrolled at McPherson.  (Defs.' Resp., Ex. G at 37-38.)

Even though V.B. will be transitioning to a new school, Burns believes that her daughter's needs will be met at McPherson.  (*Id.* 38.)  Furthermore, although she worries that V.B. may experience some emotional confusion, Burns thinks that her daughter will be fine.  (PI Dep. of Burns 38-39, 65.)  Burns also testified that she is not worried about her daughter's safety at McPherson and believes that the distance from the new school to her house is acceptable.  (*Id.* 38, 40.)  She expressed concern about students with autism and about teachers who will lose their jobs due to the school closings.  (*Id.* 65, 69.)  She is not opposed to closing some of the other forty-nine schools, but she believes that Trumbull should remain open.  (*Id.* 84-85.)

### III.  Plaintiff Bradley and Her Son "C.B."

Plaintiff Felicia Bradley's son, C.B., attended Garrett A. Morgan Elementary School during the 2012-2013 school year.  (Compl. ¶ 35.)  Morgan is scheduled to close at the end of the 2012-2013 school year.  (*Id.* ¶ 36.)  C.B. suffers from autism and receives special education services pursuant to an IEP.  Specifically, C.B. receives specialized instruction, speech therapy, and transportation services.  (Defs.' Resp., Ex. H. at 20; PI Ex Px 92B.)

CPS has designated William H. Ryder Math and Science Specialty Elementary School as the receiving school for Morgan students, but Bradley has elected to enroll C.B. at Mahalia Jackson Elementary School instead.  (PI Dep. of Felicia Bradley at 24, 26-27.)  She did so because she believes that Jackson has a good program for students with disabilities and is in a good neighborhood.  (*Id.* at 24, 26-27, 29.)  Because C.B. receives transportation services pursuant to his IEP, Bradley has no concerns about C.B.'s safety getting to or coming from school.  (*Id.* at 47.)

### IV.  Plaintiffs' Claims and the Proposed Class Definition

Plaintiffs allege that there is not enough time between the Board's approval of the closing of their children's schools and the commencement of the 2013-2014 school year to ensure that their children's IEPs will be satisfactorily implemented at their new schools.  (Compl. ¶¶ 64-66, 97.)  They also allege that Defendants have not issued specific transition plans that identify and commit specific support services for their children during the transition, and that Defendants have not put in place specific safety plans for their children who will be required to walk through new and unfamiliar neighborhoods in dangerous areas of the city.  (*Id.* ¶¶ 75, 77-78.)  Finally, Plaintiffs allege that the current closing schedule makes it impossible for special education

teachers and clinicians to conduct a transition that will avoid academic and emotional setbacks for their children. (*Id.* ¶ 100.)

Plaintiffs seek to assert their claims as a class on behalf of:

> The parents of all minor children and all children who have IEPs and are currently in special education programs at the 49 elementary schools that the Defendants recommended for closure and which the Board voted to close on May 22, 2013 . . . [and] the parents and all minor children with IEPs in the over 50 designated receiving or welcoming schools.

(Pls.' Mem. Class Cert. 2.)

## Discussion

Plaintiffs seek to certify this case as a class action under Rule 23. "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (internal citations and quotations omitted). "In order to justify a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (internal citations and quotations omitted).

To be certified, a proposed class first must meet each of the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). Once Rule 23(a) is satisfied, the proposed class must fall within one of the three categories enumerated in Rule 23(b): "(1) a mandatory class action (either because of the risk of incompatible standards for the party opposing the class or because the risk that the class action adjudication would, as a practical matter, either dispose of the claims of non-parties or substantially impair their interests), (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior." *Spano v. The Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011).

"Rule 23 does not set forth a mere pleading standard." *Dukes*, 131 S. Ct. at 2551. "On issues affecting class certification . . . a court may not simply assume the truth of the matters as asserted by the plaintiff." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Rather, the named plaintiffs bear the burden of showing that a proposed class satisfies each requirement of Rule 23 by a preponderance of the evidence. *Id.* "Failure to meet any one of the requirements of Rule 23 precludes certification of a class." *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993) (internal citations and quotations omitted). Moreover, "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Dukes*, 131 S. Ct. at 2551 (internal citations and quotations omitted).

Finally, although "as a general principle, a court is not allowed to engage in analysis of the merits in order to determine whether a class action may be maintained[,] . . . the boundary between a class determination and the merits may not always be easily discernible." *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598-99 (7th Cir. 1993) (internal citations and quotations omitted). Consequently, "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* (internal citations and quotations omitted); *see also Dukes*, 131 S. Ct. at 2551 (class certification analysis "[f]requently . . . will entail some overlap with the merits of the plaintiff's underlying claim"). As previously noted, a "district court must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co.*, 600 F.3d at 815; *see Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 889-90 & n.6 (7th Cir. 2011).

Here, Plaintiffs contend that their proposed class satisfies all four requirements of Rule 23(a) and the requirements of Rule 23(b)(2).  In response, Defendants argue that the proposed class fails to satisfy Rule 23(a)'s commonality, typicality, and adequacy requirements, as well as Rule 23(b)(2).  The Court will address each issue in turn.

## I.  Rule 23(a)(2): Commonality

To demonstrate commonality under Rule 23(a)(2), a plaintiff must show that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "It's true that '[e]ven a single [common] question' will do."  *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 497 (7th Cir. 2012) (quoting *Dukes*, 131 S. Ct. at 2556).  "But the Supreme Court explained in [*Dukes*] that superficial common questions – like whether each class member is [a public school student] or whether each class member 'suffered a violation of the same provision of law' – are not enough."  *Id.* (quoting *Dukes*, 131 S. Ct. at 2551).  Rather, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'"  *Dukes*, 131 S. Ct. at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).  The class "claims must depend upon a common contention," and "[t]hat common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Plaintiffs argue that Rule 23(a)(2)'s commonality requirement is satisfied because Defendants used the same criteria to select the forty-nine schools for closure and are implementing the closures pursuant to a uniform policy.  (Pls.' Mem. Class Cert. 7; Pls.' Reply 1.)  But, as Plaintiffs themselves recognize, even if these allegations were true, they alone would not be sufficient.  (Pls.' Mem. Class Cert. 7.)  Under *Dukes*, Plaintiffs also must establish that, as

a result of these criteria and policies, the members of the putative class have suffered "the same injury."

Mindful of this, Plaintiffs articulate three ways in which putative class members will be injured by the closures on a class-wide basis: (1) the current schedule makes it impossible for CPS to revise the students' IEPs and implement them at the new schools to ensure that the students' needs are met; (2) the students will suffer adverse academic and emotional consequences as a result of the closures; and (3) the students will face risks to their safety at a rate disproportionate to their general education peers. *(Id.* 4, 7.) Plaintiffs, however, have failed to establish by a preponderance of the evidence that the putative class members will suffer the asserted injuries on a class-wide basis.[2]

### A.    Adequacy of IEPs

Plaintiffs allege that the school closings will render their children's IEPs inadequate because there is not enough time to revise the IEPs before the commencement of the 2013-2014 school year. (*Id.*; Compl. ¶¶ 64-66, 97.) But as their title suggests, IEPs – Individualized Education Programs – are "highly individualized," *Jamie S.*, 668 F.3d at 485, and Plaintiffs have failed to show that the school closings will render the IEPs of putative class members inadequate

---

[2]     Plaintiffs also contend that Defendants employed a "uniform policy," known as the "Guideline for School Actions," to select the schools to be closed. (Pls.' Mem. Class Cert. 7; Pls.' Reply 1, 3.) In particular, Plaintiffs argue that "Defendants' utilization policy with respect to school closings promulgated disproportionately and discriminatory harmful circumstances on disabled students." (Pls.' Reply 4-5.) But nowhere in their briefs do Plaintiffs articulate what the utilization policy is or how it creates "discriminatory harmful circumstances" other than the purported harms identified here. Plaintiffs cannot rely upon such undeveloped arguments to support certification. *See, e.g.*, *Messner*, 669 F.3d at 823-24. To the extent that Plaintiffs intend to rely upon the "utilization" theory offered by the Plaintiffs in the related case *McDaniel v. Board of Education*, Case No. 13-C-3624, for the same reasons discussed in the Court's order denying certification in that case, the Court finds that the "utilization" theory without more does not satisfy the "common injury" required by *Dukes*.

on a class-wide basis.  Indeed, as we shall see, not even the named Plaintiffs agree with this proposition.

Under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, states, including Illinois, that receive federal funding for the education of disabled children must provide "each child with a disability" with a "written statement," known as an IEP.  The IEP details the child's academic and functional goals, performance, and progress, and outlines the special education and related services the child needs.  20 U.S.C. § 1414(d)(1); *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 181-82 (1982); *Jamie S.*, 668 F.3d at 485.  IEPs are "tailored to each student's specific needs" and are "highly individualized because every child is unique."  *Jamie S.*, 668 F.3d at 485.  A child's IEP is "developed, reviewed, and revised" by an "IEP team" composed of the child's parents, regular education teachers (if the child participates in regular education), special education teachers, related service providers (e.g., speech therapists, psychologists, and social workers), school administrators, and other relevant individuals.  20 U.S.C. § 1414(d)(1)(B).

The IEP team must review the IEP annually and, as appropriate, revise it.  *Id.* § 1414(d)(1)(B)(4).  If, at any time between annual meetings, an IEP team member, including a parent, wishes to revise the IEP, that team member can request an IEP team meeting, and the IDEA sets forth detailed procedures governing the IEP revision process.  *See* 20 U.S.C. § 1415; 34 C.F.R. §§ 300.320-324; 23 Ill. Adm. Code § 226.220(b); *Jamie S.*, 668 F.3d at 486 ("Once an IEP is in place, the school must provide the services listed in it, and the IDEA sets out many rules governing the process of amending an IEP.")  Within CPS, the school must respond to a parent's request for an IEP team meeting within ten days.  (PI Tr. 827.)

As these detailed procedures demonstrate, complying with the IDEA is a "complex and inherently child-specific undertaking." *Jamie S.*, 668 F.3d at 486. Indeed, the IDEA's purpose is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services *designed to meet their unique needs . . .*" 20 U.S.C. § 1400(d)(1)(A) (emphasis added); *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 859 (6th Cir. 2004) ("A 'one size fits all' approach to special education will not be countenanced by the IDEA.").

Here, although every student in the putative class has an IEP, the special education needs of each student are unique, and their IEPs differ as to whether and to what extent a transition to a new school will require a modification to the IEP. First, the more than 2,000 putative class members all experience different types and degrees of disability, falling within multiple different disability categories, including "AU" (autism), "DD" (developmental delay), "SLP" (speech and language), and "EBD" (emotional behavior disturbed). (PI Ex DX24 at 25; PI Tr. 425, 786.)[3] *See* 34 C.F.R. § 300.8 (defining a "child with a disability" as a child diagnosed with one of thirteen different conditions). This variance is evident from the IEPs of the named Plaintiffs' children, which are themselves highly individualized, not only with respect to the particular needs of the child, but also with respect to the recommended instruction, support, and accommodations that the schools must provide. (PI Ex. Px 92A; 92B; 92E.) For instance, Swan's son, I.O., has autism and spends the majority of his day in a self-contained special education class with forty-five minutes per day in a general education class. (Defs.' Resp., Ex. F at 24-25.) He requires paraprofessional support while traveling, eating meals, attending classes, going to the playground, and entering and exiting the bus to go home. (PI Tr. 851.) Like I.O., an

---

[3]     CPS estimated that 2,459 students would be impacted by the closure of the 54 schools that were originally recommended for closure to the Board. Because the Board approved the closure of only 49 schools, the actual number will be slightly less. (PI Tr. 778.)

estimated 450 students in special education programs at the closings schools suffer from a disability that requires them to be enrolled in "cluster" programs where they spend up to 100% of their day in non-general education classes. (*Id.* 778.) On the other hand, Swan's daughter, L.O., spends most of her day in a general education class and receives only speech therapy. (Defs.' Resp., Ex. F at 25.) Like L.O., approximately 75% of the students in special education programs at the closing schools are able to spend from 40% up to 100% of their school day in general education classes. (PI Tr. 778.)

Similarly, although I.O, C.B. and V.B. qualify for transportation services to and from their schools because of their respective disabilities, L.O. does not, and "E.E.," who is a named plaintiff in the related lawsuit, *McDaniel*, and a member of the putative class in this case, does not require any transportation services at all. (PI Ex. Px 92A at 31; 92B at 28; 92E at 27; 92C at 12.) Given the different types and levels of disabilities experienced by the putative class members, Plaintiffs fail to demonstrate that the IEPs of all of the approximately 2,000 putative class members will become inadequate and require revision as a result of the school closures. In fact, named Plaintiff Burns believes that V.B., who has Down Syndrome, will be fine transitioning to McPherson school and that the special needs identified in her IEP will be satisfied there. (PI Dep. of Denise Burns Dep. at 11, 20, 65.)

The need for individualized inquiry as to the adequacy of a student's IEP post-closure was confirmed by Doctor Markay Winston, the Board's Chief Officer for the Office of Diverse Learner Supports and Services and an expert on issues relating to the impact of the school closings on students with disabilities. (PI Tr. 415-16, 421.) Winston testified that students with disabilities cannot be "overgeneralized," and that it is not possible to say that "students with disabilities in general are going to struggle [with transition to new schools.]" (*Id.* 438, 461.)

Winston recognized that some students with a particular disability, like autism, might struggle more than other students with different disabilities, but she noted that even some autism students might not struggle because it is not possible to "generalize based upon a disability label or disability category which children may or may not require transition supports." (*Id.* 426.) Consequently, Winston testified that an IEP team need not meet solely because a school is closing. (*Id.* 464, 467-68, 499-500.) In short, simply knowing that a child has an IEP reveals little about what is educationally appropriate for that child and whether and how a child will be impacted when transitioning from one school to another.

For their part, Plaintiffs offered Lucy Witte, the Executive Director of Special Education at West Central Joint Services Special Education Cooperative, a cooperative of nine school districts in the Indianapolis area, as an expert in special education and the educational impact on disabled students who are moved from one school to another. Witte reviewed the IEPs of I.O., V.B., and C.B., and concluded that they were inadequate because they did not include transition supports and behavior intervention plans. (PI Tr. 111, 122, 124-37.) But, upon cross-examination, Witte acknowledged that these inadequacies would have existed regardless of whether the children's schools were closed. (*Id.* 156.) She also failed to provide any evidence as to how these three IEPs were representative of the over 2,000 other IEPs that are at issue in this case. (PI Tr. 155-56.) *See Jamie S.*, 668 F.3d at 486; *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 774-75 (7th Cir. 2013) (affirming decertification of a class where plaintiffs failed to provide evidence that their selected representatives were, in fact, representative of the entire class). Moreover, Witte was not aware that I.O. and V.B.'s parents had testified that their children's current IEPs were meeting their needs, nor was she aware that CPS had reviewed the IEPs of all of the potentially impacted students in planning the closures, as CPS's Director of

Student Supports in the Office of Diverse Learners Supports and Services, Rebecca Clark, would later testify. (*Id.* 158-59, 778.) Thus, Witte's testimony does not provide the Court with persuasive evidence that the school closings in and of themselves will ineluctably cause the IEPs of all putative class members to be inadequate on a class-wide basis.

Along similar lines, Plaintiffs also argue based upon Witte's testimony that the current schedule for the school closings does not provide enough time to make the necessary revisions to students IEPs. However, whether a parent has had or will have an opportunity to request an IEP meeting in advance of the transfer also necessitates individualized inquiry. As Clark testified, CPS has allocated funding for IEP team meetings for those parents who request such meetings, and IEP team meetings are taking place throughout the summer. (PI Tr. 792, 827, 866.) CPS has also called all parents of students with IEPs who attended closing schools to ask if the parents had any concerns about the implementation of their child's IEP at the receiving school. (*Id.* 814-15.) And CPS has held meetings where parents could express their concerns about the closings and talk with receiving school staff about their child's IEP. (*Id.* 791, 809.)

Here too, Plaintiffs' own experience undercuts their class certification theory. Swan attended two transition meetings, one at I.O.'s closing school and one at his receiving school. (*Id.* 809-13.) At the meetings, she and the other parents were invited to raise any concerns they had about their child's IEP and informed of opportunities to revise IEPs, if necessary. (*Id.* 813.) Swan did not express any concern that I.O.'s welcoming school would not meet his IEP needs. (*Id.*) It is apparent from the evidence, which is largely uncontested, that parents could have requested IEP meetings for their children during the summer, and some in fact did so and have already participated in such meetings. Therefore, Plaintiffs have failed to establish on a class-

wide basis that the current schedule provides insufficient time for the putative class members to have their IEPs revised for their new school environment.

Plaintiffs attempt to sidestep these individual factors by arguing that "Defendants' decision to delegate to the receiving schools the determination whether the IEP teams need to review and revise students' IEPs is a violation of the ADA." (Pls.' Reply 6; *see* Pls.' Mem. Class Cert. 4.) But this argument is also unavailing. Not only do Plaintiffs fail to offer any legal authority for this proposition, but similar efforts to circumvent the common injury rule by arguing that "the policy is there is no policy" were specifically rejected in *Dukes*. *Dukes*, 131 S. Ct. at 2554 ("On its face, of course, [a policy of allowing discretion by local supervisors over employment matters] is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices.").

Finally, the proposed class includes "the parents and all minor children with IEPs in the over 50 designated receiving or welcoming schools." The children of the named Plaintiffs are all students in closing schools; none of them are from any of the receiving schools. And Plaintiffs have presented no evidence that the IEPs of students at receiving schools will need to be revised simply because new students will be transferring in.[4]

For these reasons, Plaintiffs have failed to demonstrate by a preponderance of the evidence that putative class members will experience inadequate IEPs on a class-wide basis due to the school closings. Without that, Plaintiffs cannot satisfy Rule 23(a)(2)'s commonality requirement as to this claimed injury. *See Falcon*, 457 U.S. at 157; *Jamie S.*, 668 F.3d at 497

---

[4]     Plaintiffs offer the baffling comment that the "proposed class does not include special education students from non-closing schools or students whose IEP's were properly reviewed by IEP teams." (Pls.' Reply 6.) But Plaintiffs' class definition has no such limitations and expressly includes students at "non-closing" receiving schools.

(vacating the certification of an IDEA class under Rule 23(a)(2) because, although the question "Did [Milwaukee Public Schools] fulfill its IDEA obligations to each child?" was common, "it must be answered separately for each child based on individualized questions of fact and law, and the answers are unique to each child's particular situation.").[5]

### B. Academic and Emotional Harm

Plaintiffs also allege that they and the other putative class members will be harmed academically because of the school closures. But Plaintiffs' own expert acknowledged that a significant number of putative class members may *benefit* academically from the school closings. Dr. Pauline Lipman, a professor of educational policy studies at the University of Illinois in Chicago, identified two studies on the impact of school closings on children's academic achievement: a 2009 study by the Consortium on Chicago School Research ("CCSR Study"),[6] and a 2012 study conducted by the RAND Corporation ("RAND Study").[7] (PI Tr. 5, 7, 9-11.) The CCSR Study found no long term impacts, either positive or negative, on academic achievement for most students as a result of school closings. (CCSR at 14-15.) The study, however, did discover a positive effect for students who were transferred to higher performing

_____

[5] This is not to suggest that a class could never be certified where plaintiffs allege a violation of the IDEA that renders students' IEPs inadequate on a class-wide basis. *See Jamie S.*, 668 F.3d at 498 (acknowledging that a class could be certified if plaintiffs presented "significant proof" that a school district "operated under . . . *policies* that violated the IDEA") (emphasis in original). If, for example, a school district refused to draft IEPs at all or adopted a blanket policy of refusing to provide parents with IEP team meetings upon request, plaintiffs could point to policies that violated the IDEA in ways that resulted in students suffering the same harm. Here, however, closing a school is not a "polic[y] that violate[s] the IDEA," and, as discussed, Plaintiffs have failed to establish that a school closing automatically renders an IEP inadequate.

[6] *See* Marisa de la Torre & Julia Gwynne, *When Schools Close: Effects on Displaced Students in Chicago Public Schools*, Chicago: Consortium on Chicago School Research (Oct. 2009). (Defs.' Resp., Ex. K.)

[7] *See* John Engberg, Brian Gill, Gema Zamarro, & Ron Zimmer, *Closing Schools in a Shrinking District: Do Student Outcomes Depend on Which Schools are Closed?*, 71 J. URBAN. ECON. 189 (2012).

schools.  (*Id.* 14-15.)  Similarly, the RAND Study found that students displaced from schools could experience negative effects on achievement, but those affects could be offset when students move to schools with higher performance.  (*Id.* 17-18, 31.)  The RAND Study also cautioned that it should not be interpreted too broadly because it studied only one school district.  (*Id.* 31.)

Based on these studies and her review of the relevant documents in this case, Lipman concluded that "7 moves [from closing schools to receiving schools] – or just 12.5% – are to schools in the *top quartile of performance* . . . where significant academic gains can be predicted."  (Def. Resp., Ex. H at 4) (emphasis in original).  Lipman reiterated her conclusions at the preliminary injunction hearing, testifying that "12.5 percent [of students from closing schools] were sent to the top quartile schools, where we could expect . . . academic improvement, which means that 87 percent we could expect no improvement, or no difference."  (PI Tr. 28.)  Although the CCSR and Rand Study did not consider students with disabilities specifically, Lipman's testimony calls into question Plaintiffs' contention that putative class members will suffer academic harm on a class-wide basis.  Indeed, it seems likely that a substantial number of students, particularly those transferred to higher performing schools, may actually benefit post-closure.[8]

Plaintiffs also allege that they and the other putative class members will be harmed emotionally by the school closures.  Plaintiffs' expert, Witte, states that "[s]tudents with disabilities are particularly more vulnerable to transitions."  (Pls.' Mem. Class Cert., Ex. 4 at 5.)

---

[8]  Prior to the preliminary injunction hearing, Defendants filed a motion to bar the testimony of Dr. Lipman under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  (Dkt. 96.)  The Court took the motion under advisement.  (Dkt. 107.)  At the preliminary injunction hearing, Defendants did not object to Dr. Lipman's qualification as an expert.  (PI Tr. 9.)  In any event, after considering Dr. Lipman's testimony, the Court now finds that Dr. Lipman is qualified to testify as to the impact of school closings on students who attend the closing schools.  Accordingly, Defendants' motion as to Dr. Lipman (Dkt. 96) is denied.

For support, she notes that "[o]f the 2,459 students with disabilities being displaced from their home school, 63% (1553) experience low self esteem, mental health issues, social and emotional concerns, and cognitive impairments."  (*Id.*)  Similarly, Witte testified at the preliminary injunction hearing that the closures would cause students with disabilities "emotional or physical harm of being displaced" because the students "have issues of low self-esteem because they don't behave . . . like their nondisabled peers."  (PI Tr. 156.)  But to reach this conclusion, she relied solely upon the classification of the students into broad disability categories such as "autism," "emotional disabilities," and "cognitive impairments."  (*Id.* 155-56, 162-63.)  If a student fell into one of those categories, she concluded that the student experienced low self-esteem, mental health issues, social and emotional concerns, and cognitive impairments.  (*Id.* 161-63.)  Although Witte is qualified to opine on school closures and the impact of such closures on students with disabilities generally, she is not a psychologist or psychiatrist by training, she did not evaluate, review, or confirm any of the disability classifications, and she did not review any IEPs of the putative class members, other than those of I.O, V.B. and C.B.  (*Id.* 155-56.)  At the certification stage, however, the Court need not decide whether Witte's conclusion is correct. The Court need only recognize that, by her own admission, Witte's conclusion that putative class members have low self-esteem and hence will suffer harm due to the closings pertains to only 63% of the students with disabilities from closing schools.  (*Id.* 163-64.)  It is entirely unclear how Witte expects the other 27% of disabled students, who presumably do not suffer from "low self-esteem" (or, for that matter, any of the students with disabilities at the receiving schools) to

fare with the transitions.[9]  This fails to provide the Court with evidence that putative class members will suffer emotional harm on a class-wide basis.

As an additional matter, Plaintiffs again have offered no evidence regarding the potential impact of school closures on the academic and emotional state of students in the receiving schools.  Because Plaintiffs have failed to establish by a preponderance of the evidence that putative class members will suffer class-wide academic or emotional harm due to the school closings, their claims as to these purported harms fail to satisfy Rule 23(a)(2)'s commonality requirement.  *See Spano*, 633 F.3d at 588 (noting that a claim "is not common if the alleged conduct harmed some participants and helped others"); *Bieneman v. City of Chi.*, 864 F.2d 463, 465 (7th Cir. 1988) (affirming denial of class certification where some putative class members received a benefit while others experienced harm from the same conduct).[10]

---

[9]      Noting that the children of the named Plaintiffs "have significant cognitive deficits, lack of communication skills, and the inability to negotiate social circumstances and therefore cannot protect and/or defend themselves from gangs, bullying, and assaults," Witte extrapolates this condition to the entire class, claiming that the closings would cause irreparable harm to students with disabilities. (Pls.' Mem. Class Cert., Ex. 4 at 5.)  But, neither Plaintiffs nor Witte explains why this extrapolation is sound.  Indeed, one of the named Plaintiff's own children, L.O., spends most of her day in general education classes, and there is no indication that she lacks skills to acclimate to her receiving school.

[10]     Plaintiffs also cite to the expert report of Laurie Siegel to support their assertions of potential harms. (Pls.' Mem. Class Cert. 1.)  Prior to the preliminary injunction hearing, however, Defendants filed a motion to bar her testimony pursuant to Fed. R. Evid. 702 and *Daubert*. (Dkt. 94.)  This motion was granted in part, while the remainder was taken under advisement. (Dkt. 107.)  During the preliminary injunction hearing, Defendants again challenged Siegel's qualifications to testify as to potential harm.  As a result, Plaintiffs agreed to limit Siegel's testimony to her opinions that (1) there will be inadequate staffing at the receiving schools to handle the influx of transferring students with IEPs and (1) the lack of staffing will cause harm to the incoming students with disabilities. (PI Tr. 215-17; Dkt. 111.)  The Court permitted Siegel to testify as to these limited topics.  But Siegel's testimony does not provide the Court with persuasive evidence that there will be inadequate staffing at all the receiving schools on a class-wide basis.  Siegal admitted that the needs of students in special education programs depend on the individual student. (PI Tr. 248.)  She also stated that she was not aware that no social workers had been laid off because of the school closings or that many, if not all, of the social workers from the closing schools will be transitioning to the receiving schools. (*Id.* 249.)  In fact, Clark testified that clinical staff at the closing schools were not being laid off and instead will be reallocated to the receiving schools based upon a school's particular need. (PI Tr. 831.)

### C. Student Safety

In addition to the potential impacts on a student's IEP and academic and emotional well-being, Plaintiffs allege that students with disabilities will disproportionately face safety risks due to the school closures because they will be required to walk through new and unfamiliar neighborhoods in dangerous areas of the city to their receiving schools. Plaintiffs also contend that Defendants have failed to create school-specific safety plans to ensure their safety. (Compl. ¶¶ 74-75, 77-78.) But again the evidence does not demonstrate that this injury will be experienced, if at all, on a class-wide basis.

First, the class members who are students at the receiving schools will remain at their current locations and will not need to change their routines. They will not be required to walk through new and unfamiliar neighborhoods as a result of the school closings and will not suffer the harmed asserted by Plaintiffs.

Second, not all putative class members who are changing schools will be required to walk alone through new and unfamiliar neighborhoods; many of them will be provided transportation services pursuant to their IEPs or based on the location of their receiving school. (PI Tr. 66.) For example, the IEPs of I.O. and C.B. provide for specialized transportation services to and from school. (*Id.* 103; PI Dep. of Felicia Bradley Dep. 47.) Because of this, Bradley has no concerns about C.B.'s safety getting to or coming from school. (*Id.*) Similarly, students who enroll in a receiving school that is greater than 0.8 mile from the closing school will receive transportation under CPS's transition plan. (PI Tr. 715.) Thus, Plaintiffs have failed to demonstrate that all putative class members will disproportionately suffer greater safety risks as a result of the school closings.

In support of their theory, Plaintiffs offer the export report of Dr. Martin Hagedorn, a professor at the University of Illinois at Chicago who researches Chicago gangs. (Pls.' Mem. Class Cert., Ex. 2.) Hagedorn also testified at the preliminary injunction hearing.[11] According to Hagedorn, as a result of the school closures, students will be forced to walk across unfamiliar gang boundaries and students with disabilities will be especially susceptible to gang recruitment. (PI Tr. 275, 279). But Hagedorn's maps of Chicago gang boundaries demonstrate how the boundaries vary considerably depending upon the particular school and neighborhood at issue. (PI Ex. Px 89B2, 89B4, 89B5, 89B8, 89B11.) Moreover, to arrive at his conclusions, Hagedorn reviewed the closures of only six schools – Pope, Hughes, Paderewski, Peabody, Garvey and Cohn – and he provided no evidence that these six schools are representative of the other forty-three closing schools. (PI Tr. 302; Pls.' Mem. Class Cert., Ex. 2 at 9.) In fact, Hagedorn failed to review even the schools of the named Plaintiffs' children. Hagedorn's limited review is particularly troubling given his belief that gang lines are "fluid and changing." (PI Tr. 303.) Hagedorn himself acknowledges that "[e]ach school closing presents different, unique problems with gangs." (Pls. Mem. Class Cert., Ex 2 at 9.) In short, Plaintiffs have failed to provide evidence that the neighborhoods surrounding all forty-nine schools experience similar levels of gang activity and violence to warrant class treatment.

Furthermore, Plaintiffs fail to explain how Hagedorn's analysis would apply in those instances where students will be remaining at the same location post-closure, such as at Williams

---

[11]     At the preliminary injunction hearing, Defendants objected to the qualification of Dr. Hagedorn as an expert as to whether disabled students experience disproportionately greater exposure to gang violence relative to their peers. (PI Tr. 258) Hagedorn admits that he has no professional expertise with respect to special education children. Accordingly, Hagedorn was not permitted to testify as to whether students with disabilities would be disproportionately exposed to gang violence as a result of the school closures; however, he was allowed to testify as to Chicago gang boundaries and the potential recruitment of disabled students by gang members. (PI Tr. 292.)

school, where Williams is closing, while the receiving school, Drake Elementary, is moving into the building Williams currently occupies.[12]  Lastly, Hagedorn opines that CPS's Safe Passage Program, a safety program that provides adult "community watchers" and neighborhood "safe havens" along specifically designated routes children take to school, is ineffective to address the increased risks to gang violence.  But Hagedorn admitted that he has not evaluated the efficacy of the program as a whole, nor has he reviewed the individual transition plans for each closing school or any documents other than vendor contracts for the program and the deposition of Tom Tyrrell.  (PI Tr. 276, 307-09; Pls.' Mem. Class Cert., Ex. 2 at 11; PI Ex. Dx 60.)  Nevertheless, he found it "most troubling" that CPS had not devised specific safety plans tailored to each receiving school.   (Pls.' Mem. Class Cert., Ex. 4 at 7.)  Since the time of Hagedorn's report, however, CPS has developed such plans.  (PI Ex. Dx 60.)  At the certification stage, the Court need not decide whether Hagedorn's opinion is correct.  The Court need only conclude that numerous variations at both the school level and individual student level preclude a finding of common injury.

In sum, Plaintiffs have failed to establish by a preponderance of the evidence that they and putative class members will "suffer[ ] the same injury" as is required to satisfy Rule 23(a)(2).  *See Jamie S.*, 668 F.3d at 497 (internal citations and quotations omitted).

---

[12]     As Tom Tyrrell, the CPS official who is responsible for managing the closings, testified, there are four different closing-receiving scenarios:  (1) a simple closing where one school is closed, and the students from the closing school are assigned to one receiving school; (2) a scenario where the students of one closing school are assigned to more than one receiving school; (3) a scenario where students from more than one closing schools are assigned to one receiving school; and (4) a reverse consolidation, where the students of a closed school remain in the same location but are combined in that same location with students from the receiving school.  (PI Tr. 698; *see generally* Defs.' Resp., Ex. A (providing examples of the variations)).

## II.       Rules 23(a)(3) & (4): Typicality & Adequacy of Representation

Defendants also argue that Plaintiffs have not satisfied Rules 23(a)(3) and 23(a)(4).  Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  "In many cases . . . the requirement of typicality merges with the further requirement that the class representative 'will fairly and adequately protect the interests of the class.'"  *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011) (quoting Fed. R. Civ. P. 23(a)(4)).  To satisfy Rule 23(a)(3) typicality, "there must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano*, 633 F.3d at 586.  Similarly, to meet Rule 23(a)(4)'s adequacy-of-representation requirement, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (quoting *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

Here, Plaintiffs fail to satisfy the typicality and adequacy elements for a number of reasons.  First, although the proposed class includes "the parents and all minor children with IEPs in the over 50 designated receiving or welcoming schools," none of the named Plaintiffs have children who attend the receiving schools.  What is more, Plaintiffs have offered no evidence that the claims of students in receiving schools are typical of those in the closing schools or that their interests are sufficiently aligned so that they would be adequately represented by Plaintiffs.  Indeed, some of Plaintiffs' alleged harms, such as the purported increased risk of going to new neighborhoods or becoming familiar with a new school environment, will not be experienced by students in the receiving schools at all.

Additionally, many of the issues that cut against commonality also preclude a finding of typicality. For example, in light of Lipman's testimony that 12% of students whose schools will close may benefit from the closures, it may well be that some parents in the putative class welcome the opportunity to attend better performing schools. Plaintiffs have not explained how the named Plaintiffs would satisfy the typicality and adequacy-of-representation requirements as to those class members. Similarly, a number of parents already have requested and participated in IEP meetings to address the individual transitional needs of their child. Those parents, who are putative class members, do not suffer Plaintiffs' alleged harm of inadequate IEPs. Plaintiffs have not explained how they would represent those class members either. These concerns are particularly important in this case, where Plaintiffs are seeking class-wide injunctive relief under Rule 23(b)(2), and individual class members are not provided with formal notice or permitted to "opt out" as in Rule 23(b)(3) classes. In the end, Plaintiffs have failed to establish by a preponderance of the evidence that they have satisfied the typicality and adequacy requirements of Rule 23(a)(3) and (4).

### III.    Rule 23(b)(2): Injunctive Relief

Finally, under Rule 23(b)(2), Plaintiffs must show that Defendants "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." *See* Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 131 S. Ct. at 2557 (internal quotations omitted). "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.* (emphasis in original); *Jamie S.*, 668 F.3d at 499. Moreover,

"[t]hat the plaintiffs have superficially structured their case around a claim for class-wide injunctive and declaratory relief does not satisfy Rule 23(b)(2) if as a substantive matter the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made; this kind of relief would be class-wide in name only, and it would certainly not be final." *Jamie S.*, 668 F.3d at 499 (citing *Dukes*, 131 S. Ct. at 2557.)

Here, Plaintiffs have failed to establish that the injunctive relief they seek – keeping the schools open for at least one year – would provide relief that would benefit the entire putative class. Although Plaintiffs have structured their case around a claim for class-wide injunctive relief, for the reasons discussed above, whether their requested relief would benefit or harm each putative class member would require an individualized determination. Thus, Plaintiffs have failed to satisfy the requirements of Rule 23(b)(2). *See Kartman*, 634 F.3d at 893 n.8 ("Where a class is not cohesive such that a uniform remedy will not redress the injuries of *all* plaintiffs, class certification is typically not appropriate.") (emphasis in original); *Casa Orland Apartments, Ltd. v. Fed. Nat'l Mortg. Ass'n*, 624 F.3d 185, 200 (5th Cir. 2010) (finding that Rule 23(b)(2) certification was not appropriate when only some of the proposed class members would benefit from the injunction); *Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994) ("What is important [under 23(b)(2)] is that the relief sought by the named plaintiffs should benefit the entire class.").

## **Conclusion**

For the reasons herein, the Court denies Plaintiffs' motion for class certification [14].


**SO ORDERED**                    **ENTER:  8/9/13**

_____
**JOHN Z. LEE**
**U.S. District Judge**