**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MANDI SWAN on behalf of herself and her son I.O., DENISE BURNS on behalf of herself and her daughter, V.B., FELICIA BRADLEY on behalf of herself and her son, C.B.,** | ) ) ) ) | 13 C 3623 |
| | ) | **Judge John Z. Lee** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| **BOARD OF EDUCATION OF THE CITY OF CHICAGO, BARBARA BYRD-BENNETT, Chief Executive Officer,** | ) ) ) ) | |
| **Defendants.** | ) | |
| **SHERISE McDANIEL, on behalf of herself and her son, E.E., MARSHETTA ROSS, on behalf of herself and her son, M.R., , FRANCES NEWMAN and ALPHONSO NEWMAN, on behalf of themselves and their son, A.S.,** | ) ) ) ) ) ) | 13 C 3624 |
| | ) | **Judge John Z. Lee** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| **BOARD OF EDUCATION OF THE CITY OF CHICAGO, and BARBARA BYRD-BENNETT, Chief Executive Officer,** | ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

The Chicago public schools face an era of declining student enrollment, decreasing revenues, and rising operating costs. On May 22, 2013, the Board of Education of the City of Chicago ("Board") and Barbara Byrd-Bennett, the Chief Executive Officer of the Chicago Public Schools ("CPS"), (collectively "Defendants") approved the closure of forty-nine elementary schools in an effort to address these issues. The closures are scheduled to take place prior to the commencement of the 2013-2014 school year.

Understandably, this decision has roused much public discourse and scrutiny. In the debate over how to confront the challenges facing Chicago's public schools, various constituencies, including parents, teachers, administrators, public officials, and concerned citizens, have offered their own, often differing views on the wisdom and necessity of the closures. Perhaps unsurprisingly, the Board's decision has also prompted a number of lawsuits. In the two lawsuits filed before this Court, parents of students with disabilities and African-American students (collectively "Plaintiffs") argue that the closures discriminate against their children in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the Illinois Civil Rights Act ("ICRA"), 740 Ill. Comp. Stat. 23/5. They seek preliminary injunctions to prevent the closures.

It is important to note from the outset what is at issue here. First, the cornerstone of Plaintiffs' claims is that, as a result of the school closings, students with disabilities and African-American students will suffer a greater degree of harm as compared to their non-disabled and non-African American peers. Therefore, the claims at issue do not hinge on whether the closures will result in harms to students generally, but instead focus on whether the harms, to the extent they exist, will be felt disproportionately by Plaintiffs' children. Second, although Plaintiffs initially asked the Court to forestall the closure of all forty-nine schools, their motions for class certification were denied. Accordingly, Plaintiffs' motions for preliminary injunctive relief are limited to the claims brought by the individual Plaintiffs and the closing schools that their children attended – namely, Lafayette, Trumbull, Morgan, and Calhoun elementary schools and Williams middle school.

Turning then to the present motions, the Court finds that Plaintiffs have failed to establish a likelihood of success on the merits as to their ADA and ICRA claims based upon the current

record.  For example, although Plaintiffs allege that their children will suffer academic harm, they will be sending their children to higher performing schools in the fall, such as Faraday Elementary School.  Similarly, although Plaintiffs allege that their children will face greater safety risks when walking through unfamiliar neighborhoods to their new schools, only one of the Plaintiffs' children will be required to walk to a new school building.  The others will be provided busing or other transportation services or will remain in their current school building.  Finally, Plaintiffs have failed to show that the school closings would require revisions to their children's Individualized Education Programs ("IEPs").  For the same reasons, Plaintiffs' evidence does not support their contentions of irreparable harm.  Nor have Plaintiffs shown that they lack adequate remedies at law.  Finally, when the low likelihood of success on the merits is considered in conjunction with the potential harm that injunctive relief would cause by prolonging the period of uncertainty for the impacted students and their parents, causing additional instability for the administration and staff at the schools, and preventing those students who may want the opportunity to attend higher performing schools from doing so, the balancing of equities weighs against preliminary injunctive relief.  For these and the other reasons discussed below, Plaintiffs' motions for preliminary injunction are denied.

### Procedural Background

On May 15, 2013, Plaintiffs filed two suits seeking to block the school closures.  In the first suit, Mandi Swan, Denise Burns, and Felicia Bradley, all parents of children who are enrolled in special education programs in Chicago public schools slated for closure, allege that closing the schools as scheduled will disproportionately harm children in special education programs as compared to their general education peers.  According to Plaintiffs, the schedule for the closures will not allow enough time for administrators in the new schools to ensure that the

IEPs of disabled students are properly revised and implemented, nor will there be sufficient time for students with disabilities to adequately acclimate to their new schools in violation of the ADA.

In the second suit, Sherise McDaniel, Marshetta Ross, and Frances and Alphonso Newman, all parents of children enrolled in Chicago public schools, bring claims under the ADA and ICRA. McDaniel and Ross, whose children participate in special education programs, contend that the school closures will destroy their children's existing relationships with teachers, administrators, and peers, prevent them from revising their children's IEPs, and result in their children being placed in larger classes with longer, unfamiliar, and dangerous commutes to and from school in violation of the ADA. McDaniel and Ross, joined by the Newmans, also allege that the criteria Defendants used to identify schools for closure resulted in the disproportionate closure of schools with African-American children, causing African-American children to disproportionately suffer academic and personal safety harm in violation of the ICRA.

Because the first day of school is August 26, 2013, these cases have proceeded on an accelerated schedule. On May 23, 2013, the Court granted the parties leave to proceed with expedited discovery and scheduled a four-day preliminary injunction hearing for July 16, 2013. With the parties' agreement, the Court consolidated the two cases for the purposes of discovery, briefing, and the preliminary injunction hearing. Before the hearing, the Court held five discovery-related hearings, issued three orders, and ruled on motions to dismiss. On July 16, 2013, the four-day hearing commenced. At the conclusion of the hearing, the Court granted the parties leave to submit consolidated post-hearing briefs, the last of which was filed on August 7, 2013.

## Factual Background[1]

The Chicago Board of Education faces significant utilization and fiscal challenges. Due to declining enrollment in certain neighborhoods, a large number of schools are underutilized. (PI Tr. 516.) Citywide, CPS has over 510,000 seats, but just over 430,000 enrolled students. (*Id.*) Additionally, starting with fiscal year 2014, the Board faces a $1 billion structural deficit out of a $5 billion annual operating budget, due in large part to a $400 million increase in the Board's pension fund obligations. (*Id.* 574-76.) On the revenue side, statutory caps on property taxes and declining state and federal resources limit the Board's options for reducing the structural deficit. (*Id.* 577.) Over the last three years, the Board has cut approximately $600 million in non-classroom related operational and administrative expenses, and property taxes have been increased to the maximum amount allowed by law. (*Id.* 577-78.) In short, CPS has too many seats, too few students to fill those seats, and decreasing resources to allocate to the schools within the system.

## I.     CPS's Identification, Proposal, and Approval of the School Closures

In an attempt to address these issues, in October 2012, the CEO proposed "Guidelines for School Actions" that focused on underutilization. (PI Tr. 502-07; PI Ex. 1; PI Ex. 49 at 2.) The Board believed that by addressing underutilization, it would be able to reinvest its limited resources into efficiently utilized schools and provide a better environment for students. (PI Tr. 507.) Under the Illinois School Code, each year the CEO must prepare and publish written guidelines for proposed "school actions" in the coming year. 105 Ill. Comp. Stat. 5/34-230. "School actions" include school closings, consolidations, co-locations, and boundary changes

---

[1]     The facts cited herein are taken from testimony and documents introduced at the four-day preliminary injunction hearing. Testimony presented at the hearing will be cited by transcript page number as "PI. Tr. [ ];" exhibits admitted at the hearing will be referred to as "PI Ex. [ ];" deposition designations offered by the parties as part of the preliminary injunction hearing will be referred to as " __ Dep."

that require student reassignments.  *Id.* § 5/34-200.  Under the October 2012 Guidelines, if a school was "underutilized" as defined in the Board's Utilization Standards, the school was potentially subject to closure, but only if the students impacted by the closure had the option to enroll in a higher performing school,[2] and the resulting space utilization after closure did not exceed the facility's enrollment efficiency ranges as set forth in the Utilization Standards.  (PI Tr. 507-08; PI Ex. 1 at 2.)

### A.    Utilization Standards

The Board's Utilization Standards established criteria to determine a school's "utilization rate."  (PI Tr. 509; PI Ex. 6 at 1.)  A school's utilization rate was calculated by dividing the school's enrollment on the twentieth day of school by the school's "ideal capacity."  (PI Tr. 510; PI Ex. 6 at 3-4.)  To calculate the "ideal capacity," CPS counted the number of classrooms in the school, excluding spaces such as lunch rooms, auditoriums, and gymnasiums, and multiplied this number by 76% to estimate the school's "allotted homerooms."  (PI Tr. 509-10.)  Seventy-six percent represents the percentage of all classrooms used as "homerooms" in a prototype school; under the formula, the other 24% of classrooms are considered "ancillary rooms" used for purposes such as special education programming, computer labs, art rooms, and music rooms. (*Id.* 509-10, 561.)  Finally, the Board multiplied the allotted homerooms by 30, the number of students in what the Board believed was an efficiently-utilized classroom, resulting in the school's "ideal capacity."  (*Id.* 510.)

---

[2]    A higher performing school is defined as a school ranked at a higher level on the Board's Performance Policy for the 2011-2012 school year, which classifies schools into three performance levels, Levels 1 (highest performing), 2, and 3 (lowest performing).  (PI Tr. 513; PI Ex. 1 at 3; PI Ex. 5.)  If two schools were at the same level under the Policy, a school was considered higher performing if it was rated higher on the majority of specific performance metrics set forth in the Guidelines.  (PI Ex. 1 at 3.)

Schools with utilization rates less than 80% were classified as "underutilized." (*Id.*) Schools with utilization rates between 80% and 120% were classified as "efficient." (*Id.*) And schools with utilization rates over 120 percent were classified as "overcrowded." (*Id.*)

## B. Additional Criteria for Identifying Schools for Closure

In December 2012, CPS identified 330 schools as underutilized using these criteria. (*Id.* 519-20.) The CEO established an Independent Commission on School Utilization to solicit community feedback and make recommendations on how to address these underutilized schools. (*Id.* 520.) In January 2013, the Commission issued an Interim Report recommending criteria to identify underutilized schools that could be subject to closure without adversely impacting the educational opportunities of children. (PI Tr. 521; PI Ex. 2.) On January 18, 2013, the CEO adopted the Committee's recommendations to remove high schools and Level 1 high-performing schools from consideration for closure. (PI Tr. 522.) The CEO then initiated two rounds of community meetings in each of CPS's fourteen elementary school networks to obtain input on other Commission recommendations. (*Id.*)

On February 13, 2013, as a result of this feedback, the CEO announced that underutilized schools meeting any one of the following criteria would no longer be subject to closure:

- High schools;
- Level 1 ("high-performing") schools;
- Schools in the process of adding grades that are expected to reach efficient utilization based on enrollment trends;
- Schools with more than 600 students enrolled on the twentieth day of the 2012-13 school year;
- Schools with a utilization rate of at least 70%;
- Schools that have recently experienced a significant school action;
- Schools that are on the rise either in terms of enrollment gain or sustainable improving performance;
- Schools isolated from other neighborhood schools by more than a mile; and
- Schools that are surrounded by other neighborhood schools that are at or near capacity and do not have space to welcome students.

(PI Tr. 522-23; PI Ex. 49 at 3.)  The application of these criteria reduced the initial list of 330 schools to 129.  (PI Ex. 49 at 4.)

After the February announcement, CPS held another round of community meetings in the elementary school networks.  (PI Tr. 525.)  In response to feedback from these meetings, CPS adopted additional criteria, exempting from closure those schools that had been constructed or received permanent capacity expansion in the last ten years and those schools that had been turned-around in the previous year.  (PI Tr. 525-26; PI Ex. 49 at 4.)  CPS also adopted guiding principles that included: maintaining higher quality facilities; avoiding assigning students to a receiving school that was more than a mile away from the closing school; avoiding relocation into schools currently co-located with charter schools; prioritizing Level 2 schools as receiving schools; and avoiding the creation of geographic areas without a neighborhood school due to distance or other geographic barriers.  (PI Tr. 526; PI Ex. 49 at 4.)  On March 6, 2013, in its Final Report, the Commission concluded that CPS had the capacity to close approximately eighty schools.  (PI Ex. 4 at 1.)

In total, more than 20,000 people attended nearly thirty community meetings across the city.  On March 21, 2013, based on information gathered at these meetings, input from CPS staff, including experts in the Office of Diverse Learners and Safety and Security, and the review of demographic and school performance statistics, the CEO proposed the closure of fifty-three elementary schools.  (PI Tr. 523, 526-27, 529; PI Ex. 49 at 5.)

After the March 21, 2013 announcement, CPS conducted two community meetings and a public hearing presided over by an independent hearing officer for each school closing, as mandated by the Illinois School Code.  (PI Tr. 540-41.)  As a result of ongoing community engagement, the CEO recommended the removal of four elementary schools – Manierre,

Garvey, Ericson, and Mahalia Jackson – from the closure list.  (*Id.* 542-43.)  On May 22, 2013, the Board approved the closure of the remaining forty-nine elementary schools pursuant to the CEO's recommendation.  (Uncont. Fact. (i) [*McDaniel*, doc. no. 86].)

## II.     The Individual Plaintiffs and Their Children

### A.     Plaintiff Swan and Her Son "I.O."

Mandi Swan's son, I.O., attended Jean D. Lafayette Elementary School during the 2012-2013 school year.  (Swan Dep. 11, 13, 31.)  Lafayette was approved to close at the end of the 2012-2013 school year.  (PI. Ex. 49 at 12.)

I.O. has autism and receives special education services pursuant to an IEP.  (Swan Dep. 24-25, 29.)  Specifically, I.O. receives speech therapy, social work services, and inclusion classes, and has access to a sensory room, a life skills room, and a calming room.  (*Id.*)  I.O. is also eligible to receive transportation services to and from school.  (PI Ex. 92A at 31.)  I.O. will attend Lowell Elementary School in the 2013-2014 school year.  (Swan Dep. 31.)

### B.     Plaintiff Burns and Her Daughter "V.B."

Denise Burns' daughter, V.B., attended Lyman Trumbull Elementary School during the 2012-2013 school year.  (Burns Dep. 12, 18-20.)  Trumbull is scheduled to close at the end of the 2012-2013 school year.  (PI. Ex. 49 at 13.)

V.B. has Down syndrome and receives special education services pursuant to an IEP.  (Burns Dep. 22.)  Specifically, V.B. receives social work services, speech therapy, and occupational therapy.  (*Id.* 19, 22.)  Like I.O., V.B. is eligible to receive transportation services to and from school.  (*Id.* 22.)

Students who were enrolled in special education programs at Trumbull, like V.B., could elect to attend either John T. McCutcheon Elementary School or James B. McPherson

Elementary School for the 2013-2014 school year. (*Id.* 29; PI Ex. 11 at 10.) Burns chose to enroll V.B. at McPherson because she thinks that the school will better meet V.B.'s needs. (Burns Dep. 37-38.)

### C.     Plaintiff Bradley and Her Son "C.B."

Felicia Bradley's son, C.B., attended Garrett A. Morgan Elementary School during the 2012-2013 school year. (Bradley Dep. 11-14.) Morgan is scheduled to close at the end of the 2012-2013 school year. (PI. Ex. 49 at 12.) C.B. suffers from autism and receives special education services pursuant to an IEP. (Bradley Dep. 20-21.) Specifically, C.B. receives specialized instruction, speech therapy, and transportation services. (*Id.*; PI Ex. 92B at 28.)

CPS has designated William H. Ryder Math and Science Specialty Elementary School as the receiving school for Morgan students, but Bradley has elected to enroll C.B. at Mahalia Jackson Elementary School instead. (Bradley Dep. 24, 26-27.) She did so because she believes that Jackson has a good program for students with disabilities and is in a good neighborhood. (*Id.* 24, 26-27, 29.)

### D.     Plaintiff McDaniel and Her Son "E.E."

Sherise McDaniel's son, E.E., attended George Manierre Elementary School during the 2012-2013 school year. (McDaniel Dep. 9.) Manierre is not scheduled to close, and E.E. will continue to attend Manierre for the 2013-2014 school year.[3] (*Id.* 20, 28.)

E.E. is African-American and receives special education services pursuant to an IEP. (*Id.* 7-9, 10.) Specifically, E.E. receives speech therapy once a week for forty-five minutes. (*Id.*)

---

[3]     Because Manierre is no longer scheduled for closure, the Court asked the parties at a hearing on August 2, 2013, whether McDaniel's claims should be dismissed as moot. Plaintiffs' counsel stated their belief that McDaniel's claims remain viable, and the Court has asked the parties to submit briefs as to this issue.

### E.    Plaintiff Ross and Her Son "M.R."

Marshetta Ross' son, M.R., attended John Calhoun North Elementary School during the 2012-2013 school year.  (Ross Dep. 12.)  Calhoun is scheduled to close at the end of the 2012-2013 school year.  (*Id.* 23-24; PI Ex. 49 at 11.)

M.R. is African-American and has cerebral palsy, on account of which he receives special education services pursuant to an IEP.  (Ross Dep. 9, 16, 22.)  Specifically, M.R. receives speech therapy and physical therapy.  (*Id.* 16.)

Calhoun's designated receiving school is Willa Cather Elementary School, but Ross decided to enroll M.R. at Michael Faraday Elementary School.  (*Id.* 41-42.)

### F.    Plaintiffs Frances and Alphonso Newman and Their Daughter "A.S."

Frances and Alphonso Newman's daughter, A.S., is African-American and attended Williams Preparatory Academy Middle School during the 2012-2013 school year.  (Frances Newman Dep. 8-9, 14.)  Williams is an open enrollment school, meaning that students are not required to live in a certain attendance boundary to attend.  (*Id.* 14-15.)  A.S.'s neighborhood school is Mahalia Jackson Elementary School, but Newman chose to enroll A.S. in Williams because she was impressed with its curriculum.  (*Id.* 47.)  Williams is located at 2017 South Dearborn Street, approximately eight miles from A.S.'s residence.  (*Id.* 14.)  Newman usually drives A.S. to school, or sometimes A.S. takes a CTA bus.  (*Id.* 15.)

The designated receiving school for Williams is John B. Drake Elementary School.  (*Id.* 26.)  Drake is currently located at 2722 South King Drive, approximately three blocks from Williams.  (*Id.* 44.)  As part of the approved school actions, Drake will be relocating to the Williams building at 2017 South Dearborn Street beginning in the 2013-2014 school year.  (*Id.*

44-45.)  Thus, all students who attended Williams during the 2012-2013 school year and who will attend Drake in the 2013-2014 school year will remain in the same building.  (*Id.*)

## III.    CPS's Implementation of the School Closures

In December 2012, the CEO appointed retired U.S. Marine Corps Colonel Tom Tyrrell to lead the implementation of the school closings and related transitions.  (PI Tr. 691-92, 697-98.) Tyrrell is a strategic planner and has worked for the Joint Chiefs of Staff and for the United Nations, where he assisted with rebuilding the infrastructure of post-war Kosovo.  (*Id.* 689-91.) CPS's central office transition team includes roughly forty people, and each closing and receiving school pairing has a school transition team, headed by a Principal Transition Coordinator, who is a retired CPS principal.  (*Id.* 693-95; PI Ex. 29.)  The team also includes the principals from the closing and receiving schools, three staff from each school, and three volunteers from each school.  (PI Tr. 695.)  The stated goal of the transition teams is that "on the first day of SY 2013-2014, all students attending welcoming schools will experience a safe and seamless transition and have an opportunity at a fresh start."  (PI Ex. 27 at 3.)

### A.    Transition Plans

As required by the Illinois School Code, transition plans have been prepared for each receiving school.  (PI Tr. 721-22; *see* 105 Ill. Comp. Stat. 5/34-230.)  Each school has prepared a working and evolving set of documents that describe the specific plans and programs being implemented to address the academic, social and emotional learning, cultural integration, budget, staffing, and safety needs of the school community.  (PI Tr. 721-29; PI Ex. 60.)[4]  CPS's central office has directed and supported the creation and implementation of the transition plans by

---

[4]    Defendants have provided the transition plans for each closing school as they existed at the time of the preliminary injunction hearing, including those pertaining to the closing schools where Plaintiffs' children attend. (PI Ex. 60 at CBOE_0045116-45142 (Swan/Lafayette); CBOE_0045705-45801 (Burns/Trumbull); CBOE_0045278-45286 (Bradley/Morgan); CBOE_0044641-44657 (Ross/Calhoun); CBOE_0045904-45912 (Newman/Williams Middle)).

providing a detailed guidebook, reviewing draft plans, maintaining bi-weekly checklists to promote accountability, and communicating daily with school transition teams.  (PI Tr. 729-37, 746-48; PI Ex. 13-20, 23, 28.)

### 1. Academic Plans

Each receiving school has an academic support plan that analyzes the needs of students from the closing and receiving schools and presents an educational strategy for the combined student population at the new school.  (PI Tr. 721-24.)

In addition, the Board is investing money that it is saving from closing underutilized schools into academic programs in receiving schools, including STEM programs, International Baccalaureate (IB) programs, and fine and performing arts programs.  (*Id.* 535, 594-96, 631-32, 740; PI Ex. 33 at 6.)  STEM programs focus on science, technology, engineering, and math; IB programs expose students to a global curriculum, challenge students to think critically and innovatively, and are designed to prepare students for the selective enrollment high schools in their areas.  (PI Tr. 535-36, 623, 631, 637.)

### 2. Social and Emotional Learning and Cultural Integration Plans

Each receiving school also has a social and emotional learning (SEL) plan that contains strategies to help individual students adjust to new school environments.  (PI Tr. 723-24.)  The SEL plan provides experiences and opportunities to allow students to feel comfortable and welcome in their new schools.  (*Id.* 723-24.)  Each school's cultural integration plan addresses the socialization of the two schools.  (*Id.* 723.)  The purpose of these plans is to provide students from closing and receiving schools meaningful opportunities to meet, socialize, and develop friendships before the school year begins.  (*Id.*; *see, e.g.,* PI Ex. 60 at CBOE_0045886-887.)

### 3. Safety Plans

CPS's Office of School Safety and Security is responsible for developing programs and strategies to keep Chicago's public school children safe during their daily commutes and while attending school. (PI Tr. 650.) Every year, the office plans safety and security measures for students experiencing school transitions. For example, CPS implements safety strategies each summer to facilitate the temporary transfer of over 20,000 students from their regular schools to summer programs at different locations. (*Id.* 675-76.)

Jadine Chou is the Chief Safety and Security Officer, and her office has worked with parents, community members, and numerous city agencies to develop a multi-pronged strategy to address the safety of students impacted by the school closings. (*Id.* 650, 652-53, 656, 660.) Each receiving school has a school-specific safety plan that addresses the needs and circumstances of the student populations at the school. (*Id.* 652, 728.) Internal school supports include safety technology, such as digital cameras that provide high-definition footage in real time to CPS's central office, the police, and the City's 911 call center; metal detectors and hand wands; and additional security staff, which includes security personnel from the closing schools who will be transferred to the corresponding receiving schools. (*Id.* 653-55.) The schools are also implementing restorative justice programs to help students resolve conflicts. (*Id.* 655-56.)

In an effort to ensure students' safe travel to and from school, CPS uses the Safe Passage program. Safe Passage is a partnership with community-based organizations to provide travel routes for children. (*Id.* 656-57.) CPS identified draft travel routes based on data from CPS demographers showing where students currently reside and intelligence on gangs and crime activity from the Chicago Police Department ("CPD"). (*Id.* 652, 658-59.) CPS shared the draft routes with parents, school staff, and community members and incorporated their feedback when

developing the routes.  (*Id.* 658-59.)  Community watchers will be employed to stand along the safety routes within eyeshot of one another, where students walk by them on their way to and from school every day.  (*Id.* 656.)  The watchers are to provide a positive adult presence who can preempt safety issues and are trained by CPS and CPD to detect issues before they happen and contact authorities to intervene.  (*Id.* 656-57.)

The Safe Passage program is supported by several city agencies.  The Board's main partner is the CPD, which works closely with CPS to develop strategies and provide extra police presence at key locations during key times.  (*Id.* 653, 664-65.)  The Chicago Transit Authority evaluates transportation safety concerns for children and provides increased security at bus and train stops.  (*Id.* 660, 662.)  The Chicago Department of Business Affairs and Consumer Protection assists with identifying businesses on travel routes that can serve as "safe havens," *i.e.*, trusted places where children can safely go and seek adult assistance if they feel uncomfortable or unsafe for any reason.  (*Id.* 659-63.)  The agency also identifies and cracks down on "problem" businesses along the routes.  (*Id.* 661-62.)  The Department of Transportation analyzes traffic safety hazards along the travel routes and identifies needs for additional stop signs, speed bumps, or traffic lights.  (*Id.* 660.)  The Department of Buildings addresses vacant or abandoned buildings, and the Department of Streets and Sanitation removes graffiti and cleans up vacant lots, overgrown weeds, and other areas along the travel routes.  (*Id.* 660-62.)

CPS has used Safe Passage since 2009.  (*Id.* 656.)  In the thirty-five high schools that use the program, CPS has observed a 7% increase in attendance, a 20% reduction in crime, and a 27% reduction in incidents of violence.  (*Id.* 667.)  Last year, CPS implemented the program in

four elementary schools that were part of school closings.  (*Id.* 665.)  There were no incidents for those children traveling to and from school.  (*Id.* 666.)

Finally, CPS, in consultation with CPD, is utilizing a multi-pronged strategy to preempt gang conflicts, which includes analyzing complex and fluid gang landscapes and boundaries, adding police presence, conducting interventions and dispute resolutions, engaging parents, and providing at-risk students with positive alternative experiences.  (*Id.* 671-74.)

**B.  Implementation of the School Closings for Students with Disabilities**

**1.  The Selection of Schools for Closure**

CPS's Office of Diverse Learners Supports and Services is responsible for ensuring that students with disabilities (also known as "diverse learners") receive the accommodations they need and are entitled to receive.  (PI Tr. 415-16.)  Rebecca Clark, the Director of Students Supports, is the point person on the school closing transition team for issues relating to students with disabilities.  (*Id.* 774.)  During the school closing selection process, Clark's team provided input with respect to the closing and receiving school decisions, including to ensure that the proposed receiving schools could function within the state's guidelines for proportionality (*i.e.*, the ratio of students with disabilities in general education classrooms), could receive students that required placement in cluster classrooms (*i.e.*, self-contained classrooms providing more intensive supports and services), and had appropriate space and facilities for the incoming students with disabilities.  (*Id.* 774-77.)

There are slightly more than 2,000 students with disabilities in the closing schools.  (*Id.* 778.)  Federal and state guidelines list thirteen different types of disabilities, ranging from speech and language, to learning disabilities such as dyslexia, to autism.  34 C.F.R. § 300.8(c); 23 Ill. Adm. Code § 226.75.  The largest percentage of students with disabilities affected by the school

closings fall within the category of learning disability. (PI Tr. 779; PI Ex. 24 at 25.) Approximately 50% of diverse learners are in general education classrooms for 80% or more of the school day. (PI Tr. 782, 830.) Another 25% of the students are in general education classrooms for 79% to 40% of their school day. (*Id.* 778, 782.) Approximately 450 of the students in the closing schools are in cluster programs. (*Id.*) Compared to the percentage of students with disabilities within CPS generally, the percentage of students with disabilities impacted by the school closings is nearly the same, approximately 13% to 14%. (*Id.* 779.) Likewise, the percentage of CPS schools with cluster classrooms, and the percentage of closing schools with cluster programs is the same, approximately 30%. (*Id.* 779-80.)

### 2. Implementation of School Closures

CPS has taken a number of steps in an attempt to ensure that by the first day of school: (a) students with disabilities know their new school and feel welcome; (b) the staff understands the needs of students; (c) instructional supports and equipment are in place and teachers know how to use them; (d) schools have provided activities to support the transitions; (e) the students are scheduled in accordance with their IEPs; and (f) any necessary IEP revisions have been completed. (PI Tr. 788-89; PI Ex. 24 at 29.)

First, in order to address as much as possible the concerns of every parent of a student with a disability impacted by the school closings, the transition team has engaged in an outreach campaign. In April 2013, CPS hosted meetings at each proposed closing school to explain the transition process for students with disabilities. (PI Tr. 807-08, 814.) Some parents asked for follow-up meetings to address concerns about the receiving schools' capabilities to meet their children's IEPs, which were conducted. (*Id.* 808.) At these meetings, CPS staff encouraged parents to review their children's IEPs to make sure they are satisfied with the supports their

children are receiving.  (*Id.* 810.)  CPS also hosted meetings at the receiving schools to address the same issues.  (*Id.* 811, 814.)  Additionally, CPS reached out to all parents of students with an IEP to confirm that the parents knew their receiving school, and to determine whether they had concerns about IEPs being implemented or if there was any additional information about their child that CPS should know.  (*Id.* 814-15.)  If a parent requested a follow-up meeting, CPS responded.  (*Id.* 816-17.)  Finally, CPS sent letters to parents and conducted telephonic town hall meetings with opportunities to ask questions.  (*Id.* 817-18.)

Second, Clark and her team are completing a review of every IEP of students impacted by school closings to help receiving schools identify what supports need to be in place for each student.  (*Id.* 828-29, 835.)  At the school building level, administrators are working with case managers to review all of the IEPs, so that the staff members know what supports and services are in a student's IEP, and to ensure that students are appropriately scheduled and their IEPs will be implemented when school starts.  (*Id.* 828-29.)  If a parent or other IEP team member believes that a student may need transition services that are not listed in the IEP, the IEP team can meet to address those issues.  (*Id.* 827.)  CPS has designated funding so that parents who wish to convene an IEP team meeting over the summer can do so.  (*Id.* 827, 866.)

Third, CPS is providing training to receiving school staff.  CPS is requiring that each receiving school's staff complete a series of training sessions over the summer.  (*Id.* 794-95.)  The transition team has prepared customized disability awareness training that reaffirms the general requirements of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, and covers new issues that the school may face because of the particular needs of the incoming students.  (*Id.* 795.)  Receiving school staff must also complete training on specific instructional supports and equipment being provided to the incoming students,

instructional methodologies, and best practices. (*Id.* 795-98, 804-05; PI Ex. 10.) CPS is also partnering with nationally recognized advocacy groups, such as Autism Speaks, to provide sensitivity awareness training to receiving school students. (PI Tr. 806.)

Fourth, both closing and receiving schools are in the process of implementing strategies to welcome new diverse learners. (*Id.* 790; PI Ex. 24 at 31.) For example, all diverse learners from the closing schools are being asked to prepare written and pictorial presentations about themselves to be shared with their new teachers at their receiving schools. (PI Tr. 790-94.) Over the summer, receiving schools are scheduling a variety of events to introduce parents of diverse learners to the school, administrators and staff, such as tours, "meet-and-greets," and information sessions with case managers. (*Id.* 790-92, 819.) For students in cluster programs, CPS has taken photos of the closing school classrooms and is trying to replicate them as much as possible in the receiving school to aid in the transition. (*Id.* 439, 800-801.) Additionally, schools receiving students in cluster programs are preparing social stories with pictures of the school and classrooms in a story book format to provide to transitioning students. (*Id.* 802-03.)

Fifth, the allocations of clinical staff to the receiving schools will be based on the clinical support needs of the students at those schools, as described in their IEPs. (*Id.* 831.) The Board did not lay off clinical staff as a result of the school closings. (*Id.*)

Finally, CPS has identified the building needs of every transitioning student through their IEPs and will confirm that the receiving school building meets ADA accessibility requirements for those students and that any necessary construction will be completed before the start of the school year. (*Id.* 696-97, 738, 750, 807.)

**<u>Legal Standard</u>**

Plaintiffs seek preliminary injunctions to prevent their schools from closing. "[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the USA, Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008) (internal citations and quotations omitted). The moving party bears the burden of making a clear showing that it is entitled to the relief it seeks. *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005). To determine whether a situation warrants a preliminary injunction, the Court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase. *See Girl Scouts*, 549 F.3d at 1085-86.

"To survive the threshold phase, a party seeking a preliminary injunction must satisfy three requirements." *Id.* at 1086. First, the party must show that it will suffer irreparable harm without the injunction. *Id.* Second, that traditional legal remedies would be inadequate. *Id.* And third, that its claim has some likelihood of succeeding on the merits. *Id.* If the party cannot show each of these threshold requirements, the preliminary injunction must be denied. *Id.* If, however, the party satisfies this initial threshold, the Court proceeds to the balancing phase of the analysis. *Id.*

In the balancing phase, the party seeking the injunction must demonstrate that its harm in the absence of such relief outweighs any harm that may be suffered by the non-moving party if the injunction is granted. *Id.* In making this determination, the Court employs a sliding scale approach: "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor, the less likely he is to win, the more need it weigh in his favor." *Id.* (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984)). Additionally,

where appropriate, this balancing process "should . . . encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the "public interest")." *Id.* (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). Taking into account all of these considerations, the Court must exercise its discretion "to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Id.* (internal citations and quotations omitted).

Here, Plaintiffs contend that they satisfy all of the threshold and balancing requirements. In response, Defendants argue that Plaintiffs have failed to satisfy any of these requirements. The Court addresses each requirement in turn.

## I. Likelihood of Success

To preliminary enjoin the school closings, Plaintiffs must show that they have some likelihood of succeeding on the merits of their claims. *See Girl Scouts*, 549 F.3d at 1096. Swan, Burns, Bradley, McDaniel, and Ross bring claims under Title II of the ADA. McDaniel, Ross, and Frances and Alphonso Newman assert claims under the ICRA.

### A. ADA Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A Title II ADA claim can be based on one of three theories: (1) intentional discrimination on the basis of a disability, (2) disproportionate impact on disabled people, or (3) a refusal to reasonably accommodate disabled people. *See Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006) (en banc). Plaintiffs proceed under the second and third theories – disparate impact and failure to accommodate.

Plaintiffs' disparate impact theory is not likely to succeed on the merits. Plaintiffs argue that the underutilization criterion used by the Board to identify potential schools to close resulted in the disproportionate closure of schools with special education classes.

Disparate impact claims are cognizable under the ADA. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003). Disparate impact discrimination occurs when an entity adopts a policy or practice that is "facially neutral in [its] treatment of different groups but that in fact fall[s] more harshly on one group than another and cannot be justified by [a nondiscriminatory] necessity." *Id.* To establish a disparate impact claim, a plaintiff must (1) isolate and identify specific practices that are allegedly responsible for any observed statistical disparities; and (2) establish causation by "offer[ing] statistical evidence of a kind and degree sufficient to show that the practice in question has caused the [alleged harm] because of their membership in a protected group." *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012).[5]

Here, Plaintiffs contend that "the Board's space utilization criteria appears to discriminate against schools with cluster programs, because they have a large number of self-contained classrooms that limit the number of children in a room to eight – not the Board's 'ideal'

---

[5]     The Seventh Circuit has not directly addressed the elements of a prima facie case of disparate impact discrimination under the ADA. In analyzing claims under the ADA, however, the Seventh Circuit "borrow[s] from [its] approach to the respective analog under Title VII." *Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1017 (7th Cir. 1996). Thus, the Court applies the Title VII disparate impact analysis here. This is consistent with the analysis other circuits have developed in cases that have directly addressed the elements of a prima facie case of disparate impact discrimination under the ADA. *See, e.g.*, *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 574-75 (2d Cir. 2003) ("To establish a prima facie cause under [an ADA disparate impact] theory, the plaintiff must show (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices . . . [f]urthermore, the plaintiff must show a causal connection between the facially neutral policy and the alleged discriminatory effect."); *Gonzales v. City of New Braunfels*, 176 F.3d 834, 839 (5th Cir. 1999) (a prima facie case of ADA discrimination by disparate impact requires a plaintiff to (1) identify the challenged practice or policy and pinpoint its use; (2) demonstrate a disparate impact on a protected group; and (3) demonstrate a causal relationship between the identified practice and the disparate impact).

enrollment of 30." (Pls.' Br. 10.) But Plaintiffs offer no quantitative evidence or analysis to support their claim. Plaintiffs also argue that "rushing the closings" will "cause harm to them greater than and different from their non-disabled peers." (*Id.* 8.) But again, other than characterizing students with disabilities as "delicate" and "fragile," Plaintiffs have not provided any statistical evidence regarding the closures and the impacts that they would have on students with disabilities as compared to their non-disabled peers. (*Id.* 4, 10.) In fact, in their papers, Plaintiffs do not even attempt to explain how they will be able to meet the elements of an ADA disparate impact claim. Due to the paucity of evidence and argument, the Court finds that Plaintiffs have an extremely low likelihood of success on the merits as to this claim.

According to Plaintiffs, the Board also failed to reasonably accommodate students with disabilities in violation of the ADA. Failure to make a reasonable accommodation is an independent basis for a Title II ADA claim. *Wis. Cmty. Servs.*, 465 F.3d at 753.; *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 848 (7th Cir. 1999). Here, Plaintiffs contend that Defendants violated the ADA's reasonable accommodation requirement because they "failed to allow IEP teams to determine the needs of disabled children in moving from one school to another" and they failed to provide enough time to transition the students with disabilities.[6] (Pls.' Br. 1, 7.) But Plaintiffs misunderstand the detailed legal landscape that governs educational accommodations for students with disabilities and have failed to demonstrate a likelihood of success on the merits as to their reasonable accommodation claim.

---

[6] In their post-hearing briefs, Plaintiffs focus on Defendants' failure to reasonably accommodate special education students by not adequately addressing or implementing their IEPs. Although in their complaint and class certification briefs, Plaintiffs argued that Defendants' actions caused children in special education programs disproportionate emotional, academic, and physical safety harm outside of the IEP context, Plaintiffs do not make these arguments in their post-hearing briefs. Accordingly, the Court addresses Plaintiffs' claim of injury under the ADA only as it relates to IEPs.

### 1.     Revisions to IEPs

Although Plaintiffs bring their claims under the ADA, the central premise of their case is that Defendants failed to allow IEP teams to determine the transition needs of disabled students in violation of the IDEA. (Pls.' Br. 1.) The IDEA requires participating states, including Illinois, to provide "all children with disabilities . . . [with] a free appropriate public education." 20 U.S.C. § 1400(d)(1)(A); *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005). A free appropriate public education "guarantees a reasonable probability of educational benefits with sufficient support services at public expense." *Bd. of Educ. of Cmty. Consol. Sch. Dist. No. 21 v. Ill. State Bd. of Educ.*, 938 F.2d 712, 715 (7th Cir. 1991). To customize the free appropriate public education to individual students, the IDEA requires that "each child with a disability" receive a "written statement," known as an IEP, that details the child's academic and functional goals, performance, and progress, and outlines the special education and related services the child needs. 20 U.S.C. § 1414(d)(1); *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 181-82 (1982); *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 485 (7th Cir. 2012).

IEPs are "tailored to each student's specific needs" and are "highly individualized because every child is unique." *Jamie S.*, 668 F.3d at 485. A child's IEP is "developed, reviewed, and revised" by an "IEP team" composed of the child's parents, regular education teachers (if the child participates in regular education), special education teachers, related service providers (*e.g.*, speech therapists, psychologists, and social workers), school administrators, and other relevant individuals. 20 U.S.C. § 1414(d)(1)(B). The IEP team must review the IEP annually and, as appropriate, revise it. *Id.* § 1414(d)(1)(B)(4). If, at any time between annual meetings, an IEP team member, including a parent, wishes to revise the IEP, that team member

can request an IEP team meeting, and the IDEA sets forth detailed procedures governing the IEP revision process. *See* 20 U.S.C. § 1415; 34 C.F.R. §§ 300.320-324; 23 Ill. Adm. Code § 226.220(b); *Jamie S.*, 668 F.3d at 486 ("Once an IEP is in place, the school must provide the services listed in it, and the IDEA sets out many rules governing the process of amending an IEP.") Within CPS, the school must respond to a parent's request for an IEP team meeting within ten days. (PI Tr. 827.)

Plaintiffs quote Section 1414 of the IDEA, which states that "[t]he local education agency . . . shall ensure . . . that the IEP team . . . revises the IEP as appropriate to address . . . the child's anticipated needs." 20 U.S.C. § 1414(d)(4)(A)(ii)(IV) (cited at Pls.' Br. 1-2.) Plaintiffs argue that this section legally required CPS to hold IEP meetings for every student with an IEP who may be impacted by the school closings before the beginning of the next school year to determine whether these students will need additional services to help them transition to their new schools. (Pls.' Br. 1-3.) This is incorrect as a matter of fact and law.

First, Plaintiffs' argument is based on the false premise that all students with disabilities have the same needs, behave in the same manner, and struggle with transitions more than their non-disabled peers. Students with IEPs, however, have disabilities that fall into many different disability classifications, including "AU" (autism), "DD" (developmental delay), "SLP" (speech and language), and "EBD" (emotional behavior disturbed). (PI Ex DX24 at 25; PI Tr. 425, 786.) *See* 34 C.F.R. § 300.8(c) (enumerating thirteen disability classifications, including mental retardation, hearing impairment, speech or language impairment, visual impairment, serious emotional disturbance, orthopedic impairment, autism, and traumatic brain injury). The variety of special education needs is evident in Plaintiffs' own children. For instance, Swan's son, I.O., has autism and spends the majority of his day in a self-contained special education class with

forty-five minutes per day in a general education class. (Swan Dep. 24-25.) He requires paraprofessional support while traveling, eating meals, attending classes, going to the playground, and entering and exiting the bus to go home. (PI Tr. 851.) On the other hand, McDaniel's son, E.E., spends most of his days in a general education class and receives only forty-five minutes of speech therapy per week. (McDaniel Dep. 10.) Similarly, although I.O, C.B., and V.B. qualify for transportation services to and from their schools because of their respective disabilities, E.E. does not require any transportation services at all. (PI Ex. 92A at 31; 92B at 28; 92E at 27; 92C at 12.)

The individualized nature of a student's special education needs as documented in the student's IEP was confirmed by Doctor Markay Winston, the Board's Chief Officer for the Office of Diverse Learner Supports and Services and an expert on issues relating to the impact of the school closings on students with disabilities. (PI Tr. 415-16, 421-22.) Winston testified that students with disabilities cannot be "overgeneralize[d]," and that it is not possible to say that "students with disabilities in general are going to struggle [with transition to new schools.]" (*Id.* 438, 461.) Winston recognized that some students with a particular disability, like autism, might struggle more than other students with different disabilities, but she noted that even some autism students might not struggle because it is not possible to "generalize based upon a disability label or disability category which children may or may not require transition supports." (*Id.* 426.) Indeed, students with IEPs make significant transitions every year, if not to a new school, then at least to a new teacher. (*Id.* 434, 830.) Consequently, Winston testified that an IEP team need not meet just because a school is scheduled to close. (*Id.* 464, 467-68, 499-500.)

Here too, Plaintiffs' experiences reflect this. For example, Burns testified that V.B.'s IEP met her daughter's needs last year, and she believes her daughter's new school will meet her

daughter's needs next year. (Burns Dep. 23, 38-39.) In fact, Burns is "fairly confident that [her] daughter will be fine" transitioning to a new school. (*Id.* 65.) Similarly, Bradley believes that C.B.'s IEP met his needs during the 2012-2013 school year, and thinks that his new school, Mahalia Jackson, will be able to implement his IEP properly. (Bradley Dep. 21, 27, 52, 57.) Ross has no reason to believe that M.R.'s needs will not be met at Faraday. (Ross Dep. 95.) Finally, although Swan testified that her son, I.O., has experienced difficulty transitioning from school to school, she acknowledged that I.O. previously transitioned from an out-of-district school to Lafayette and within just a few months made "significant" and "tremendous" progress. (PI Tr. 102-03.) He achieved this progress without any additional transition supports or services to his IEP. (Swan Dep. 14.) And, when provided an opportunity to raise any concerns she had about the implementation of her son's IEP at the receiving school, Swan did not do so. (PI Tr. 809-13.)

For their part, Plaintiffs offer the testimony of Lucy Witte, the Executive Director of Special Education at West Central Joint Services Special Education Cooperative, a cooperative of nine school districts in the Indianapolis area, and an expert in special education and the educational impact on disabled students who are moved from one school to another. Witte reviewed the IEPs of I.O., V.B., and C.B. and concluded that they were inadequate because they did not include transition reports and behavior intervention plans. (PI Tr. 110-11, 122-37.) But Witte acknowledged that the inadequacies that she observed would have existed regardless of whether the children's schools closed.[7] (*Id.* 156.) Thus, Witte's testimony does not provide the

---

[7]    Witte also acknowledged that she was not aware that I.O.'s and V.B.'s parents had testified that their children's current IEPs were meeting their needs, nor was she aware that CPS was reviewing the IEPs of all of the potentially impacted students in planning the closures, as CPS's Director of Student Supports in the Office of Diverse Learners Supports and Services, Rebecca Clark, would later testify. (PI Tr. 158-59, 778.)

Court with persuasive evidence that the Board's decision to close Plaintiffs' schools or the closures themselves would require revisions to Plaintiffs' IEPs.

Second, Plaintiffs' argument ignores the fact that if a student with a disability struggles with transitions, the deficits that cause that struggle should already be supported in the student's IEP. IEPs are not situation-dependent, but are written globally to support the student. An IEP does not prescriptively state every eventuality that may occur, but addresses a student's deficits more broadly, so that the needed supports and services are in place for circumstances that may arise. (PI Tr. 840, 850-51.) For example, I.O.'s IEP provides support for his transition needs because it identifies that he "requires paraprofessional support" to transition between most activities and that he has communication deficits, social/interpersonal skills deficits, and issues identifying safety issues, which impede his ability to transition. (PI. Ex. 92A at 4.) To support his communication deficits, I.O. has a monitored goal of increasing his communication skills, has access to a picture-based communication board, a picture exchange system, a visual picture schedule, paraprofessional support, and speech therapist support. (*Id.* at 6-8, 25-26.) To support his social/interpersonal skills deficits, he is provided with a weekly monitored goal of overcoming "his reaction to resist transitions," 100 minutes per week of direct social/emotional service, a peer buddy, and adult supervision to promote socially appropriate behavior. (*Id.* at 9-10, 23-24, 27.) To support his issues identifying safety issues, he receives adult supervision and special transportation. (*Id.* at 11, 31.) Additionally, Swan admitted that the Board is addressing I.O.'s transition needs. For example, Swan requested that CPS transfer I.O. and his classmates together to their new school to make the transition easier, and CPS agreed. (PI Tr. 104, 811.) CPS has also worked to replicate I.O.'s classroom in his receiving school with detailed attention down to the color of the computer cords. (*Id.* 800-01.) At a meeting, when CPS personnel asked

Swan if she had any concerns about I.O.'s IEP and informed her of opportunities to revise his IEP if she thought such a revision was necessary to make sure I.O.'s transition needs would be met, Swan did not request such a meeting. (*Id.* 809-13.)

Third, Plaintiffs' argument that all IEPs must be modified to provide services to assist the students in transitioning to a new school incorrectly assumes that IEPs are building-specific. The educational experience and services required by an IEP apply regardless of the physical building in which the student is placed. The receiving school can, and must, provide the services required by the students' IEP. Defendants have recognized this and are undertaking to meet this requirement. CPS's Office of Diverse Learners and Supports is reviewing all IEPs of students impacted by school closings to help receiving schools identify what supports need to be in place. (*Id.* 828-29, 835.) Receiving school administrators are working with case managers to review all of the IEPs to ensure that students' IEPs will be implemented when school starts. (*Id.* 828-29.) CPS is providing training to receiving school staff on disability awareness, the IDEA, and new issues that may arise because of the particular needs of the incoming students. (*Id.* 795.) Receiving schools are also completing training on specific instructional supports and special equipment being provided to the incoming students at their schools. (*Id.* 795-98, 804-05; PI Ex. 10.) Additionally, the allocations of clinical staff to the receiving schools will be based on the clinical support needs of the students at those schools, as described in their IEPs. (PI Tr. 831.) And CPS has identified the building accessibility needs of every transitioning student through their IEPs and has confirmed that the receiving school building will meet ADA accessibility requirements for those students. (*Id.* 696-97, 738, 750, 807.)

Plaintiffs nevertheless argue that these steps are inadequate. Their expert, Laurie Siegel, testified that there will be inadequate staffing at the receiving schools to handle the influx of

transferring students with IEPs.  (*Id.* 236-46.)  But Siegal admitted that the needs of students in special education programs depend on the individual student and, upon cross-examination, admitted that she was not aware that CPS had not laid off any social workers because of the school closings and that many, if not all, of the social workers from the closing schools will be transitioning to the receiving schools, as Clark later testified.  (*Id.* 248-49, 831.)

In fact, Plaintiffs themselves have testified that they have no concerns that the receiving schools will fail to provide the necessary IEP services for their children.  At an individual meeting Swan had with CPS administrators, she was told that I.O.'s new school will provide all of the services in I.O.'s IEP that he received in his old school, and she expressed little concern that his IEP will be inadequate post-closure.  (*Id.* 103, 809-13.)  Similarly, Burns is not claiming that any of the services identified in V.B.'s IEP will not be provided next year, and Bradley believes that C.B.'s new school, Mahalia Jackson, will be able to appropriately implement his IEP.  (Burns Dep. 78; Bradley Dep. 27.)  Because E.E. is not changing schools, McDaniel is not concerned about E.E.'s IEP being implemented next year, and Ross has no basis to believe that M.R.'s new school, Faraday, will not be able to provide all of the services listed in M.R.'s IEP. (PI Tr. 386; Ross Dep. 95; *see* Ex. 60 at CBOE 0044886-8 (Faraday transition plan for diverse learners).)  Accordingly, at this preliminary injunction stage, the weight of the evidence does not demonstrate that Plaintiffs are likely to succeed in their claim that the IEPs of their children will become deficient once the children transfer to the receiving schools.

Additionally, Plaintiffs cite no legal authority, and the Court has found none, to support their contention that a school closure, in and of itself, triggers the requirement of an IEP team meeting under the IDEA.  It is not an ADA violation for the Board to leave it up to IEP team members, including parents and school personnel, to determine whether an IEP meeting was

needed at the end of the year, over the summer, at the start of next school year, or anytime thereafter to consider needs arising from school closings. The IDEA simply requires that IEP teams meet at least annually, absent a request from an IEP team member. 20 U.S.C. § 1414(d)(4)(A)(i); *see M.M. ex rel. L.R. v. Special Sch. Dist. No. 1*, 512 F.3d 455, 460-61 (8th Cir. 2008) (school district not responsible under IDEA for any failure to revise an IEP during a certain school year where a child's parent did not request revisions to the IEP); *Taylor P. ex rel. Chris P. v. Mo. Dep't of Educ.*, No. 06-4254, 2007 WL 2907825, at *3 (W.D. Mo. 2007) ("Nothing in section 1414(d)(4)(A)(ii), or in subsection (c)(1)(B), addresses timing or specifically requires a school district to immediately convene an IEP meeting as soon as it discovers new information.") Additionally, if either the parent or the school believes the IEP should be revised between annual meetings, the school can schedule additional meetings at any time. Ill. Adm. Code tit. 23, § 226.220 (requiring the school district to respond to a request for an IEP meeting within ten days). And, in fact, such meetings have been taking place over the summer when parents have requested them. (PI Tr. 819.) Moreover, in some cases, an IEP can be changed without convening a full IEP team meeting.[8] 20 U.S.C. § 1414(d)(3)(D). Thus, Plaintiffs have failed to provide the Court with sufficient evidence to establish that they are likely to succeed on their claim that the Board failed to reasonably accommodate their special education children by preventing or not requiring IEP teams to determine the transition needs of students with disabilities.

---

[8]     Plaintiffs incorrectly contend that the Board cannot provide transition services beyond those required in students' IEPs without first vetting those services through IEP teams. (Pls.' Br. 3.) But school districts may provide supports beyond those listed in students' IEPs. The U.S. Department of Education's commentary on the regulations implementing the IDEA state that "consistent with section 614(d)(1)(A)(ii)(I) of the Act, we cannot interpret section 614 of the Act to require that all elements of a program provided to a child be included in an IEP." Assistance to States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities, 71 Fed. Reg. 46,540, 46,664 (Aug. 14, 2006) (codified at 34 C.F.R. pts. 300, 301).

## 2. Timing of Closures

Plaintiffs also claim that the Board violated the ADA's reasonable accommodation requirement by failing to provide more time to transition students with disabilities to their receiving schools. (Pls.' Br. 7.) But the evidence does not support Plaintiffs' contention that more time is necessary for the review and revision of their children's IEPs. For example, both Winston and Clark testified that there is sufficient time to transition students with disabilities to their new schools successfully based on the work they are doing with the transitions, as discussed above. Indeed, as Clark testified, CPS has allocated funding for IEP team meetings for those parents who request such a meeting, and such IEP team meetings are taking place throughout the summer. (PI Tr. 792, 827, 866.) CPS has also called all parents of students with IEPs who attended closing schools to ask if the parents had any concerns about the implementation of their child's IEP at the receiving school. (*Id.* 814-15.) And CPS has held meetings where parents could express their concerns about the closings and discuss their child's IEP with school staff. (*Id.* 791, 809.)

Swan herself attended two such transition meetings, one at I.O.'s closing school and one at his receiving school. (*Id.* 809-13.) At those meetings, she and the other parents were invited to raise any concerns they had about their child's IEP and informed of opportunities to revise the IEP, if necessary. (*Id.* 813.) Swan did not express any concern that I.O.'s receiving school would not meet his IEP. (*Id.*) As discussed, Burns does not allege that V.B. will not receive the services in her IEP next year, and Bradley believes that C.B.'s new school will be able to appropriately implement his IEP. (Burns Dep. 78; Bradley Dep. 27.) Similarly, because E.E. is not changing schools, McDaniel is not concerned about his IEP, and Ross has no basis to believe that M.R.'s IEP will not be implemented at Faraday. (PI Tr. 386; Ross Dep. 95.) It is apparent

from the evidence, which is largely uncontested, that parents could have requested IEP meetings for their children during the summer, and some in fact did so and have already participated in such meetings.

Plaintiffs correctly point out that Witte testified that the Board's plans for school transitions are too vague and that school districts need twelve to eighteen months to transition students to new schools. (PI Tr. 140-41.) But she has no experience transitioning students as part of a school closing and has never researched or studied the topic. (*Id.* 154-55.) Additionally, her opinion as to the sufficiency of CPS's transition plans is based on her review of a single PowerPoint presentation made before the school closings were approved, which she erroneously interpreted as a transition plan. (*Id.* 160-61, 423.) She did not take into account the fact that CPS is reviewing the IEP of every student impacted by the school closings, has extensive plans and detailed timelines in place, has spent a year planning for the closures, and has reached out to every parent and guardian, even though she acknowledged these were "best practices" for transitioning students with disabilities. (*Id.* 156-57.) In contrast, Winston's testimony that CPS has enough time to transition students in special education is based on over twenty years of experience transitioning students with disabilities to new schools, ten years as the director of student services for the City of Cincinnati where she oversaw at least twenty school closings, and personal knowledge of the actions being taken by her office to ensure that diverse learners successfully transition to new schools. (*Id.* 420-21.)

Plaintiffs also cite to the "Broad Foundation guidelines" to argue that the transition from closing schools to receiving schools should be allotted twelve to eighteen months. (Pls.' Reply 5; Pls.' Br. 7-8.) But, Plaintiffs' characterization of the document is incorrect. The 2009 "School Closure Guide" published by the Broad Foundation states that "[w]hen considering

school closures, districts should allot between 12 and 18 months from the time of the first board meeting during which school closures are discussed to the actual relocation of students, materials and equipment." (Broad Report at 3.)[9] The twelve to eighteen month timeframe includes the "decision-making phase" during which the school board is to analyze such basic questions as "do we close schools and, if so, which one?" (*Id.* at 3-4, 10-21.) Here, the decision-making process started well before October 2012, when the Board published its final Guideline for School Actions, consistent with the time period recommended in the Broad Report. And, in any event, Plaintiffs provide no evidence as to why the recommendations in the Broad Report should apply to the particular facts of this case. Thus, the weight of the evidence does not show that Plaintiffs are likely to succeed on their claim that Defendants failed to reasonably accommodate their children by not providing enough time to transition to their new schools.

### 3. IDEA Exhaustion

Finally, as discussed in detail below,[10] Plaintiffs' have failed to demonstrate a likelihood of success on the merits of their reasonable accommodation claim because they have failed to exhaust administrative remedies under the IDEA. *See* 20 U.S.C. § 1415(*l*); *Charlie F. v. Bd. of Educ. of Skokie Sch. Dist.*, 98 F.3d 989, 991 (7th Cir. 1991).

---

[9]     The Broad Foundation (Education) is a charitable foundation. On its website, the foundation states that its mission is to "[t]ransform[] K-12 urban public education through better governance, management, labor relations and competition." *See* http://broadeducation.org/_news/factsheet.html Although Plaintiffs' counsel used the Broad Report (PI Ex. 36) in examining witnesses at the preliminary injunction hearing, the report itself was not offered in evidence. The Court refers to it here for the limited purpose of evaluating the argument raised by Plaintiffs in their papers. A link to the report can be found at: http://www.ctunet.com/blog/broad-academy-school-closure-guide.

[10]     See Section III, *infra*.

## B.     ICRA Claims

In addition to ADA claims, Plaintiffs McDaniel, Ross, and Frances and Alphonso Newman bring disparate impact race discrimination claims under the ICRA.  The ICRA prohibits any unit of government from discriminating against a person due to their race.  *See* 740 Ill. Comp. Stat. 23/5.  To prevail on a disparate impact claim under the ICRA, Plaintiffs are responsible for "isolating and identifying the specific . . . practices that are allegedly responsible for any observed statistical disparities."  *Puffer*, 675 F.3d at 717.[11]  Simply pointing to a generalized policy that leads to such a disparity is not enough.  *Id.*  "Failure to identify the specific practices could lead to [defendants] being held liable for the myriad of innocent causes that may lead to statistical imbalances."  *Id.* (internal quotations omitted).  Plaintiffs must also establish causation by "offer[ing] statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion [of plaintiffs] because of their membership in a protected group."  *Id.*  If Plaintiffs make these threshold showings, then the burden of production shifts to Defendants to show a legitimate, nondiscriminatory reason for its actions.  Finally, if Defendants satisfy this hurdle, the burden again shifts to Plaintiffs who must prove the existence of an "equally valid and less discriminatory practice" that Defendants refused to use.  *Id.*  The weight of the evidence presented by Plaintiffs does not establish a likelihood of success as to Plaintiffs' ICRA claim.

---

[11]     Although the plaintiff in *Puffer* brought disparate impact claims under Title VII, the Court looks to Title VII law for guidance because the ICRA "was expressly intended to provide a state law remedy that was *identical* to the federal disparate impact canon."  *Jackson v. Cerpa*, 696 F. Supp. 2d 962, 964 (N.D. Ill. 2010) (emphasis in original).  Indeed, the ICRA "was not intended to create new rights.  It merely created a new venue in which plaintiffs could pursue in the State courts discrimination that had been available to them in the federal courts."  *Ill. Native Am. Bar Ass'n v. Univ. of Ill.*, 856 N.E.2d 460, 467 (Ill. App. Ct. 2006).

### 1.    Discriminatory Policy or Practice

Plaintiffs contend that the Board's "decision to carry out any school closings based on the concept of 'underutilization'" resulted in the closure of a disproportionate number of schools with African-American student populations.  (Pls.' Reply 10.)  The "concept of underutilization" is not a specific policy or practice sufficient to establish a disparate impact claim in and of itself. *See Puffer*, 675 F.3d at 717.  Plaintiffs further contend, however, that "the Board knew that its decision to use 'underutilization' as a criterion for closing schools would result in an enormous impact on African-American children," and that they are challenging "the legitimacy of the [Board's] criteria" for identifying schools for closure.  The Court understands this as a challenge to (1) the Board's use of "underutilization" as a criterion for identifying schools for closure, and (2) the numerous additional criteria that the Board employed to identify schools for closure.  In support of their contentions, Plaintiffs offer a single statistic:  African-American students make up 87% of the students in the closing schools, but only 40.5% of the students in CPS as a whole. (PI Tr. 20-21.)  These figures, however, fail to provide the Court with statistical evidence of a kind and degree sufficient to show that the criteria employed by the Board to identify schools for closure caused the disproportionate closure of schools with African-American student populations.

First, Plaintiffs' single statistic does not advance their theory that the "utilization" criterion caused the disproportionate closure of schools attended by African-Americans because the process of winnowing down the list of 330 underutilized schools to the 49 schools at issue involved the application of numerous additional criteria unrelated to utilization.  (PI Tr. 520.) For example, the CEO eliminated high schools and Level 1 schools from schools subject to closure, which decreased the number of eligible schools to 129.  (*Id.* 526-27.)  CPS also adopted

and applied guiding principles such as maintaining higher quality facilities with a lower cost to maintain, and avoiding the creation of areas with no neighborhood schools due to distance or other geographic boundaries, which further decreased the number of schools eligible for closure. (*Id.* 526; PI Ex. 49, guiding principles, at 4.)  By providing only the racial composition of students in the forty-nine schools approved for closure, and not the racial composition of students in the 330 schools identified by the utilization criterion as underutilized, Plaintiffs have provided no evidence that it was the utilization criterion, and not the additional criteria considered by the Board, that caused 87% of students in closing schools to be African-American.

Similarly, the statistic Plaintiffs provide fails to show that the Board's consideration of these additional criteria – separate and apart from the utilization criterion – resulted in a statistical imbalance.  To do so, Plaintiffs must show a statistical imbalance between the racial composition of the original 330 schools eligible for closure and the racial composition of the forty-nine schools ultimately selected for closure.  For example, if African-American students comprised 95% of students in the 330 schools identified as underutilized, and then, after applying the additional criteria, African-American students comprised only 87% of students in schools ultimately approved for closure, the Court would have no basis to conclude that the additional criteria disproportionately impacted African-American students in the closing schools.

Lastly, Plaintiffs' statistic that African-Americans constitute 40.5% of the students in CPS system-wide also fails to provide the Court with relevant evidence because the 40.5% includes students in high schools and charter schools, but the closing schools are all elementary and middle schools operated by CPS.  (*See* Pls.' Reply, Ex. 9, Morales-Doyle Decl., Ex. B, All Schs. Racial Ethnic Survey (listing high schools and charter schools).)  Plaintiffs do not explain why the 40.5% is an appropriate benchmark when assessing the percentage of students who are

African-American in closing schools. In short, Plaintiffs have failed to provide the Court with statistical evidence of a kind and degree sufficient to show that Plaintiffs are likely to succeed on their claim that Defendants' utilization criterion or the additional criteria used by the Board caused the disproportionate closure of schools with African-American students. *See Puffer*, 675 F.3d at 717.

## 2. Actionable Harm

To succeed on their ICRA claim, Plaintiffs must also show that they have been subjected to an adverse action. *See Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005) ("In order to advance a disparate impact claim, the plaintiff must first establish a prima facie case by proving by a preponderance of the evidence that the . . . policy or practice had an *adverse* disparate impact.") (emphasis added). The weight of the evidence, however, falls short of showing that African-American students have suffered or will suffer actionable harm as a result of the school closings.

Closing a neighborhood school is not, by itself, an actionable harm. *See Smith v. Henderson*, No. 13-420, 2013 WL 2099804, at *18 (D.D.C. May 15, 2013) ("Although Plaintiffs undoubtedly value their neighborhood schools, the injury seems slight given that their children – along with thousands of others – are moving to better performing . . . schools."); *Incantalupo v. Lawrence Union Free Sch. Dist. No. 15*, 652 F. Supp. 2d 314, 329 (E.D.N.Y. 2009) ("Unquestionably, any plan that forces children to change schools may be traumatic for children and parents alike . . . But this court cannot enjoin conduct unless that harm is a 'cognizable injury' that the law protects against."); *Friends of Lakeview Sch. Dist. No. 25 of Phillips Cnty. v. Huckabee*, No. 2:04 CV 00184, 2005 WL 2076478, at *10 (E.D. Ark. Aug. 26, 2005) ("While . . . plaintiffs want the District's campus to remain open, the Court cannot say that irreparable harm

will occur if the campus remains closed."); *Bronson v. Bd. of Educ. of Cincinnati*, 550 F. Supp. 941, 957 (S.D. Ohio 1982) ("While Plaintiffs and others may feel saddened by the loss of a neighborhood school, there is nothing in the record to distinguish the present situation from that of any community in which a neighborhood school has been closed.").  As such, Plaintiffs here argue that African-American students will suffer a disproportionate degree of academic harm, as well as a greater risk to their safety as compared to their non-African-American peers.  But as discussed below, Plaintiffs have failed to establish a likelihood of success on their claims that their children will suffer actionable harm because of the school closings.  The Court addresses each alleged injury in turn.

First, Plaintiffs allege that African-American students will suffer academically because of the school closings.  (Pls.' Br. 14.)  But Plaintiffs' own expert acknowledged that a significant number of students may *benefit* academically from the school closings.  Dr. Pauline Lipman, a professor of educational policy studies at the University of Illinois at Chicago, identified two studies on the impact of school closings on children's academic achievement: a 2009 study by the Consortium on Chicago School Research ("CCSR Study"),[12] and a 2012 study conducted by the RAND Corporation ("RAND Study").[13]  (PI Tr. 5, 7, 9-11.)  The CCSR Study found no long-term impacts, either positive or negative, on academic achievement for most students as a result of school closings.  (CCSR Study at 14-15.)  The study, however, did discover a positive effect for students who were transferred to higher performing schools.  (*Id.*)  Similarly, the RAND Study found that students displaced from schools could experience negative effects on

---

[12]     (Defs.' Resp. *McDaniel* Class Cert., Ex. D, Lipman Report (citing Marisa de la Torre & Julia Gwynne, *When Schools Close: Effects on Displaced Students in Chicago Public Schools*, Chicago: Consortium on Chicago School Research (Oct. 2009)).)

[13]     (*Id.* (citing John Engberg, Brian Gill, Gema Zamarro, & Ron Zimmer, *Closing Schools in a Shrinking District:  Do Student Outcomes Depend on Which Schools are Closed?*, 71 J. URBAN. ECON. 189 (2012)).)

achievement, but those affects could be offset when students move to schools with higher performance. (PI Tr. 17-18, 31.) The RAND Study also cautioned that it should not be interpreted too broadly because it studied only one school district. (*Id.* 31.)

Based on these studies and her review of the relevant documents in this case, Lipman testified that "12.5 percent [of students from closing schools] were sent to the top quartile schools, where we could expect . . . academic improvement, which means that 87 percent we could expect no improvement, or no difference." (PI Tr. 28.) Lipman's testimony, therefore, fails to show that actionable harm is likely to occur to each and every African-American student who will be impacted by the closures.[14]

Plaintiffs' own experiences also fail to establish that their children will suffer academic harm due to the school closings. McDaniel has no specific concerns about her son, E.E., for the 2013-2014 school year because his school is not closing and he will be attending the same school as he did last year. (McDaniel Dep. 27, 28, 31.) Ross also is not concerned about academic issues or educational harm; M.R. is going to Faraday, which is a Level 1 school as compared to Calhoun, which is a Level 2 school. (Ross Dep. 120-21; PI Ex. 11 at CBOE_0001567, CBOE_0001571.) Newman is concerned about academic issues and believes that her daughter, A.S., will be harmed by the instability that comes with having new teachers and classmates, but she does not know whether A.S. will receive a lesser-quality education at her receiving school. (Newman Dep. 45, 50, 57.) Newman also does not know whether the teachers from Williams, the school A.S. attended in the 2012-2013 school year, will remain with A.S. in the 2013-2014

---

[14]     In their preliminary injunction brief, Plaintiffs argue that "plaintiffs will and should prevail because the Board has no substantial basis to believe that children will improve academically or have a 'better educational experience' to justify the disparate racial impact and distress from the closings of these neighborhood schools." (Pls.' Br. 14.) But this assertion incorrectly assumes that it is the Board's burden to prove that harm will not occur as a result of the closings. To the contrary, in order to obtain a preliminary injunction, it is Plaintiffs' burden to show the existence of actionable harm.

school year when Williams closes and Drake moves into the Williams building. (*Id.* 57, 59.) In contrast, Defendants have provided evidence that, although Drake and Williams are both Level 3 schools, Drake has higher academic scores. (PI Ex. 11 at CBOE_0001741.) Accordingly, Newman has failed to provide persuasive evidence that A.S. will be harmed academically by the school closings.[15]

In addition, Plaintiffs allege that children in closing schools will face disproportionate levels of safety risks due to the school closures because they will be required to walk through new and unfamiliar neighborhoods in dangerous areas of the city to their receiving schools.

---

[15] To support their claim that Plaintiffs' children will be academically harmed, Plaintiffs also offered PI Ex. 108, which purports to be a compilation of admissible evidence under Fed. R. Evid. 1006. Federal Rule of Evidence 1006 allows parties to use a summary, chart, or calculation to prove the content of voluminous materials. *See* Fed. R. Evid. 1006. Here, Defendants objected to the admission of this exhibit at the hearing, and the Court admitted the exhibit on a provisional basis subject to the Court's further review. (PI Tr. 411.) Plaintiffs then submitted a CD-ROM containing the documents on which the chart is based. After reviewing those materials, which consist of voluminous school progress reports and a large spreadsheet, the Court now finds that PI Ex. 108 does not satisfy the strictures of Rule 1006 and is inadmissible as a result. First, it is clear from an examination of the underlying documents that the creation of PI Ex. 108 required its creator, Pavlyn Jankov, a research facilitator at the Chicago Teachers Union, to exercise his judgment in selecting particular performance data from the progress reports, while excluding others, such as whether a school had been designated as a Level 1, 2 or 3 school and other academic metrics. Furthermore, the chart does not include academic data contained in the progress reports related to the performance of African-American students at the relevant schools. For example, according to the 2012 school progress reports, African-American students at Ryder (the designated receiving school for Morgan) performed significantly better in math (64% making "expected gains on the Scantron test") than African-American students at Morgan (32.1% making "expected gains on the Scantron test"), while comparably in reading (48% making "expected gains on the Scantron test" at Ryder; 47.9% making "expected gains on the Scantron test" at Morgan). *Compare* PI Ex 108-280 with PI Ex. 108-260. Such information would, of course, be relevant here. Second, Jankov's selection process resulted in errors not readily apparent from the chart. For example, the data for Williams (School ID 610232) relates to Williams elementary school and not Williams middle school, which is where Newman's child attends. Nor does the chart accurately reflect the circumstances of Swan (whose child is going to Lowell, not Chopin), Bradley (whose child is enrolled at Jackson, not Ryder), and Ross (whose child is going to Faraday, not Cather). (Swan Dep. 31; Bradley Dep. 24, 26-27; Ross Dep. 41-42.) For these reasons, the Court exercises its discretion to exclude PI Ex. 108 from evidence under Fed. R. Civ. P. 1006. *See U.S. v. Driver*, 798 F.2d 248, 253 (7th Cir. 1986). The Court notes, however, that even if PI Ex. 108 were admitted, the failings discussed above substantially undermine its persuasive weight and make its reliability suspect. Furthermore, on its face, PI Ex. 108 does not conclusively demonstrate that Plaintiffs' children will be transferred to lesser performing schools and, for some Plaintiffs, shows exactly the opposite.

(Pls.' Br. 19.)  Plaintiffs also contend that Defendants have failed to create school-specific safety plans to ensure their children's safety.  (*Swan* Compl. ¶¶ 76-79; *McDaniel* Compl. ¶¶ 58-65.)

As an initial matter, each receiving school, including the schools that Plaintiffs' children will attend, has a school-specific safety plan that addresses the needs and circumstances of the student populations at the school.  (PI Tr. 652-79, 728; *see*, *e.g.*, PI Ex. 60, Transition Plans, at CBOE_0044642-43, CBOE_0045905-06.)   Additionally, CPS's Office of School Safety and Security has worked with parents, community members, and numerous city agencies to develop a multi-pronged strategy to ensure the safety of students impacted by the school closings.  (PI Tr. 650, 652-53, 656, 660.)  Internally, schools will use digital cameras that provide high-definition footage in real time to CPS's central office, the police, and the City's 911 call center; metal detectors and hand wands; and additional security staff comprised of security personnel from the closing schools who will be transferred to the corresponding receiving schools.  (*Id.* 653-55.)

Using the Safe Passage Program, CPS also has identified draft travel routes based on data from CPS demographers showing where students currently reside and intelligence on gangs and crime activity from the Chicago Police Department ("CPD").  (*Id.* 652, 658-59.)  CPS shared the draft routes with parents, school staff, and community members and incorporated their feedback when finalizing the routes.  (*Id.* 658-59.)  Designated community watchers will stand along the safety routes and will be trained by CPS and CPD to detect issues before they happen and contact authorities to intervene.  (*Id.* 656-57.)

The Safe Passage program is also supported by multiple city agencies, including the CPD, which works closely with CPS to develop strategies and provide extra police presence at key locations during key times; the CTA, which evaluates transportation safety concerns for children and provides increased security at bus and train stops; and the Chicago Department of

Business Affairs and Consumer Protection, which assists with identifying businesses on travel routes that can serve as "safe havens." (*Id.* 653, 659-60, 662-65.) In addition, CPS is coordinating with the Department of Transportation to analyze traffic safety hazards along the travel routes and identify needs for additional stop signs, speed bumps, or traffic lights. (*Id.* 660.) The Department of Buildings also is addressing vacant or abandoned buildings, and the Department of Streets and Sanitation is removing graffiti and cleaning up vacant lots, overgrown weeds, and other areas along the travel routes. (*Id.* 660-62.) Finally, CPS, in consultation with CPD, will be implementing a multi-pronged strategy to preempt gang conflicts. (*Id.* 671-74.)

For their part, Plaintiffs assert that the closings still will result in substantial safety risks to children who will be changing schools. For support, Plaintiffs offer the export report of Dr. Martin Hagedorn, a professor at the University of Illinois at Chicago who researches Chicago gangs. (Pls.' Mem. Class Cert., Ex. 2, Hagedorn Report) Hagedorn also testified at the preliminary injunction hearing. According to Hagedorn, as a result of the school closures, students will be forced to walk across unfamiliar gang boundaries. (PI Tr. 264, 276.) But Hagedorn's maps of Chicago gang boundaries demonstrate how the boundaries vary considerably depending upon the particular school and neighborhood at issue. (PI Ex. 89B5, 89B8, 89B11.) Despite this variance, to arrive at his conclusions Hagedorn reviewed the closures of only six schools – Pope, Hughes, Paderewski, Peabody, Garvey and Cohn. But he provided no evidence that these six schools are representative of any of the Plaintiffs' schools. (PI Tr. 302; Pls.' Mem. Class Cert., Ex. 2 at 9); *see Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 774-75 (7th Cir. 2013) (rejecting plaintiffs' attempt to prove damages by offering a representative sample because plaintiffs failed to demonstrate that the sample was, in fact, representative). Moreover, Hagedorn failed to review the schools that Plaintiffs' children will

attend, which is particularly troubling given his belief that gang lines are "fluid and changing." (PI Tr. 302-03.)

Furthermore, although he opines that CPS's Safe Passage Program is ineffective to address the increased risks to gang violence, Hagedorn admitted that he has not evaluated the efficacy of the program as a whole, nor has he reviewed the individual transition plans for each closing school or any documents other than vendor contracts for the program and the deposition of Tom Tyrrell. (*Id.* at 276, 307-09; Pls.' Mem. Class Cert., Ex. 2, Hagedorn Report, at 11; PI Ex. 60, Transition Plans.) In contrast, the only evidence of the effectiveness of the Safe Passage program, presented by Jadine Chou, shows that the since the program's 2009 implementation, in the thirty-six high schools that use the program, CPS has observed a 7% increase in attendance, a 20% reduction in crime around the schools, and a 27% reduction in incidents of violence. (PI Tr. 666-67.) Moreover, last year, CPS implemented the program in four elementary schools that were part of school closings, and there have been no incidents for those children traveling to and from school. (*Id.* 665-66.) Finally, Hagedorn's analysis ignores the Board's investment in resources and partnerships with other city agencies, community organizations, and local businesses to ensure the safety of children on their daily commutes and in the classroom. Thus, Hagedorn's analysis provides insufficient evidence for Plaintiffs to demonstrate a likelihood of success in showing an actionable harm of increased safety risks due to the school closings.

In addition to failing to put forth expert testimony demonstrating a likelihood of success on their safety claim, Plaintiffs own circumstances fail to show they will suffer from such harm. McDaniel's son, E.E., attends a school that is not closing. (*Id.* 386.) Newman's daughter, A.S., will be attending school in the same building, so she also will not be required to walk along new

and unfamiliar routes.[16] (Newman Dep. 44-45.) The only Plaintiff whose child will be required to walk along a new route to school is Ross' son, M.R. (Ross Dep. 119-20.) But M.R.'s new school is only three blocks from his home, and Ross is not concerned about M.R.'s safety on his new route. (*Id.*) Thus, Plaintiffs have failed to establish a likelihood of success on their claim that the school closings will cause them increased safety risks.

### 3. Legitimate, Nondiscriminatory Reason

Plaintiffs ICRA claim also is likely to fail because Defendants provide legitimate, nondiscriminatory reasons for their actions. Due to declining enrollment in certain neighborhoods and a $1 billion structural deficit (out of a $5 billion annual operating budget), the Board faces significant utilization and fiscal challenges. Indeed, citywide CPS has roughly 80,000 unused seats. (PI Tr. 516.) The Board believes that by closing schools it can reallocate resources currently being spent on the non-instructional expenses of maintaining underutilized buildings to instead benefit students. (*Id.* 507, 629-32.) Specifically, the Board estimates that the school closings will save between $40 and $43 million annually in operating costs and $438 million over the next ten years in capital expenditures.[17] (*Id.* 579; Ostro Dep. 12, 16.)

Plaintiffs' expert, Woods Bowman, concluded that the Board is not facing a fiscal crisis. (PI Tr. 320, 326, 329.) But Bowman ignored a $400 million increase in the Board's pension fund contribution requirements under state law in the coming fiscal year and did not take into account the significant increased employment costs resulting from a new collective bargaining

---

[16] Although A.S.'s school, Williams Middle is closing, the receiving school, Drake, is moving into the Williams Middle building. (Newman Dep. 45.)

[17] The Board's estimates are based on closing the fifty-three schools the CEO originally proposed to close on March 22, 2013, not the forty-nine schools that are actually closing.

agreement.  (*Id.* 351-55, 575.)  Thus, Bowman's testimony that the Board does not face significant fiscal challenges is unpersuasive.

Plaintiffs also argue that the Board's estimate that it will save $438 million in capital expenditures over the next ten years due to the school closings is "entirely unrealistic" because the Board has spent only $75 million on the closing schools over the last ten years.  (Pls.' Reply 13.)  As an initial matter, to support the $75 million figure, Plaintiffs rely on a spreadsheet introduced during the cross-examination of Ginger Ostro, the Board's budget and grants officer.  (PI Tr. 605-08.)  Although Defendants stipulated to the spreadsheet's admissibility, Ostro did not create the spreadsheet and was unfamiliar with it.  (*Id.*)  Plaintiffs did not introduce any witnesses to testify as to what, specifically, the spreadsheet contained and what assumptions, calculations, and methodologies were used to create it.  But even assuming the Board had, in fact, spent only $75 million on the closing schools over the last ten years, and assuming that the Board will spend the same amount on the closing schools over the next ten years, another assumption for which Plaintiffs have offered no support, Plaintiffs still would fail to demonstrate that the Board will not save a substantial amount of money as a result of the proposed closures.  Indeed, the Board estimates a savings of approximately $40 million each year in operating expenses, or approximately $400 million over ten years.  (PI Tr. 598, 613.)  That amount, added to $75 million in capital expenditure savings, totals $475 million over ten years.  As Plaintiffs admit, the Board is spending $233 million over the next two years on the closures ($155 in capital expenditures and $78 million in operating expenditures).  (Pls.' Reply 11.)  Thus, even by this estimation, the Board still would save more than $200 million over time.  In any event, regardless of the particular amount, the reallocation of the Board's resources away from maintaining underused buildings and into efficiently utilized buildings to benefit students is a

legitimate, nondiscriminatory goal.[18] *See Spurlock v. Fox*, 716 F.3d 383, 403 (6th Cir. 2013) (efficient allocation of district resources justified closing underutilized schools).

### 4. Equally Valid, Less Discriminatory Alternative

Finally, Plaintiffs have failed to establish that there is an equally effective, less discriminatory alternative that the Board has failed to implement. *See Puffer*, 675 F.3d at 717. In determining whether an alternative is equally effective, the Court considers factors such as the cost or other burdens of proposed alternatives. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 998 (1988). "The same factors would also be relevant in determining whether the challenged practice has operated as the functional equivalent of a pretext for discriminatory intent." *Id.*

First, Plaintiffs assert that the "status quo" of doing nothing is a better alternative. (Pls.' Br. 22.) But this ignores the financial and educational harms caused by maintaining half-empty buildings instead of using resources in efficiently used schools. For example, Annette Gurley, the Board's chief officer for teaching and learning, testified that underutilized schools often lack the resources to support a teacher for each grade level, resulting in "split-level" classes in which a single teacher must teach two different curricula to two different grades, dividing the teacher's

---

[18]     One such benefit would be the reduction of "split-level" classrooms, where one teacher teaches two grade levels in the same room at the same time due to the paucity of students. (PI Tr. 629-32.) Defendants also point to the reallocation of money to advance academic programs at some of the receiving schools, such as IB and STEM programs (*Id.* 535, 594-96, 631-32; PI Ex. 33 at 6.) For their part, Plaintiffs criticize the Board for the amount and specific allocations it has made for the $233 million it is spending on the transition. (Pls.' Reply 11-12.) For example, Plaintiffs claim that "only $15.7 million will go to the new IB and STEM programs the Board touted." (*Id.* 12.) Plaintiffs contend that "the Board has never provided evidence that these sums will produce any educational benefits." (*Id.*) But, it is Plaintiffs' burden to establish that the Board's legitimate, non-discriminatory reasons for the closures are pretextual and, as discussed above, Plaintiffs have failed to show a likelihood of success on the merits as to their claim that the Board's cost-saving rationale is a pretext. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 403-04 (7th Cir. 2008).

attention and depriving students of grade-level instruction and full teacher interaction. (PI Tr. 628-32.)

Second, Plaintiffs contend that the Board could have adjusted school district boundaries and shifted students from overcrowded schools into underutilized schools. Adam Anderson, the Officer of Portfolio Planning and Strategy at CPS, testified that the Board concluded that this was not a viable option due to the distance between the closing schools and overcrowded schools and because most of the overcrowded schools are not in geographic proximity to the underutilized schools. (*Id.* 519.)

In response, Plaintiffs allege that these reasons are pretextual and that the real reason the Board did not consider redrawing school district boundaries was because the Board did not want to send white children to predominantly black schools. (Pls.' Reply 14-16.) For support, Plaintiff McDaniel points to Manierre, the school her son, E.E., attended in the 2012-2013 school year. (PI Tr. 359.)

On March 21, 2013, the Board proposed Manierre for closure. (*Id.* 370.) McDaniel received a letter stating that her son would be sent to Jenner Elementary School in the 2013-2014 school year, a predominantly African-American school. (*Id.*) McDaniel did not want Manierre to close, so she and other Manierre parents attended community meetings to voice their opposition to the closure plan. (*Id.* 372.) At the community meetings, she and other Manierre parents proposed to solve Manierre's underutilization problem by allowing students from Lincoln Elementary, a school that she understood to be overcrowded, use classrooms in Manierre. (*Id.* 372-73.) She also presented this proposal to an Independent Review Board at a public hearing regarding the school closures. (*Id.* 375-76; PI Ex. 102 at 0000250.) It is McDaniel's personal belief that the Board rejected her proposal because the Board did not want

students from Lincoln, which she believes is predominantly white, to attend school with students from Manierre, which she knows is predominantly black. (*Id.* 376-79.)

In response, the Board contends that it rejected this proposal because Lincoln Elementary is more than a mile from Manierre, and doing so would contradict CPS's guiding principle that students should not be required to travel more than a mile to their neighborhood school. (*Id.* 525, 534; PI Ex. 49, "guiding principles," at 4.) By contrast, Jenner, the school to which Manierre students were to transition, is less than a half of a mile from Manierre.

Plaintiffs have failed to show that CPS's guiding principle of not requiring students to travel more than a mile is a pretext for discrimination. For example, they have failed to provide evidence that CPS has not uniformly implemented this principle such that the policy falls more harshly on African-American students than their non-African-American peers and that any disparity is because of Plaintiffs' race.

Additionally, the proposal would have constituted a co-location of two schools, and the timeline mandated by the Illinois School Code for announcing such a school action had passed by the time that the proposal was made. (PI Tr. 543-44.) Finally, Manierre was ultimately not approved for closure because the school received five different multi-million dollar grants, and McDaniel's son, E.E., will attend Manierre during the 2013-2014 school year. (*Id.* 386, 543.)

Accordingly, Plaintiffs have failed to demonstrate that Defendants' reasons for considering Manierre for closure were pretextual.

## II. Irreparable Harm

In addition to likelihood of success on the merits, a second threshold requirement that an injured party must meet to obtain preliminary injunctive relief is to demonstrate that it will suffer irreparable harm in the absence of the relief. *Girl Scouts*, 549 F.3d at 1087. To establish

irreparable harm, Plaintiffs must show "that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). The threat of irreparable injury necessary to justify the extraordinary remedy of preliminary injunctive relief must be "real," "substantial," and "immediate," not speculative or conjectural. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

As mentioned, a school closing is not, by itself, a harm. *See Smith*, 2013 WL 2099804, at *18; *Incatalupo*, 652 F. Supp. 2d at 329; *Friends of Lakeview*, 2005 WL 2076478, at *10; *Bronson*, 550 F. Supp. at 956-57. Additionally, as discussed above, Plaintiffs have failed to establish by a preponderance of the evidence that the school closings will cause them actionable injury. Thus, Plaintiffs have failed to establish that they will suffer irreparable injury as a result of the school closings.

## III.    Adequate Remedy at Law

Finally, the third threshold requirement Plaintiffs must satisfy to obtain preliminary injunctive relief is to demonstrate that traditional legal remedies would be inadequate. *Girl Scouts*, 549 F.3d at 1095. Plaintiffs have failed to satisfy this requirement as to their ADA claims.

As discussed, although Plaintiffs bring ADA claims, they allege that Defendants failed to allow IEP teams to determine the transition needs of disabled students in violation of the IDEA. The IDEA contains detailed procedural safeguards that provide parents of children with disabilities an opportunity to present complaints "with respect to any matter relating to the . . . provision of a free appropriate public education to such child," including the adequacy of an IEP. *See* 20 U.S.C. § 1415. Under the IDEA, before bringing a case in federal court, a parent must exhaust the IDEA's administrative remedies. 20 U.S.C. § 1415(*l*); *Charlie F. v. Bd. of Educ. of*

*Skokie Sch. Dist.*, 98 F.3d 989, 991 (7th Cir. 1991).  Additionally, under what has been characterized as an "unusual provision" in the IDEA, "any pupil who wants 'relief that is available' under the IDEA must use the IDEA's administrative system, even if he invokes a different statute."  *Charlie F.*, 98 F.3d at 991 (requiring plaintiffs to exhaust the IDEA's administrative remedies even though they brought claims under only the ADA, the Rehabilitation Act, 29 U.S.C. § 794, and the Constitution of the United States (through 42 U.S.C. § 1983)).  Furthermore, "[t]he [IDEA] speaks of available relief, and what relief is 'available' does not necessarily depend on what the aggrieved party wants." *Id.* at 991.  Instead, courts must look to the "theory behind the grievance" to see if the IDEA's process is triggered.  *Id.* at 991-92 ("The nature of the claim and the governing law determine the relief no matter what the plaintiff demands.") Indeed, "[b]y making an unreasonable or unattainable demand parents cannot opt out of the IDEA." *Id.*  Thus, if the IDEA can provide Plaintiffs relief, they must exhaust the IDEA's administrative process before coming to federal court, unless exhaustion would have been futile. *Honig v. Doe*, 484 U.S. 305, 326-27 (1988).

Here, the basis for Plaintiffs' ADA claim is that that Defendants failed to allow IEP teams to determine the transition needs of students with disabilities in violation of the IDEA. Plaintiffs contend, however, that they need not exhaust the IDEA's administrative remedies because the relief they seek – an injunction preventing their children's schools from closing – is not available under the IDEA and, therefore, exhaustion would have been futile.  But the IDEA can and does provide relief for Plaintiffs' claims because administrative hearing officers routinely examine the individual needs of students, how those needs relate to a change of schools, and whether a particular student needs a transition plan for such a change, as well as what that plan requires.  *See*, *e.g.*, *Edwardsville Cmty. Unit Sch. Dist. 7*, 113 LRP 17990 (Ill.

SEA 2013) (hearing officer ordered school district to convene an IEP meeting to develop a transition plan because a student was transferring from one environment to another and the district had not considered the child's needs in the transferring process); *Dep't of Educ., State of Hawaii*, 110 LRP 73209 (Haw. SEA 2010) (finding a denial of a free appropriate public education where a school district proposed to move a student from a private to a public school and did not provide adequate transition services and ordering a year of tuition at the private school). Thus, Plaintiffs' have failed to demonstrate that the administrative review process cannot provide a remedy for the harms they allege. Plaintiffs have failed, therefore, to show that there is not an adequate remedy at law for their ADA claims.

**IV.    Balancing of the Harms**

Lastly, even if Plaintiffs' claims could survive the threshold phase of the preliminary injunction analysis, their claims cannot survive the balancing phase. *Girl Scouts*, 549 F.3d at 1085-86. In the balancing phase, Plaintiffs must demonstrate that the harm they will suffer without an injunction outweighs any harm that may be suffered by Defendants or third-parties (the "public interest") if the injunction is granted. *See id.*; *Ty*, 237 F.3d at 895. The Court employs a sliding scale approach: "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor, the less likely he is to win, the more need it weigh in his favor." *Girl Scouts*, 549 F.3d at 1086.

Here, because Plaintiffs are not likely to succeed on the merits based on the evidence they have presented at this stage in the two cases, they must demonstrate great harm in the absence of an injunction. But Plaintiffs have not provided the Court with persuasive evidence that the harm they will suffer without an injunction is greater than the harm others will suffer, including other students, if an injunction was granted. On Plaintiffs' side of the ledger, as discussed above, the

evidence offered by Plaintiffs in support of their motions for preliminary injunction falls short of establishing that their children would suffer substantial harm as a result of the school closures.

On Defendants' side of the ledger, in light of Lipman's testimony that students who are transferred to higher performing schools may benefit from the transfer, there may be students at a number of the schools at issue who may wish to attend a higher performing school, such as Faraday. Moreover, Lipman acknowledged that the CCSR study found that the largest negative impact of school closings on students' reading and math achievement occurred in the year *before* the schools were closed as parents, students, teachers, and other community members experienced angst. (PI Tr. 29-30.) Thus, if the Court granted an injunction delaying the school closures, based on the findings of Plaintiffs' own expert, students may suffer a negative impact. Similarly, Winston testified that a delay or halting of the school closings would have an adverse impact on students with disabilities in particular because of anxiety, unrest, and stress among staff members resulting from the uncertainty of closure in the future. (*Id.* 444.) Winston also stated that such a delay would cause staff members to flee looking for job security elsewhere and, as a result, leave children with less-qualified substitute teachers. (*Id.*)

Weighing the two sides, the Court finds that the harm to Defendants and third-parties, including other students, if the preliminary injunctions were granted, outweighs the harm, if any, that the individual Plaintiffs would experience in the absence of a preliminary injunction, particularly in light of the low likelihood that Plaintiffs would be successful on the merits of their claims based upon the current record.

## **Conclusion**

For these reasons, the Plaintiffs' motions for preliminary injunction [*Swan* doc. no. 16; *McDaniel* doc. no. 16] are denied.


**SO ORDERED**                    **ENTER:  August 15, 2013**


**JOHN Z. LEE**
**U.S. District Judge**